**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE IROBOT CORPORATION SECURITIES LITIGATION | Case No. 1:24-cv-11158-WGY<br><br>CLASS ACTION<br><br>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiff Premca Extra Income Fund LP ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through Lead Plaintiff's attorneys, for its First Amended Complaint (the "Complaint") against iRobot Corporation ("iRobot" or the "Company"), Colin Angle ("Angle"), and Julie Zeiler ("Zeiler"), allege the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, interviews with former employees, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Lead Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities that purchased or otherwise acquired iRobot securities between February 13, 2023, and January 29, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants'

violations of the federal securities laws and to pursue remedies under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act) and SEC Rules 10b-5 and 14a-9 promulgated thereunder, against the Company and certain of its top officials. Excluded from the Class are Defendants, former and current officers and directors of iRobot, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, family members, legal representatives, heirs, successors or assigns of, and of the above.

2. iRobot designs, builds, and sells robots and home innovation products in the U.S., Europe, the Middle East, Africa, Japan, and internationally. The Company is primarily known for its robot vacuum cleaner ("RVC") products sold under the "Roomba" brand name.

3. For the past decade, save for a brief sales bump due to the COVID-19 pandemic, iRobot substantially declined in both sales and available cash. However, shareholders believed the Company was saved in 2022 when Amazon.com, Inc. ("Amazon") agreed to acquire iRobot.

4. In August 2022, after months of negotiations, iRobot and Amazon, which sells iRobot's RVCs on its online marketplace, announced their entry into a definitive merger agreement (the "Merger Agreement"), pursuant to which Amazon would "acquire iRobot for $61 per share in an all-cash transaction valued at approximately $1.7 billion, including iRobot's net debt" (the "Merger").

5. The Merger was vital to the Company's stock value, protecting it from the declines that would normally be expected from continued missed earnings reports, plummeting sales figures, and dwindling cash reserves. As analysts explained during the Class Period, absent the Merger, the Company's share price would be trading at $5 to $12 per share. *See* Yiqin Shen, *Amazon's (AMZN) IRobot (IRBT) Deal Path Gets Muddied by Antitrust Concerns*, BLOOMBERG,

Nov. 28, 2023, at 1, https://news.bloomberglaw.com/mergers-and-acquisitions/irobot-amazon-deal-path-gets-muddied-by-antitrust-concerns. Consequently, understanding regulatory threats to the Merger or deviations from customary approaches to obtaining regulatory clearance was vitally important to iRobot shareholders.

6. On August 5, 2022, iRobot filed with the SEC to make available to investors the Merger Agreement, which informed investors that iRobot and Amazon would: (a) use "reasonable best efforts" to complete the Merger; (b) use "reasonable best efforts" to obtain regulatory clearance and resolve regulatory objections; (c) would "supply as promptly as reasonably practicable any additional information and documentary material" requested or required; and (d) would contest any proceedings challenging the Merger. *See https://www.sec.gov/ix?doc=/Archives/edgar/data/0001159167/000119312522213174/d389581d8k.htm.*

7. The provisions of the Merger Agreement leave no doubt that iRobot and its executives received actual notice of Amazon's regulatory communications. The agreement expressly required both sides to "promptly notify the other parties of the substance of any communication from the FTC, DOJ, or any other domestic or foreign Governmental Authority regarding the transactions contemplated by this Agreement." *Id.* The Merger Agreement also made clear that Amazon would consult with iRobot about concessions. *Id.*

8. Shortly after the Merger was announced, regulators swiftly raised both antitrust and privacy concerns. Regulatory pushback increased in the months that followed. By February 2023, despite iRobot and Amazon's public commitment to work cooperatively with regulators, actual cooperation began to stop, and Amazon – with iRobot's knowledge – refused to even respond to certain regulatory inquiries. As 2023 progressed, iRobot and Amazon ceased significant

integration meetings (and soon thereafter, ceased all integration meetings), and iRobot planned to continue as an independent entity without the Merger. All of this was hidden from investors.

9. Throughout the Class Period, Defendants made materially false and misleading statements regarding known, then-existing regulatory impediments threatening the Merger, purported cooperation by Merger participants with governmental regulators, and regulatory communications. Specifically, Defendants:

- claimed that "intensifying competitive conditions" supported the Merger receiving regulatory approval, when in reality, regulators expressed concerns that the Merger would harm competition because of concentration of power in the RVC market and Amazon's ability to unfairly promote iRobot over competitors;

- claimed that iRobot and Amazon were "working cooperatively" with governmental regulators, when in fact they were taking an adversarial approach and refusing to provide requested information, answer regulators' questions, or offer any concessions to address expressed concerns as is standard practice in merger clearance negotiations;

- claimed that iRobot fully expected the Merger to receive regulatory approval, when in reality, by late Summer 2023, iRobot and Amazon had secretly ceased integration meetings and iRobot was planning for a future without the Merger;

- omitted that regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; and

- omitted that the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making approval unlikely.

10. As a result of misrepresenting their regulatory communications and concealing known regulatory risks threatening the Merger, Defendants materially misled investors about the prospects of iRobot successfully completing the Merger that was largely responsible for sustaining iRobot's stock price.

11. On June 22, 2023, news outlets reported that the European Commission was planning to launch a full-scale investigation into the Merger. On this partial disclosure and/or

materialization of the risk, iRobot's stock price fell from $49.66 by $5.17, or 10.4%, to a low of $44.49, before slightly rebounding to close at $45.41 on June 22, 2023. Nevertheless, Defendants continued to maintain inflation by falsely asserting that they were "working cooperatively" with regulators.

12. On November 27, 2023, the European Commission issued a press release, entitled "Commission sends Amazon Statement of Objections over proposed acquisition of iRobot", which outlined numerous objections that European regulators had to the Merger. On this news, iRobot's stock price fell from $42.10 by $10.97, or 26%, to a low of $31.13 before rebounding to close at $34.35 on November 27, 2023.

13. On January 10, 2024, during intraday trading hours, news outlets reported that Amazon had deviated from the standard practice of offering concessions to address regulatory objections, and refused to provide any concessions to the European Commission despite the Merger Agreement calling for to appease their concerns over the Merger. On this news, iRobot's stock price fell from $36.99 by $7.99, or 21.6%, to $29, before rebounding to close at $29.75 per share on January 10, 2024.

14. On January 18, 2024 during post-market hours, *The Wall Street Journal* published an article (the "*WSJ* Article") entitled "EU Commission Intends to Block Amazon's iRobot Acquisition", stating that the European Commission intended to deny the Merger regulatory approval. The next day, during intraday trading hours, *Bloomberg* reported that the FTC was also planning to block the Merger. Following the publication of the *Bloomberg* and *WSJ* Articles, iRobot's stock price fell from closing on January 18, 2024 at $23.62 by $7.85, or 33.2%, to a low of $15.77, before closing at $17.26 per share on January 19, 2024.

15. Finally, on January 29, 2024, during pre-market hours, Amazon and iRobot issued a joint press release entitled "Amazon and iRobot Agree to Terminate Pending Acquisition", finally announcing their entry "into a mutual agreement" to terminate the Merger before any official decision to prohibit the Merger was issued by regulators. On this news, iRobot's stock price fell from a January 26, 2024 closing price of $16.99 by $3.19, or 18.7%, before closing at $15.50 per share on January 29, 2024.

16. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

19. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). iRobot is headquartered in this Judicial District, and a substantial part of the property that is the subject of this action is thus situated in this Judicial District. Moreover, both Angle and Zeiler reside in this Judicial District. Further, pursuant to iRobot's most recent annual report on Form 10-K, as of January 26, 2024, there were 27,964,564 shares of the Company's common stock outstanding. iRobot's common stock trades on the Nasdaq Stock Market ("NASDAQ"). Accordingly, in addition to Lead Plaintiff, there are presumably

hundreds, if not thousands, of investors in iRobot's securities located in the U.S., some of whom undoubtedly reside in this Judicial District.

20. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

21. Lead Plaintiff Premca Extra Income Fund LP purchased iRobot securities at artificially inflated prices during the Class Period. As set forth in its previously filed certification, Lead Plaintiff was damaged by the conduct alleged herein.

22. Defendant iRobot is a Delaware corporation with principal executive offices located at 8 Crosby Drive, Bedford, Massachusetts 01730. The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "IRBT".

23. Defendant Colin M. Angle served as iRobot's Chief Executive Officer ("CEO") and Chairman of the Board at all relevant times. As CEO, Angle had access to, ultimate authority, and oversight over iRobot's business, including its merger process with Amazon. Angle routinely certified filings with the SEC that affirmed that he had reviewed and evaluated iRobot's filings with the SEC and concluded that the "report[s] [do] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [the] report[s]" and "the information contained in [iRobot's filings] fairly presents, in all material respects, the financial condition and results of operations of the Company." Defendant Angle stepped down as the Company's CEO and Chairman of the Board on January 29, 2024.

24. Defendant Julie Zeiler has served as iRobot's Executive Vice President and Chief Financial Officer ("CFO") at all relevant times. As CFO, Zeiler had access to, and authority and oversight over iRobot's business. Further, Zeiler was involved in Merger negotiations and in responding to regulators concerning the Merger. Zeiler routinely certified filings with the SEC that affirmed that she had reviewed and evaluated iRobot's filings with the SEC and concluded that the "report[s] [do] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [the] report[s]" and "the information contained in [iRobot's filings] fairly presents, in all material respects, the financial condition and results of operations of the Company."

25. Defendants Angle and Zeiler are collectively referred to herein as the "Individual Defendants".

26. The Individual Defendants possessed the power and authority to control the contents of iRobot's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of iRobot's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with iRobot, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

27. iRobot and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I. Background on the United States Federal Trade Commission's Hart-Scott-Rodino Merger Review Process

28. The United States Federal Trade Commission ("FTC") is an independent agency empowered by Congress to enforce, among other things, the Clayton Act, 15 U.S.C. §§ 12 *et seq.*, a key U.S. antitrust statute. One part of the FTC's stated mission is to promote competition. Section 7 of the Clayton Act prohibits mergers and acquisitions between two companies when the effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

29. The Hart-Scott-Rodino Antitrust Improvements Act of 1976 amended the Clayton Act to require companies seeking to merge to first file a premerger notification report with the FTC Bureau of Competition. Submission of a premerger notification report triggers a 30-day waiting period before the parties are allowed to effect the merger.

30. The FTC reviews premerger notification reports to determine whether the proposed merger would likely lead to anticompetitive effects in affected markets. During the 30-day waiting period (unless extended), the FTC must either allow the merger (sometimes by allowing the 30-day period to lapse) or file suit to block the merger.

31. If the FTC determines during the waiting period that further inquiry is necessary, Section 7A(I) of the Clayton Act authorizes the FTC to issue a request for additional information and documentary material (a "Second Request"). The Second Request extends the waiting period for a specified period of time (usually 30 days) after all parties have complied with the Second Request (or, in the case of a tender offer or bankruptcy sale, after the acquiror complies). This additional time provides the FTC with the opportunity to analyze the information and to take

appropriate action before a transaction is consummated. If the FTC believes that a proposed transaction may substantially lessen competition, the agency may seek an injunction in federal district court to block the transaction.

32. In 2022, the FTC issued Second Requests in 0.8% of cases. Of the 3,029 transactions in which a Second Request could have been issued, the FTC issued Second Requests only 25 times.[1]

33. According to the FTC Bureau of Competition,[2] if the FTC determines that a merger is likely to create anticompetitive effects, the FTC will attempt to negotiate remedies with the merging parties to reduce or eliminate such effects. Throughout the FTC's review of a potential transaction, the FTC Bureau of Competition remains in regular contact with the merging companies.

## II. Background on European Commission's Merger Review Process

34. The European Commission is part of the executive body of the European Union ("EU"). On January 20, 2004, the European Commission passed Council Regulation (EC) No. 139/2004 (the "Merger Regulation") that sets out when and how the European Commission regulates mergers between two entities, for the purpose of ensuring that competition in the EU is not impaired.

35. The European Commission only examines mergers with an EU dimension that reach certain turnover (revenue) thresholds. Those thresholds include: (a) the combined aggregate worldwide turnover of all undertakings concerned is more than €5000 million; and (b) the

---

[1] *See* FTC, *Hart-Scott-Rodino Annual Report for FY2016*, *available at:* https://www.ftc.gov/system/files/ftc_gov/pdf/FY2022HSRReport.pdf (Dec. 2023).

[2] *See* FTC, *Negotiating Merger Remedies: Statement of the Bureau of Competition of the Federal Trade Commission*, *available at:* https://www.ftc.gov/system/files/attachments/negotiating-merger-remedies/merger-remediesstmt.pdf (Jan. 2012).

aggregate Community-wide turnover of each of at least two of the undertakings concerned is more than €250 million.

36. If merging companies operate in the same or related markets, or if they have only minimal market shares, the European Commission employs a "simplified procedure," which involves only a routine check. However, if the merging companies exceed the turnover thresholds outlined in the European Commission's Merger Regulation, then it conducts a full investigation.

37. The first step for any merger with an EU dimension is for merging parties to notify the European Commission. Companies can contact the European Commission beforehand to obtain advice on how best to prepare their notification.[3]

38. After notification, the European Commission has twenty-five (25) working days to analyze the proposed merger during the first phase of the investigation ("Phase I"). More than 90% of all cases are resolved in Phase I, generally without any requested alterations to the proposed merger. A Phase I review will generally consist of requests for information from the merging companies and questionnaires to competitors and/or customers seeking their views on the merger. Importantly, the European Commission keeps the merging companies informed about the progress of the Phase I analysis and, towards the end of Phase I, holds a "state-of-play meeting" with the merging companies where the European Commission informs the companies of the results of the investigation. If the European Commission has competition concerns, the merging companies are able to offer remedies, which can extend the Phase I deadline by 10 working days. The European Commission then analyzes those proposed remedies to test their viability and ability to eliminate competition concerns, as well as utilizes a "market test" to take into account the views of market

---

[3] *See* European Commission, *Competition: Merger control procedures*, https://competition-policy.ec.europa.eu/system/files/2021-02/merger_control_procedures_en.pdf.

participants. At the end of Phase I, the proposed merger is either "cleared," either unconditionally or subject to accepted remedies, or the European Commission will open a Phase II investigation ("Phase II").

39. Phase II is a more intensive analysis initiated only when the European Commission has concerns that the proposed merger could restrict competition in the EU market. From the opening of a Phase II investigation, the European Commission has 90 working days, subject to certain extensions, to make a final decision on the compatibility of the planned transaction with the European Commission's Merger Regulation. If the merging companies fail to provide an important piece of requested information for the European Commission's review, the deadline tolls until that missing information is supplied. A Phase II review generally involves more extensive information gathering, including companies' internal documents, extensive economic data, more detailed questionnaires to market participants and/or on-site visits. A Phase II review also analyzes claimed efficiencies which the companies assert could be obtained by the proposed merger. If the positive effects for consumers outweigh the negative effects of the merger, then the merger will be approved, but the efficiencies must fulfill strict conditions and it is on the merging companies to prove that they are met. Similar to the Phase I review, the European Commission updates the merging companies regularly about the process. If the European Commission concludes that the proposed merger will likely impede competition, it sends a statement of objections to the merging companies, informing them of the European Commission's preliminary conclusions. The merging companies then have the right to respond to a statement of objections in writing, consult the European Commission's case file, and request an oral hearing conducted independently by a competition hearing officer.

40. In 2022, the European Commission was notified of 371 mergers, and that same year, only 8 mergers, or 2.1%, initiated a Phase II proceeding.[4]

41. Following a Phase II investigation, the European Commission will either (1) unconditionally clear the proposed merger to proceed, (2) approve the merger subject to remedies, or (3) prohibit the merger if no adequate remedies to the competition concerns have been proposed by the merging parties.

## III. Open Dialog, Forthright Responses to Regulatory Questions, and Concessions to Regulators are Necessary for Mergers to Receive Regulatory Approval

42. Concessions and open dialog with regulators play a vital part in obtaining regulatory approval from both the FTC and European Commission. Indeed, "different jurisdictions may ultimately require different concessions" when seeking regulatory approval, so merging companies are generally advised to communicate regularly with regulators. *See* Brandon Van Dyke, Clifford H. Aronson, David P. Wales, Frederic Depoortere, and Kyle J. Hatton, *Boards and M&A: Playing, and Winning, the Game of Regulatory Risk*, SKADDEN PUBLICATION/THE INFORMED BOARD, Sept. 22, 2022, https://www.skadden.com/insights/publications/2022/09/the-informed-board/boards-and-ma.

43. For example, most companies seeking merger approval from the European Commission obtain it by working cooperatively with regulators to address regulatory questions, or offer concessions. Consequently, since 1990, out of the 9,282 merger notifications made to the EU, the European Commission has only blocked a merger 33 times.[5]

---

[4] *See* European Commission, *Statistics on Mergers cases*, https://competition-policy.ec.europa.eu/mergers/statistics_en.

[5] *See* European Commission, *Statistics on Mergers cases*, https://competition-policy.ec.europa.eu/mergers/statistics_en.

44. A merger between Activision Blizzard and Microsoft, which occurred around the same time as the iRobot/Amazon merger, is illustrative of how concessions and open dialog with regulators are crucial to obtaining regulatory approval. There, Microsoft planned to purchase Activision Blizzard, a video game company, for approximately $68.7 billion. Government regulators were concerned about the antitrust implications of the merger. Specifically, regulators were concerned that Microsoft would obtain a near monopoly in the gaming industry, hurting both consumers and developers, and restrict exclusive gaming content. To address these concerns, Microsoft corresponded with regulators at the FTC, European Commission, and the United Kingdom's Competition and Markets Authority ("CMA") over two years, and ultimately made several concessions, including: (1) third-party access to platforms; (2) a cross-platform commitment; (3) data access and privacy safeguards; and (4) license agreements for competing platforms. These concessions appeased government regulators and allowed the merger to receive governmental approval. Without such open dialog with governmental regulators and concessions, it is unlikely that the Activision/Microsoft merger would have been allowed to proceed.

**IV. iRobot's History**

45. In 1990, iRobot was founded by Angle, Helen Greiner and Rodney Brooks with a focus on developing and manufacturing military and domestic robots. In its first decade of existence, iRobot focused primarily on creating robots that catered to the military establishment. However, in 2002, iRobot shifted its focus to the consumer market and introduced its flagship cleaning product, the Roomba. The Roomba was an autonomous RVC that could detect the presence of dirt on the floor, and had a cliff sensor to prevent it from falling off staircases or landings between floors. The Roomba was an immediate success. By 2004, one million Roombas had been sold.

46. In 2005, the Scooba, the Roomba's mop counterpart, hit stores in limited quantities; the following year would see a broader release of the floor-washing robot. In that same year, iRobot stock began trading on the NASDAQ.

47. On September 12, 2012, iRobot acquired Evolution Robotics for $74 million, a company that had designed and manufactured an RVC exclusively for hard surface floors, expanding iRobot's product line.

48. Although iRobot continued to introduce products for the military establishment until 2016, its domestic line of RVCs remained its focus. On February 4, 2016, Arlington Capital Partners acquired iRobot's military robot business, leaving iRobot with only its domestic line of RVCs, mainly the Roomba, to generate revenue.

**V. iRobot's Dire Financial Condition**

49. After rapidly rising to the top of the RVC market, iRobot's dominant market share steadily declined beginning in 2014. Global market share dropped to 64% in 2016 and to 46% by 2020, as new market entrants piled on. Competitors from China undercut the luxury-priced Roomba, and other consumer electronics firms like Samsung and SharkNinja introduced their own RVCs.

50. A once-in-a-generation event – the COVID-19 pandemic – briefly stemmed Roomba's decline. On June 15, 2020, iRobot issued a business update regarding its anticipated second-quarter 2020 performance. In that release, iRobot stated that it "has experienced stronger-than-expected orders during the second quarter as consumers worldwide are increasingly relying on Roomba® robot vacuums and Braava® robot mops to address their home floor care needs."

51. In the same press release, iRobot highlighted that it "anticipate[d] second-quarter 2020 revenue between $260 million and $270 million versus prior expectations for second-quarter

2020 revenue to be down modestly from first-quarter 2020 revenue of $193 million." iRobot's revenue boom bucked predictions from Wall Street analysts at the time who forecast that iRobot would experience a 30% drop in revenue. Angle also attributed the jump in revenue to the pandemic: "We have experienced strong demand thus far into the second quarter, particularly in the U.S., with solid growth in our premium products. Maintaining a clean home has become a higher priority for many consumers as COVID-19 has forced people to spend more time in their homes." Dan Gallagher, *iRobot Cleans Up*, WALL ST. J., June 15, 2020, https://www.wsj.com/articles/irobot-cleans-up-11592235681.

52. However, the pandemic bump soon waned, and iRobot's revenue dropped almost as fast as it initially rose.

53. In the quarters leading up to the Merger, iRobot's revenue and margins declined consistently. For example, beginning in the fourth quarter of 2021, revenue declined 16% overall, with the U.S. region experiencing a 29% drop, leading to a $44.9 million operating loss. Similarly, in the first quarter of 2022, revenue declined by $11.3 million, with an operating loss of $23.3 million.

54. On August 5, 2022, iRobot reported its second-quarter 2022 financial results. In that release, iRobot reported that revenue was $255.4 million in comparison to $365.6 million in the second quarter of 2021, a decline of approximately 30%. Geographically, revenue declined 39% in EMEA, 29% in U.S. and 18% in Japan. iRobot reported an operating loss of $63.9 million. Moreover, during August 2022, iRobot was forced to initiate a restructuring of its operations to align its expenses with its expected near-term revenue and constrained cash flow. As a result, iRobot terminated 100 employees, or 8% of its workforce, froze hiring, and downsized its global headquarters.

55. iRobot employed Confidential Witness 1 ("CW1") as the Director of FP&A, Supply Chain and Digital Business from November 2021 until April 2024. CW1 reported to the Vice President of FP&A, who in turn reported to Defendant Zeiler. CW1's job responsibilities included creating financial projections for the Company.

56. According to CW1, iRobot missed internal sales forecasts for 18 months starting around the time the Merger was announced. CW1 stated that iRobot had extremely aggressive sales projections but lacked a concrete plan to achieve those sales. According to CW1, Zeiler instituted this aggressive approach. CW1 further stated that the Roomba was no longer competitive and remained a high-end product that consumers did not want to pay for compared to lower-priced models.

## VI. Amazon and iRobot Begin Merger Negotiations

57. In the midst of iRobot's financial woes, Amazon's proposed merger offered a lifeline. On May 16, 2022, Amazon contacted Angle to express interest in acquiring iRobot. Notably, Amazon had previously tried to acquire iRobot in 2016 but was rebuffed by the Company. Since that time, iRobot continued to engage approximately once a year with Amazon on matters unrelated to a potential acquisition. However, iRobot was now in dire financial straits and thus had to consider more seriously Amazon's overtures. Angle informed the iRobot Board of Directors and iRobot began to consider a deal with Amazon.

58. A merger with Amazon would not only solve iRobot's financial problems, but also facilitate Amazon's attempts to control the RCV market. Despite losing ground to competitors globally, iRobot's Roomba still had a 75% market share by revenue in the US market, while Amazon struggled to make an impact with customers. Amazon had introduced its own smart vacuum in the fall of 2021, a three-wheeled device called the "Astro" that retailed for

approximately $1,450, but that was a flop. *See* Leah Nylen, *Amazon's iRobot Deal Seen Facing Touch FTC Antitrust Review*, BLOOMBERG (Aug. 5, 2022).

59. In the first half of June, 2022, iRobot executives, led by Angle, met numerous times with Amazon executives to discuss the potential merger. On June 23, 2022, Angle spoke with a representative of Amazon who verbally communicated to Angle a non-binding proposal for Amazon to acquire iRobot for $64.00 per share in cash.

60. On June 29, 2022, iRobot's executives presented the Company's Board of Directors with a set of long-range plans and projections for the period from fiscal year 2022 to fiscal year 2027 (the "LRP"). The LRP acknowledged that the Company's financial performance for the second quarter of fiscal year 2022 would fall significantly below the low end of the publicly announced guidance range for the same period and would cause the full-year 2022 performance to fall below the low end of the publicly announced guidance range for fiscal year 2022.

61. With its own financial results set to deteriorate even further, iRobot needed the proposed merger. Over the next few days, iRobot and Amazon executives negotiated the share price proposal. On July 6, 2022, iRobot determined that Amazon's recent offer of $64.50 per share was the best deal iRobot could receive and began to negotiate a definitive agreement with Amazon.

62. On July 22, 2022, Amazon conveyed to Angle that it planned to reduce its offer price from $64.50 per share to $60 per share due to iRobot's deteriorating financial performance. The two companies continued price negotiations and, on August 4, 2022, ultimately agreed that Amazon would acquire iRobot for $61 per share, which they documented in the Merger Agreement. Upon this news, iRobot's stock price jumped from $49.99 at close on August 4, 2022 to close at $59.62 on August 5, 2022.

## VII. The Merger is Announced

63. On August 5, 2022, iRobot announced its Merger with Amazon through a press release, filed with the SEC in a Form 8-K, stating:

> Today Amazon (NASDAQ:AMZN) and iRobot (NASDAQ:IRBT) announced that they have entered into a definitive merger agreement under which Amazon will acquire iRobot…. Amazon will acquire iRobot for $61 per share in an all-cash transaction valued at approximately $1.7 billion, including iRobot's net debt. Completion of the transaction is subject to customary closing conditions, including approval by iRobot's shareholders and regulatory approvals. On completion, Colin Angle will remain as CEO of iRobot.

64. Filed with their Form 8-K was the Merger Agreement itself, dated August 4, 2022. Notably, the Merger Agreement provided that iRobot and Amazon would notify each other if any government entity made a request or commenced a proceeding related to the Merger, and would keep each other informed about the status of any governmental request:

> (c) Without limiting the generality of anything contained in this Section 6.5, each party shall: (i) give the other parties prompt notice of the making or commencement of any request or proceeding by or before any Governmental Authority with respect to the transactions contemplated by this Agreement; (ii) keep the other parties informed as to the status of any such request or proceeding; (iii) to the extent practicable, give the other parties notice and an opportunity to participate in any communication made to the United States Federal Trade Commission (the "FTC"), the United States Department of Justice (the "DOJ"), or any other competition authority or other domestic or foreign Governmental Authority regarding the transactions contemplated by this Agreement; and (iv) promptly notify the other parties of the substance of any communication from the FTC, DOJ, or any other domestic or foreign Governmental Authority regarding the transactions contemplated by this Agreement.

65. Thus, the provisions of the Merger Agreement leave no doubt that iRobot and its executives received actual notice of Amazon's regulatory communications.

66. The Merger Agreement also stated that iRobot and Amazon would: (a) use "reasonable best efforts" to complete the Merger; (b) use "reasonable best efforts" to obtain regulatory clearance and resolve regulatory objections; (c) would "supply as promptly as

reasonably practicable any additional information and documentary material" requested or required; and (d) would contest any proceedings challenging the Merger. *See* https://www.sec.gov/Archives/edgar/data/1159167/000119312522213174/d389581dex21.htm. Consequently, the Merger Agreement also made clear that Amazon would consult with iRobot about concessions. *Id.*

67. On August 5, 2022, iRobot separately filed a Form 8-K to announce its second quarter 2022 financial results. In that Form 8-K, iRobot announced that revenue for Q2 2022 was over $100 million less than Q2 2021. However, this poor financial news was offset by iRobot's announcement of the Merger with Amazon, blunting its impact.

68. In conjunction with its second quarter earnings release, iRobot had scheduled a conference call for August 10, 2022. However, iRobot stated that it would not hold that or any further conference calls to discuss financial results and was suspending guidance "[i]n light of the transaction with Amazon.com, Inc." iRobot also withdrew "its prior 2022 financial expectations issued in early May 2022, as well as its long-term financial targets provided in December 2021."

69. iRobot employed Confidential Witness 2 ("CW2") from June 2017 to December 2023, first as a Senior Tax Manager for Global Finance, then during the Class Period as the Director of Global Finance. As the Director of Global Finance, CW2 reported directly to Defendant Zeiler, who in turn reported to Defendant Angle. CW2's job responsibilities included serving as the finance lead for mergers and acquisitions. In 2023, CW2's responsibilities largely involved iRobot's global real estate. CW2 attended monthly Senior Leadership Team Meetings with the iRobot executive team, including Angle and Zeiler.

70. According to CW2, iRobot stopped hosting earnings calls because it was in such a bad financial situation that it did not want to discuss its forecasts. CW2 stated that Zeiler made the decision to not host earnings calls.

71. On August 10, 2022, iRobot filed its Form 10-Q with the SEC for the second quarter of fiscal year 2022, ended July 2, 2022 (the "Q2 2022 Form 10-Q"). The Q2 2022 Form 10-Q was signed by Zeiler. Therein, the Company discussed the Merger and its contingencies, stating, in relevant part:

> The Merger is conditioned upon, among other things, the approval of the Merger Agreement by the Company's stockholders, the expiration of the applicable waiting period (and any extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, certain other approvals, clearances or expirations of waiting periods under other antitrust laws and foreign investment laws, and other customary closing conditions.

72. The Q2 2022 Form 10-Q also discussed the risks related to the Merger, and stated, in relevant part:

> On August 4, 2022, we entered into the Merger Agreement with Amazon and Merger Sub, providing for the acquisition of iRobot by Amazon. Completion of the Merger is subject to the satisfaction of various conditions, including (1) the adoption of the Merger Agreement by a majority of the holders of the outstanding shares of our common stock, (2) the expiration or early termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and certain other approvals, clearances or expirations of waiting periods under other antitrust laws and foreign investment laws, (3) the absence of any order, injunction or law prohibiting the consummation of the Merger, (4) the accuracy of the other party's representations and warranties, subject to certain materiality standards set forth in the Merger Agreement, (5) compliance in all material respects with the other party's obligations under the Merger Agreement, and (6) no Material Adverse Effect (as defined in the Merger Agreement) having occurred since the date of the Merger Agreement that is continuing. There is no assurance that all of the various conditions will be satisfied, or that the Merger will be completed on the proposed terms, within the expected timeframe, or at all. Furthermore, there are additional inherent risks in the Merger, including the risks detailed below.

***

> The Merger may be delayed, and may ultimately not be completed, due to a number of factors, including:
>
> - the failure to obtain the approval of the Merger Agreement by our stockholders;
> - the failure to obtain regulatory approvals from various governmental entities (or the imposition of any conditions, limitations or restrictions on such approvals);
> - potential future stockholder litigation and other legal and regulatory proceedings, which could delay or prevent the Merger; and
> - the failure to satisfy the other conditions to the completion of the Merger, including the possibility that a Material Adverse Effect on our business would permit Amazon not to close the Merger.
>
> If the Merger does not close, our business and stockholders would be exposed to additional risks, including:
>
> - to the extent that the current market price of our common stock reflects an assumption that the Merger will be completed, the price of our common stock could decrease if the Merger is not completed;
> - investor confidence could decline, stockholder litigation could be brought against us, relationships with existing and prospective customers, distributors, retailers, service providers, investors, lenders and other business partners may be adversely impacted, we may be unable to retain key personnel, and profitability may be adversely impacted due to costs incurred in connection with the pending Merger;
> - the requirement that we pay a termination fee of $56.0 million if the Merger Agreement is terminated in certain circumstances, including by the Company to enter into a superior proposal or by Amazon because the Board withdraws its recommendation in favor of the Merger.

73. Defendants repeated these same boilerplate risk warnings (which could apply to any merging companies and said nothing about the acute specific risks here) in a near-identical format a year later throughout the Class Period, despite the changing circumstances and increasing likelihood that the Merger would not receive regulatory approval due to the specific and highly-unusual approach of non-cooperation that Amazon and iRobot would take towards regulators.

## VIII. The iRobot/Amazon Merger Immediately Faces Regulatory Resistance and iRobot's Financial Situation Worsens

74. Almost immediately after the Merger was announced, antitrust experts anticipated stiff opposition from the FTC, stating that "the deal is expected to draw a tough review from the US Federal Trade Commission led by Chair Lina Khan, a critic of the e-commerce platform's market dominance." Leah Nylen, *Amazon's iRobot Deal Seen Facing Touch FTC Antitrust Review*, BLOOMBERG (Aug. 5, 2022). According to anti-monopoly advocacy groups, the Merger allowed Amazon to "basically tak[e] out their largest competition in a market they want to dominate[.]" *Id*. Moreover, absent concessions, the Merger "would put Amazon in a position to disadvantage rivals on the platform and block access to important tools to reach new consumers, like buying ads on Amazon.com." *Id*.

75. Around September 2, 2022, the FTC officially started its review of the Merger. The FTC's review was "wide-ranging" and included "both head-to-head competition and whether the deal will illegally boost Amazon's market share in both the connected device market and the retail market generally . . . . [t]he FTC [ ] also investigat[ed] how the purchase would add to Amazon's increasing smart device lineup, which also includes Ring security cameras and the Alexa digital assistant." Josh Sisco, *FTC digs in on Amazon's iRobot deal*, POLITICO, September 2, 2022, https://www.politico.com/news/2022/09/02/amazons-ftc-problem-keeps-growing-with-irobot-one-medical-probes-00054749.

76. Soon thereafter, privacy activists mobilized to oppose the Merger. On September 9, 2022, two days after iRobot filed a definitive proxy statement on Form DEFM14A with the SEC in connection with the Merger, twenty-six privacy groups issued an open letter to the FTC opposing the Merger, stating that, "Amazon's business model largely relies on acquiring rivals, sometimes in adjacent markets, and then rapidly expanding through anti-competitive predatory

pricing while leveraging vast troves of consumer data to grow its overall grip on the economy . . . by selling the Roomba brand at or near a loss via the Prime subscription, the company can access more personal consumer data to buttress its anti-competitive advantages online. In short, the deal will further entrench Amazon's hold on the smart home technology ecosystem, eliminate competition in that sector and enhance the company's monopoly power . . . . [l]inking iRobot devices to the already intrusive Amazon home system incentivizes more data collection from more connected home devices, potentially including private details about our habits and our health that would endanger human rights and safety." Fight for the Future, *Letter Calling on the FTC to Challenge Amazon-iRobot deal* (Sept. 9, 2022), https://www.fightforthefuture.org/news/2022-09-09-letter-to-the-ftc-challenge-amazon-irobot-deal/.

77. On September 19, 2022, the FTC sent a Second Request for additional information and documentary materials in connection with the FTC's review of the Merger – one of only 25 second requests issued in 2022 out of 3,029 transactions reviewed by the FTC – demonstrating the serious concerns and reservations the FTC had with the Merger.

78. Lawmakers in the United States soon joined the fray, expressing opposition to the Merger due to concerns about competition in the home robotics market, Amazon's history of anti-competitive practices, and threats to consumer privacy. Press Release, Warren, Jones, Lawmakers Call on FTC to Oppose Amazon's Proposed $1.65 Billion Acquisition of iRobot (Sept. 29, 2022), https://www.warren.senate.gov/newsroom/press-releases/warren-jones-lawmakers-call-on-ftc-to-oppose-amazons-proposed-165-billion-acquisition-of-irobot.

79. Despite the mounting regulatory opposition, iRobot's public filings in the latter half of 2022 repeated the same boilerplate risk warnings when discussing the Merger's regulatory prospects.

80. Also in the latter half of 2022, iRobot's financial situation worsened. On November 8, 2022, iRobot filed a Form 8-K announcing its third quarter 2022 financial results. In it, iRobot announced that their revenue for the third quarter of 2022 was over $162 million less than the third quarter of 2021, and the revenue for the first nine months of 2022 was $825.5 million, compared to the revenue of $1,109.5 million from the first nine months of 2021. iRobot also stated that "[g]eographically, third-quarter 2022 revenue declined 60% in EMEA, 32% in the U.S. and 20% in Japan over the prior period last year" and reported an operating loss of $68.4 million. iRobot's cash reserves were also being depleted. In the same release, iRobot reported that its cash, cash equivalents, and short-term investments had dwindled to $89.6 million from $234.5 million at the end of 2021. These poor results prompted iRobot to draw upon $90 million of the $150 million credit facility with Bank of America. It also forced iRobot to amend its credit agreement with Bank of America to temporarily increase its loan limit by $50 million for the period from October 28, 2022 to December 29, 2022. The increase in the credit facility was secured by substantially all of iRobot's U.S. assets.

81. Nevertheless, iRobot shares remained buoyant because investors continued to count on the Merger.

## MATERIALLY FALSE AND MISLEADING <u>STATEMENTS ISSUED DURING THE CLASS PERIOD</u>

### IX. EU and FTC Scrutiny Intensifies

82. At the start of 2023, the European Commission intensified its scrutiny of the Merger. This enhanced scrutiny followed an investigation by *MIT Technology Review*, published in December 2022, that detailed how a development version of a Roomba being tested by paid volunteers captured intimate images. *See* Javiar Espinoza, Dave Lee, *EU set to investigate Amazon's $1.7bn purchase of Roomba-maker*, FINANCIAL TIMES, Feb. 15, 2023,

https://www.ft.com/content/b05a1260-ee5a-4ac8-9a34-31cdb8104cf1. The *MIT Technology Review* article, published on December 19, 2022, outlined how a Roomba captured photographic images of a woman on the toilet, and those images were subsequently posed to closed social media groups, including on social media groups on Facebook. *Id*. iRobot knew of the incident and its impact on the public's privacy concerns, and its executives, including Angle, even gave statements to *MIT Technology Review* for the article. In a direct response to the privacy concerns sparked by the *MIT Technology Review* investigation, "regulators in Brussels have sent [Amazon] a series of detailed questions over the proposed transaction[.]" *Id*. This move was seen as a prelude to a formal probe by the European Commission. *Id*. Because the Merger Agreement included a provision mandating that iRobot and Amazon would notify each other if any government entity made a request or commenced a proceeding related to the Merger, iRobot was aware of the European Commission's list of detailed questions sent to Amazon. Further, iRobot management later conceded internally that Amazon refused to cooperate with European regulators' requests. *See* ¶95.

83. Pursuant to the *Financial Times*' own editorial standards, any article that contains contentious allegations, like those in the February 15, 2023 article, requires at least two (2) sources. *See* FT Editorial Code, FINANCIAL TIMES, at 4, https://ip-about-us.cdn.prismic.io/ip-about-us/f340249b-9808-4333-8627-f468083d7222_FT+EDITORIAL+CODE+OF+PRACTICE++%2815+Jan+2024%29.pdf. Further, any article published on the Financial Times requires the review and approval of editors. *Id*., *see also* Brooke Masters, *Want to write a piece for the Financial Times opinion page?*, FINANCIAL TIMES, Apr. 12, 2020, https://www.ft.com/content/e3e8ff2b-95c7-48f8-9eda-312494422e10. Consequently, the February 15th article would have taken days, if not weeks, of reporting and editing before it was published. Therefore, the European Commission

would have sent Amazon and iRobot their detailed questions about the Merger well before February 15, 2023.

84. Nevertheless, iRobot refused to inform investors of the European Commission's actions or the increased scrutiny that the Merger was facing when it submitted its filings on iRobot's fourth quarter and full-year 2022 financial results between February 13 and February 14, 2023.

85. The Class Period begins on February 13, 2023, two days prior to the European Commission's intensified scrutiny being reported upon, when iRobot filed a Form 8-K announcing its fourth quarter and full-year 2022 financial results.

86. In that Form 8-K, iRobot revealed that its full-year revenue dropped by 24% from 2021 and stated that its "full-year 2022 GAAP operating loss was ($240.4) million, compared with a GAAP operating loss of ($1.1) million in 2021." This lackluster quarter again emphasized the importance of the Merger's regulatory approval for the Company's financial livelihood. Nevertheless, despite iRobot's poor year and the European Commission reaching out to Amazon well before iRobot filed its February 13th Form 8-K, the Company did not make investors aware of the intensified scrutiny, only describing the risks in the same hypothetical tone as before:

> Important risk factors that may cause such a difference include, but are not limited to: ***(i) the ability of the parties to consummate the proposed transaction with Amazon.com, Inc in a timely manner or at all; (ii) the satisfaction (or waiver) of closing conditions to the consummation of the proposed transaction; (iii) potential delays in consummating the proposed transaction; (iv) the ability of the Company to timely and successfully achieve the anticipated benefits of the proposed transaction; (v) the occurrence of any event, change or other circumstance or condition that could give rise to the termination of the merger agreement;*** (vi) the impact of the COVID-19 pandemic and the current conflict between the Russian Federation and Ukraine on the Company's business and general economic conditions; (vii) the Company's ability to implement its business strategy; (viii) significant transaction costs associated with the proposed transaction; (ix) potential litigation relating to the proposed transaction; (x) the risk that disruptions from the proposed transaction will harm the Company's business,

> including current plans and operations; (xi) the ability of the Company to retain and hire key personnel; (xii) potential adverse reactions or changes to business relationships resulting from the announcement or completion of the proposed transaction; ***(xiii) legislative, regulatory and economic developments affecting the Company's business;*** (xiv) general economic and market developments and conditions; ***(xv) the evolving legal, regulatory and tax regimes under which the Company operates;*** (xvi) potential business uncertainty, including changes to existing business relationships, during the pendency of the merger that could affect the Company's financial performance; (xvii) restrictions during the pendency of the proposed transaction that may impact the Company's ability to pursue certain business opportunities or strategic transactions; (xviii) unpredictability and severity of catastrophic events, including, but not limited to, acts of terrorism or outbreak of war or hostilities, (xviv) current supply chain challenges including current constraints in the availability of certain semiconductor components used in our products; (xx) the financial strength of our customers and retailers; (xxi) the impact of tariffs on goods imported into the United States; and (xxii) competition, as well as the Company's response to any of the aforementioned factors.

87. The above statements identified in ¶86 were materially false and/or misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission had increased its scrutiny of the Merger after the MIT exposé in December 2022 and sent Amazon detailed questions over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) as a result of all the foregoing, iRobot materially understated the regulatory threat to the Merger; and

(f) as a result, the Company's public statements were materially false and misleading at all relevant times.

88. On February 14, 2023, iRobot filed its Form 10-K with the SEC for its fourth quarter and full-year 2022 financial results, ended December 31, 2022 (the "2022 Form 10-K"). The 2022 Form 10-K was signed by Angle. Therein, the Company discussed the Merger and, in a carbon-copy statement compared to previous drafts – despite the intensified scrutiny of the FTC and European Commission, stated:

> On August 4, 2022, the Company entered into the Merger Agreement with Amazon.com, Inc., subject to the terms of which Amazon has agreed to acquire the Company. ***The Merger is conditioned upon, among other things, the expiration of the applicable waiting period (and any extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act"), certain other approvals, clearances or expirations of waiting periods under other antitrust laws and foreign investment laws, and other customary closing conditions. On September 19, 2022, the Company and Amazon each received a request for additional information and documentary material (the "Second Request") from the Federal Trade Commission ("FTC") in connection with the FTC's review of the transactions contemplated by the Merger Agreement. The effect of the Second Request is to extend the waiting period imposed by the HSR Act, until 30 days after the Company and Amazon have substantially complied with the Second Request, unless that period is extended voluntarily by the parties or terminated sooner by the FTC. The Company and Amazon continue to work cooperatively with the FTC staff in its review of the Merger.*** Completion of the Merger remains subject to the expiration or termination of the waiting period under the HSR Act.

89. The 2022 10-K also repeated the same boilerplate risks previously stated:

> On August 4, 2022, we entered into the Merger Agreement with Amazon and Merger Sub, providing for the acquisition of iRobot by Amazon. Completion of the Merger is subject to the satisfaction of various conditions, including (1) the adoption of the Merger Agreement by a majority of the holders of the outstanding shares of our common stock (which we obtained at the special meeting of our stockholders held on October 17, 2022), (2) the expiration or early termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and certain other approvals, clearances or expirations of waiting periods under other antitrust laws and foreign investment laws, (3) the absence of any order, injunction or law prohibiting the consummation of the Merger, (4) the accuracy of the other party's representations and warranties, subject

to certain materiality standards set forth in the Merger Agreement, (5) compliance in all material respects with the other party's obligations under the Merger Agreement, and (6) no Material Adverse Effect (as defined in the Merger Agreement) having occurred since the date of the Merger Agreement that is continuing. There is no assurance that all of the various conditions will be satisfied, or that the Merger will be completed on the proposed terms, within the expected timeframe, or at all. Furthermore, there are additional inherent risks in the Merger, including the risks detailed below.

***

The Merger may be delayed, and may ultimately not be completed, due to a number of factors, including:

- the receipt on September 19, 2022, of a request for additional information and documentary materials (the "Second Request") from the Federal Trade Commission ("FTC") in connection with the FTC's review of the Merger;

- the failure to obtain regulatory approvals from various governmental entities (or the imposition of any conditions, limitations or restrictions on such approvals);

- potential future stockholder litigation and other legal and regulatory proceedings, which could delay or prevent the Merger; and

- the failure to satisfy the other conditions to the completion of the Merger, including the possibility that a Material Adverse Effect on our business would permit Amazon not to close the Merger.

If the Merger does not close, our business and stockholders would be exposed to additional risks, including:

- to the extent that the current market price of our common stock reflects an assumption that the Merger will be completed, the price of our common stock could decrease if the Merger is not completed;

- investor confidence could decline, stockholder litigation could be brought against us, relationships with existing and prospective customers, distributors, retailers, service providers, investors, lenders and other business partners may be adversely impacted, we may be unable to retain key personnel, and profitability may be adversely impacted due to costs incurred in connection with the pending Merger;

- the requirement that we pay a termination fee of $56.0 million if the Merger Agreement is terminated in certain circumstances, including by the Company

to enter into a superior proposal or by Amazon because the Board withdraws its recommendation in favor of the Merger; and

- the potential inability of the Company to restore business with any customers, retailers, or distributors lost due to uncertainty or competitive forces in the marketplace relating to the pending Merger, including the loss of one of the Company's top five customers by revenue in early November 2022, that is believed to have been caused by the pending Merger, as well as the potential negative impact of these forces on the ability of the Company to attract prospective customers, which could adversely impact the Company's business, financial condition, and stock price in the event that the Merger is not completed.

90. The above statements identified in ¶¶88-89 were materially false and/or misleading when made because (1) iRobot and Amazon were not "work[ing] cooperatively" with governmental regulators, but instead taking an adversarial approach and refusing to provide requested information or answer regulators' questions; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission had increased its scrutiny of the Merger after the MIT exposé in December 2022 and sent Amazon detailed questions over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) as a result of all the foregoing, iRobot materially understated the regulatory threat to the Merger; and (f) as a result, the Company's public statements were materially false and misleading at all relevant times.

91. Appended as exhibits to the 2022 Form 10-K were signed certifications by Zeiler and Angle certifying that the 2022 Form 10-K "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [the 2022 Form 10-K.]"

92. The above statements identified in ¶91 were materially false and/or misleading when made because (1) iRobot and Amazon were not "work[ing] cooperatively" with governmental regulators, but instead taking an adversarial approach in refusing to provide requested information or answer regulators' questions; and (2) the statements in the 2022 Form 10-K omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission had increased its scrutiny of the Merger after the MIT exposé in December 2022 and sent Amazon detailed questions over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) as a result of all the foregoing, iRobot materially understated the regulatory threat to the Merger; and (f) as a result, the Company's public statements were materially false and misleading at all relevant times.

93. Despite iRobot's poor quarter, the Company's stock price remained steady, as the misrepresentations and omissions maintained hope for the Merger's passage. Indeed, analysts at the time weighed "the binary outcome of the merger and its separation from the fundamentals" when analyzing the Company's value. *See* Brian Gesuale, Ryan Rackley, Astrid Huang, *Reports Lackluster 4Q22 While It Waits for Merger Approval*, RAYMOND JAMES FINANCIAL, INC., February 14, 2023, at 1.

**X. Amazon, with iRobot's Knowledge, Engages in a Strategy of Obstruction and Non-Cooperation**

94. On March 20, 2023, Politico reported on the FTC's investigations into Amazon, including on its proposed Merger with iRobot, and stated that it was weighing whether to challenge the Merger, but the FTC was leaning towards suing to stop the Merger. *See* Josh Sisco, *Washington prepares for war with Amazon*, POLITICO, March 20, 2023, https://www.politico.com/news/2023/03/20/ftc-amazon-irobot-antitrust-00087711. While the FTC had not yet decided whether to sue to block the Merger, the article cited FTC staff raising competition and privacy concerns. *Id*. Notably, despite iRobot and Amazon's commitment in the Merger Agreement to use "reasonable best efforts" to obtain regulatory clearance and to "supply as promptly as reasonably practicable any additional information and documentary material" requested or required, the article reported that Amazon had been "largely unresponsive to the FTC's investigation" and "refus[ed] to turn over information requested by the FTC[.]" *Id*. Pursuant to the Merger Agreement and its commitment for Amazon and iRobot to share information related to governmental requests about the Merger, iRobot would have known about both the FTC's requests and Amazon's refusal to cooperate. Neither company admitted to the facts asserted in the Politico article, and Amazon claimed it was, in fact, cooperating.

95. In May 2023, according to CW2, at a Senior Leadership Team Meeting with Angle and Zeiler, iRobot's Chief Legal Officer, Glen Weinstein ("Weinstein"), announced to iRobot employees that European Commission regulators asked Amazon for information on how its search engine worked, due to antitrust concerns over Amazon boosting its own products at the expense of competitors, and Amazon steadfastly refused to cooperate with regulators' requests. Thus, in the Spring of 2023, iRobot had actual knowledge that, contrary to the Company's public statements to investors, Amazon was not cooperating with regulators and instead ignoring their requests for information to review the Merger.

96. On May 9, 2023, iRobot filed a Form 8-K announcing its first quarter 2023 financial results. In that Form 8-K, iRobot informed investors that the Company's revenue continued to decline, with the revenue of the first quarter of 2023 being $160.3 million, compared with $292 million for the first quarter of 2022. As outlined in the May 9th Form 8-K, iRobot's revenue dropped most precipitously in the United States by approximately 53% compared to the previous year. Moreover, as of April 1, 2023, the company's cash and cash equivalents were dwindling, down to $47.9 million, compared with $117.9 million at the end of 2022, causing the Company to draw $27 million from its credit facility. These dismal financial numbers reinforced iRobot's dependence on the Merger.

97. The May 9th Form 8-K did not disclose any increase in regulatory risks, instead repeating the same boilerplate risk warnings that were issued in August 2022 after the Merger was announced:

> Important risk factors that may cause such a difference include, but are not limited to: ***(i) the ability of the parties to consummate the proposed transaction with Amazon.com, Inc in a timely manner or at all; (ii) the satisfaction (or waiver) of closing conditions to the consummation of the proposed transaction; (iii) potential delays in consummating the proposed transaction; (iv) the ability of the Company to timely and successfully achieve the anticipated benefits of the***

***proposed transaction; (v) the occurrence of any event, change or other circumstance or condition that could give rise to the termination of the merger agreement;*** (vi) the impact of the COVID-19 pandemic and the current conflict between the Russian Federation and Ukraine on the Company's business and general economic conditions; (vii) the Company's ability to implement its business strategy; (viii) significant transaction costs associated with the proposed transaction; (ix) potential litigation relating to the proposed transaction; (x) the risk that disruptions from the proposed transaction will harm the Company's business, including current plans and operations; (xi) the ability of the Company to retain and hire key personnel; (xii) potential adverse reactions or changes to business relationships resulting from the announcement or completion of the proposed transaction; ***(xiii) legislative, regulatory and economic developments affecting the Company's business;*** (xiv) general economic and market developments and conditions; ***(xv) the evolving legal, regulatory and tax regimes under which the Company operates;*** (xvi) potential business uncertainty, including changes to existing business relationships, during the pendency of the merger that could affect the Company's financial performance; (xvii) restrictions during the pendency of the proposed transaction that may impact the Company's ability to pursue certain business opportunities or strategic transactions; (xviii) unpredictability and severity of catastrophic events, including, but not limited to, acts of terrorism or outbreak of war or hostilities, (xviv) current supply chain challenges including current constraints in the availability of certain semiconductor components used in our products; (xx) the financial strength of our customers and retailers; (xxi) the impact of tariffs on goods imported into the United States; and (xxii) competition, as well as the Company's response to any of the aforementioned factors.

98. The above statements identified in ¶97 were materially false and/or misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge,

was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (f) as a result, the Company's public statements were materially false and misleading at all relevant times.

99. On May 9, 2023, iRobot also filed its Form 10-Q with the SEC for the first quarter of fiscal year 2023, ended April 1, 2023 (the "Q1 2023 Form 10-Q"). The Q1 2023 Form 10-Q was signed by Zeiler. Like the May 9th Form 8-K, despite the increasing risks to the success of the Merger, the Company only discussed the Merger by repeating substantially the same talking points it had used since the Merger was announced, giving investors a false impression that nothing had changed in the interim period that put the Merger at risk. Specifically, the Company stated, in relevant part:

> On August 4, 2022, the Company entered into the Merger Agreement with Amazon.com, Inc., subject to the terms of which Amazon has agreed to acquire the Company. ***The Merger is conditioned upon, among other things, the expiration of the applicable waiting period (and any extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act"), certain other approvals, clearances or expirations of waiting periods under other antitrust laws and foreign investment laws, and other customary closing conditions. On September 19, 2022, the Company and Amazon each received a request for additional information and documentary material (the "Second Request") from the Federal Trade Commission ("FTC") in connection with the FTC's review of the transactions contemplated by the Merger Agreement. The effect of the Second Request is to extend the waiting period imposed by the HSR Act, until 30 days after the Company and Amazon have substantially complied with the Second Request, unless that period is extended voluntarily by the parties or terminated sooner by the FTC. The Company and Amazon continue to work cooperatively with the FTC staff in its review of the Merger. Completion of the Merger remains subject to the expiration or termination of the waiting period under the HSR Act***.

100. The above statements identified in ¶99 were materially false and/or misleading when made because (1) iRobot and Amazon were not "work[ing] cooperatively" with

governmental regulators, but instead taking an adversarial approach in refusing to provide requested information or answer regulators' questions; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (f) as a result, the Company's public statements were materially false and misleading at all relevant times.

101. Even worse, iRobot's risk warnings became even less fulsome. Unlike the Company's previous 10-Qs and 10-K, the Q1 2023 Form 10-Q completely omitted ***any*** risk warning about the possibility of the Merger not being approved or of the specific and highly-unusual approach of non-cooperation that Amazon and iRobot were taking towards regulators. Consequently, by May 9, 2023, despite growing knowledge of risks to the Merger within the Company, the Company did not warn iRobot investors of known threats to the Merger closing.

102. Appended as exhibits to the Q1 2023 Form 10-Q were signed certifications by Zeiler and Angle certifying that the Q1 2023 Form 10-Q "does not contain any untrue statement

of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [the Q1 2023 Form 10-Q.]"

103. The above statements identified in ¶102 were materially false and/or misleading when made because (1) iRobot and Amazon were not "work[ing] cooperatively" with governmental regulators, but instead taking an adversarial approach in refusing to provide requested information or answer regulators' questions; and (2) the statements in the Q1 2023 Form 10-Q omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (f) as a result, the Company's public statements were materially false and misleading at all relevant times.

104. Despite iRobot issuing another quarter of moribund results, the Company's stock price remained artificially high because of investors' expectations for the Merger's approval. As

one analyst report put it, "[t]he stock remains in limbo as the FTC evaluates the Merger with Amazon . . . . [o]n a standalone basis shares could trade to ~$15[.]" *See* Brian Gesuale, Ryan Rackley, Astrid Huang, *Another Shortfall While Regulators Do Their Thing*, RAYMOND JAMES FINANCIAL, INC., May 11, 2023, at 1.

## XI. The True Risk of Amazon's Non-Cooperation and Regulatory Disapproval Starts to be Revealed as the European Commission Announces a Full-Scale Investigation

105. On June 1, 2023, almost a year after iRobot announced its Merger with Amazon, the companies officially notified the European Commission of the Merger. Shortly thereafter, the European Commission initiated its Phase I review.

106. On June 16, 2023, *Reuters* reported that the Merger was cleared to proceed by the United Kingdom. Eva Mathews, *UK clears Amazon's $1.7 billion deal for Roomba-maker iRobot*, REUTERS, June 16, 2023, https://www.reuters.com/markets/deals/uk-regulator-clears-amazons-planned-purchase-irobot-2023-06-16/. The article quoted Defendant Angle as confirming that "***both companies are continuing to work cooperatively with other relevant regulators in their review of the merger***[.]" *Id.*

107. The above statements identified in ¶106 were materially false and/or misleading when made because (1) iRobot and Amazon were not "work[ing] cooperatively" with governmental regulators, but instead taking an adversarial approach in refusing to provide requested information or answer regulators' questions; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control

over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (f) as a result, the Company's public statements were materially false and misleading at all relevant times.

108. News of CMA's clearance was almost immediately undercut by commentators at the time, who noted that the CMA did not conduct an in-depth investigation and that the unique privacy issues raised by the FTC and European Commission "inexplicably do not appear to have featured in the CMA's review." Katharine Gemmell, *Amazon's iRobot Deal Gets UK Competition and Markets Authority Clearance*, BLOOMBERG, June 16, 2023, https://www.bloomberg.com/news/articles/2023-06-16/amazon-s-irobot-deal-gets-uk-competition-and-markets-authority-clearance?embedded-checkout=true.

109. On June 22, 2023, shortly after markets opened, news outlets reported that the European Commission was planning to launch a full-scale investigation into the Merger. For example, in an article published that day, entitled "Amazon's iRobot deal faces EU antitrust investigation, sources say", *Reuters* reported, in relevant part:

> Amazon's . . . $1.7 billion acquisition of robot vacuum cleaner maker iRobot . . . faces a full-scale EU antitrust investigation, people familiar with the matter said, weeks after the U.S. online retail giant won UK approval for the deal.
>
> * * *
>
> The [European Commission] is scheduled to launch a four-month investigation following the end of its preliminary review of the deal on July 6, the people said.

> Amazon is unlikely to offer remedies during this initial phase, one of the people said. It has a final shot in the next few days at convincing the EU competition watchdog that the deal is pro-competitive, although the odds against it are high.
>
> The [European] Commission and Amazon declined to comment. Amazon has previously said the vacuum cleaner market is very competitive, with lots of Chinese players.

110. On this partial disclosure and/or materialization of the risk, iRobot's stock price fell from $49.66 by $5.17, or 10.4%, to a low of $44.49, before rebounding to close at $45.41 on June 22, 2023. However, iRobot securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning the Merger, Amazon and iRobot's interactions with regulators, and the Merger's true regulatory prospects.

111. On July 6, 2023, the European Commission sent out a press release confirming that it had initiated a Phase II review of the Merger. The release explained that the "Commission is concerned that the transaction would allow Amazon to restrict competition in the market for robot vacuum cleaners ('RVCs') and to strengthen its position as online marketplace provider." Press Release, Mergers: Commission opens an in-depth investigation into the proposed acquisition of iRobot by Amazon (July 6, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_3702. The European Commission also outlined the preliminary concerns that were raised in its Phase I review, including concerns over the access to Amazon's marketplace by iRobot's competitors and significant privacy concerns. *Id*.

## XII. iRobot's Financial Issues Require Additional Credit and a Modification to the Merger Agreement

112. On July 24, 2023, the Company filed a Form 8-K announcing that it had entered into a credit agreement with TCG Senior Funding L.L.C. for a loan of $200 million. The credit agreement was necessary because of iRobot's continued dwindling cash reserves and the delay in the Merger's regulatory approval.

113. On July 25, 2023, iRobot and Amazon issued a joint press release (the "Modified Merger Announcement") "announc[ing] that they have agreed to amend the existing terms of their merger agreement to reflect a change to the price per share" whereby "Amazon will pay $51.75 per share revised from $61.00 per share" (the "Amended Merger Agreement"). The Modified Merger Announcement downplayed the European Commission's investigation into the Merger, stating, in relevant part, that "***[c]ompletion of the transaction remains subject to customary closing conditions, including regulatory approvals*** and approval of the amended merger agreement by iRobot's stockholders"; and that "***Amazon and iRobot are working cooperatively with the relevant regulators in their review of the merger***."

114. The above statements identified in ¶113 were materially false and/or misleading when made because (1) iRobot and Amazon were not "working cooperatively" with governmental regulators, but instead taking an adversarial approach in refusing to provide requested information or answer regulators' questions; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market,

threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (f) as a result, the Company's public statements were materially false and misleading at all relevant times.

## XIII. Amazon and iRobot Begin to Halt Integration Meetings

115. Despite iRobot's continued outside assurances to investors that the Merger would be approved, internal actions confirm that the Company and its senior executives knew that the Merger was either dead or, at the very least, imperiled.

116. Right after the Merger was announced, Amazon and iRobot began to conduct monthly (and sometimes weekly) meetings to address integration. The two companies had separate meetings for nine different work streams, including finance, production, research and development, and real estate. CW2 routinely attended the monthly real estate integration meeting. However, in August 2023, shortly after the European Commission announced its formal probe of the Merger, the real estate integration meetings stopped occurring.

117. iRobot employed Confidential Witness 3 ("CW3") from April 2021 to May 2024 as a Director-level employee. CW3's job responsibilities included overseeing the Company's user experience and software design.

118. CW3 corroborated CW2 and, according to CW3, employees in iRobot's software engineering department stopped working on all integration matters with Amazon in August 2023.

119. At the same time that Amazon and iRobot were ceasing integration meetings, according to CW3, Weinstein admitted during a meeting with Angle, Zeiler, and other iRobot executives that Amazon was refusing to cooperate with the EU Commission. Specifically, Weinstein announced that the European Commission had requested information about how Amazon's search engine worked, in order to determine whether Amazon was favoring its internal products to the detriment of competition, but Amazon refused to cooperate or share that information. Nevertheless, when speaking with investors, Defendants failed to disclose the heightened risk. Although the refusal to cooperate threatened Merger approval, Defendants continued to parrot their expectation that regulators would approve the Merger, and mislead investors about cooperation.

120. On August 8, 2023, iRobot filed a Form 8-K, announcing its second quarter 2023 financial results. While the Company informed investors of its amendment to the Merger Agreement to lower the acquisition price, it did not inform investors that it had stopped significant integration meetings with Amazon or that Amazon had refused to cooperate with European regulators. Instead, the August 8th Form 8-K simply stated:

> On July 24, 2023, iRobot entered into a $200 million financing facility to fund its ongoing operations. At the same time, iRobot and Amazon amended the existing terms of their merger agreement to reflect a reduction in the price per share. For Amazon, the change in price per share is expected to be largely offset by the increase in iRobot's net debt under the new financing facility. In light of the pending transaction with Amazon, which was originally announced on August 5, 2022, iRobot will not hold a financial results conference call, and its practice of providing full-year financial guidance remains suspended.

121. The above statements identified in ¶120 were materially false and/or misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon

detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval; (f) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (g) as a result, the Company's public statements were materially false and misleading at all relevant times.

122. Moreover, when discussing risks to the Company, instead of updating the risks to reflect the increasing likelihood that the Merger would not be approved, iRobot restated the same carbon-copy risks that it had used since the beginning of the Class Period:

> Important risk factors that may cause such a difference include, but are not limited to: ***(i) the ability of the parties to consummate the proposed transaction with Amazon.com, Inc in a timely manner or at all; (ii) the satisfaction (or waiver) of closing conditions to the consummation of the proposed transaction, including with respect to the approval of the Company's stockholders; (iii) potential delays in consummating the proposed transaction; (iv) the ability of the Company to timely and successfully achieve the anticipated benefits of the proposed transaction; (v) the occurrence of any event, change or other circumstance or condition that could give rise to the termination of the merger agreement;*** (vi) the impact of the COVID-19 pandemic and the current conflict between the Russian Federation and Ukraine on the Company's business and general economic conditions; (vii) the Company's ability to implement its business strategy; (viii) significant transaction costs associated with the proposed transaction; (ix) potential litigation relating to the proposed transaction; (x) the risk that disruptions from the

proposed transaction will harm the Company's business, including current plans and operations; (xi) the ability of the Company to retain and hire key personnel; (xii) potential adverse reactions or changes to business relationships resulting from the announcement or completion of the proposed transaction; ***(xiii) legislative, regulatory and economic developments affecting the Company's business;*** (xiv) general economic and market developments and conditions; ***(xv) the evolving legal, regulatory and tax regimes under which the Company operates;*** (xvi) potential business uncertainty, including changes to existing business relationships, during the pendency of the merger that could affect the Company's financial performance; (xvii) restrictions during the pendency of the proposed transaction that may impact the Company's ability to pursue certain business opportunities or strategic transactions; (xviii) unpredictability and severity of catastrophic events, including, but not limited to, acts of terrorism or outbreak of war or hostilities, (xviv) current supply chain challenges including current constraints in the availability of certain semiconductor components used in our products; (xx) the financial strength of our customers and retailers; (xxi) the impact of tariffs on goods imported into the United States; and (xxii) competition, as well as the Company's response to any of the aforementioned factors.

123. The above statements identified in ¶122 were materially false and/or misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval; (f) as a result of

all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (g) as a result, the Company's public statements were materially false and misleading at all relevant times.

124. On August 8, 2023, iRobot also filed its Form 10-Q with the SEC for the second quarter of fiscal year 2023, ended July 1, 2023 (the "Q2 2023 Form 10-Q"). The Q2 2023 Form 10-Q was signed by Zeiler. Akin to its August 8th Form 8-K, when discussing the Merger, iRobot minimized known and increasing risks to approval and omitted that it had stopped significant integration meetings with Amazon, stating instead:

> On August 4, 2022, the Company entered into the Merger Agreement with Amazon.com, Inc., subject to the terms of which Amazon has agreed to acquire the Company. On July 24, 2023, the Company entered into the Merger Agreement Amendment which amends the Merger Agreement. The Merger is conditioned upon, among other things, the adoption of the Amended Merger Agreement by holders of a majority of the outstanding shares of Common Stock, the expiration of the applicable waiting period (and any extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act"), certain other approvals, clearances or expirations of waiting periods under other antitrust laws and foreign investment laws, and other customary closing conditions. On September 19, 2022, the Company and Amazon each received a request for additional information and documentary material (the "Second Request") from the Federal Trade Commission ("FTC") in connection with the FTC's review of the transactions contemplated by the Amended Merger Agreement. The effect of the Second Request is to extend the waiting period imposed by the HSR Act, until 30 days after the Company and Amazon have substantially complied with the Second Request. Completion of the Merger remains subject to the expiration or termination of the waiting period under the HSR Act. On April 18, 2023, Amazon notified the Merger to the UK Competition and Markets Authority (the "CMA"). On June 16, 2023, the CMA announced a decision to approve unconditionally the Merger. On June 1, 2023, Amazon notified the Merger to the European Commission. On July 6, 2023, the European Commission referred the Merger for an in-depth Phase 2 review which currently has a deadline of December 13, 2023.

125. The above statements identified in ¶124 were materially false and/or misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a the European Commission and FTC had

taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval; (f) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (g) as a result, the Company's public statements were materially false and misleading at all relevant times.

126. Moreover, when discussing the risks to the Company, iRobot repeated the same boilerplate risk warnings that it had used right after the Merger was announced, failing to update them to reflect the growing likelihood that the Merger would not be approved by regulators due, in large part, to the specific and highly-unusual approach of non-cooperation that Amazon and iRobot were taking towards regulators:

> On August 4, 2022, we entered into the Merger Agreement with Amazon and Merger Sub, providing for the acquisition of iRobot by Amazon. On July 24, 2023, we entered into the Merger Agreement Amendment, which amends the Merger Agreement. Under the terms of the Merger Agreement Amendment, we, Amazon and Merger Sub have agreed to reduce the merger consideration to be paid by Amazon for each share of Common Stock in the Merger to $51.75 in cash per share, without interest, from $61.00 in cash per share, without interest. Completion of the Merger is subject to the satisfaction of various conditions, including (1) the

adoption of the Amended Merger Agreement by a majority of the holders of the outstanding shares of our Common Stock, (2) (i) the expiration or termination of the applicable waiting period under the HSR Act, or of any voluntary agreement with the Department of Justice Antitrust Division or the FTC not to consummate the Merger and (ii) the expiration, termination or obtainment of the applicable waiting period or clearances, as applicable, under certain specified foreign antitrust laws and foreign investment laws, (3) the absence of any law restraining, enjoining, rendering illegal or otherwise prohibiting the Merger, (4) the accuracy of the other party's representations and warranties, subject to certain materiality standards set forth in the Amended Merger Agreement, (5) compliance in all material respects with the other party's obligations under the Amended Merger Agreement, and (6) no Material Adverse Effect (as defined in the Amended Merger Agreement) being continuing as of the closing date.

***

The Merger may be delayed, and may ultimately not be completed, due to a number of factors, including:

- the failure to obtain the approval of the Amended Merger Agreement by our stockholders;
- potential enforcement actions by the FTC, which could delay or prevent the Merger;
- on July 6, 2023, the European Commission initiated a Phase 2 investigation of the merger that currently has a deadline of December 13, 2023, which may be extended for a variety of reasons;
- the failure to obtain regulatory approvals from various governmental entities (or the imposition of any conditions, limitations or restrictions on such approvals), or challenge of such regulatory approvals by a third party;
- potential future stockholder litigation and other legal and regulatory proceedings, which could delay or prevent the Merger; and
- the failure to satisfy the other conditions to the completion of the Merger, including the possibility that a Material Adverse Effect on our business would permit Amazon not to close the Merger.

If the Merger does not close, our business and stockholders would be exposed to additional risks, including:

- to the extent that the current market price of our common stock reflects an assumption that the Merger will be completed, the price of our common stock could decrease if the Merger is not completed;

- investor confidence could decline, stockholder litigation could be brought against us, relationships with existing and prospective customers, distributors, retailers, service providers, investors, lenders and other business partners may be adversely impacted, we may be unable to retain key personnel, and profitability may be adversely impacted due to costs incurred in connection with the pending Merger;

- the requirement that we pay a termination fee of $56.0 million if the Amended Merger Agreement is terminated in certain circumstances, including by us to enter into a superior proposal or by Amazon because the Board withdraws its recommendation in favor of the Merger;

- the potential inability of us to restore business with any customers, retailers, or distributors lost due to uncertainty or competitive forces in the marketplace relating to the pending Merger, including the loss of one of our top five customers by revenue in early November 2022, that is believed to have been caused by the pending Merger, as well as the potential negative impact of these forces on the ability of us to attract prospective customers, which could adversely impact our business, financial condition, and stock price in the event that the Merger is not completed;

- to the extent a termination fee is received by us under the Amended Merger Agreement, we may be required to pay all or a portion of the amount of such termination fee to its lenders under the Credit Agreement and, to the extent not paid to the lenders, may not be able to utilize such additional funds as and when needed due to additional restrictions with respect to such funds imposed by the Credit Agreement;

- to the extent a termination fee is not received by us under the Amended Merger Agreement and the Merger is not consummated, we may be required to reserve a portion of its cash in a controlled account in favor of the lenders under the Credit Agreement and may not be able to utilize such funds as and when needed due to additional restrictions with respect to such funds imposed by the Credit Agreement; and

- to the extent a termination fee is not received by us under the Amended Merger Agreement and the Merger is not consummated, the minimum core assets required to comply with our minimum core assets covenant under the Credit Agreement may temporarily or permanently increase and we may not be able to maintain compliance with such covenant.

127. The above statements identified in ¶126 were materially false and/or misleading when made because the statements omitted to disclose the following material adverse information

necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval; (f) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (g) as a result, the Company's public statements were materially false and misleading at all relevant times.

128. Appended as exhibits to the Q2 2023 Form 10-Q were signed certifications by Zeiler and Angle certifying that the Q2 2023 Form 10-Q "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [the Q2 2023 Form 10-Q.]"

129. The above statements identified in ¶128 were materially false and/or misleading when made because the statements in the Q2 2023 Form 10-Q omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the

European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval; (f) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (g) as a result, the Company's public statements were materially false and misleading at all relevant times

130. On August 24, 2023, iRobot filed a definitive proxy statement (the "Modified Merger Proxy Statement") on Form DEFM14A, signed by Angle, with the SEC in connection with the Amended Merger Agreement. Notably, the Modified Merger Proxy Statement used substantially similar language as the original Proxy Statement to downplay known regulatory hurdles, falsely suggesting to investors that the risk of regulatory disapproval had not changed since the Merger was announced, and stating, in relevant part:

> iRobot and Amazon.com have agreed to use their respective reasonable best efforts to consummate the transactions contemplated by the amended merger agreement (including the merger) no later than the outside date (as defined herein), including obtaining any applicable regulatory approvals and satisfying all statutory waiting period requirements, subject to certain specified limitations under the amended merger agreement. These approvals include approval under the HSR Act, clearance

> by the European Commission, and certain other merger filings or clearances that may be required or advisable in other jurisdictions. Although ***we expect that all applicable regulatory approvals will be obtained***, the merger cannot be consummated until after expiration or termination of the applicable waiting period under the HSR Act, and after the mandatory approval requirements outside of the United States have been obtained under applicable antitrust and foreign investment laws.
>
> * * *
>
> In connection with the merger, iRobot and Amazon.com filed notification and report forms under the HSR Act with the FTC and the DOJ on August 19, 2022. On September 19, 2022, iRobot and Amazon.com each received a Second Request from the FTC in connection with the FTC's review of the merger. The Second Request extended the waiting period imposed by the HSR Act, until 30 days after iRobot and Amazon.com have substantially complied with the Second Request, unless that period is extended voluntarily by the parties or terminated sooner by the FTC. ***iRobot and Amazon.com continue to work cooperatively with the FTC staff in its review of the merger***.
>
> * * *
>
> Although ***Amazon.com and iRobot believe that the merger will not violate the antitrust or foreign investment laws and expect that all required regulatory clearances and approvals will be obtained***, Amazon.com and iRobot cannot assure that these regulatory clearances and approvals will be timely obtained, obtained at all or that the granting of these regulatory clearances and approvals will not involve the imposition of additional conditions, restrictions, qualifications, requirements or limitations on the completion of the merger, including the requirement to divest assets, license or hold separate assets or terminate existing relationships and contractual rights, or agree to other remedies, or require changes to the terms of the amended merger agreement, or that a challenge to the merger on antitrust or foreign investment grounds will not be made, or if such challenge is made, what the result will be. These conditions or changes could result in the conditions to the merger not being satisfied. There is currently no way to predict how long it will take to obtain all of the required regulatory approvals or whether such approvals will ultimately be obtained and there may be a substantial period of time between the approval of the proposal to approve and adopt the amended merger agreement by stockholders and the completion of the merger.

(Emphases added.)

131. In addition, the Modified Merger Proxy Statement told investors that Company management's and the Board's review of "intensifying competitive conditions" in iRobot's market

weighed in favor of the Merger's approval. The Modified Merger Proxy Statement swayed iRobot investors, and on October 12, 2023, iRobot shareholders voted in favor of the Merger.

132. The above statements identified in ¶¶130-31 were materially false and/or misleading when made because (1) iRobot and Amazon did not subjectively expect that the Merger would receive all regulatory approvals, as reflected in their decision to cease many integration activities; (2) iRobot had no reasonable basis that the Merger would be approved, since it and Amazon ceased "work[ing] cooperatively" with governmental regulators and adopted an adversarial approach, refusing to provide requested information or answer regulators' questions; (3) "intensifying competitive conditions" did not support Merger, but instead, regulators had expressed concerns over the Merger worsening competitive conditions; and (4) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval; (f) as a result of all the

foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (g) as a result, the Company's public statements were materially false and misleading at all relevant times.

133. On August 29, 2023, the European Commission' suspended the Merger's Phase II deadline so that regulators could obtain additional information on the Merger. The European Commission ultimately gained the requested information and formally restarted the clock on its Phase II investigation of the Merger on October 19, 2023, and set a deadline of February 14, 2024 to decide whether or not to approve the Merger.

## XIV. In the Fall of 2023, the Merger's Failure to Obtain Regulatory Approval Appears Likely to iRobot Executives, but Investors Remain Unaware

134. As the Summer turned into Fall, the prospects for the Merger grew increasingly dim, and iRobot began – for the first time – to contemplate contingencies in case the Merger was not approved. According to CW2, in September 2023, during monthly Senior Leadership Team Meetings, iRobot executives internally formulated plans for the business without the Merger. This reflected a growing understanding within the Company that the Merger was unlikely to be approved by regulators.

135. Further, in August 2023, the long-time Amazon executive who led Amazon's push for the Merger, Senior Vice President of Devices and Services Dave Limp, announced his plans to leave Amazon. In September 2023, it was announced that he would be replaced by Panos Panay, who was even less supportive of the Merger. *See* Tom Warren and Jay Peters, *Microsoft's former Surface chief Panos Panay is reportedly heading to Amazon*, THE VERGE, Sep. 18, 2023, https://www.theverge.com/2023/9/18/23879036/microsoft-panos-panay-amazon-hire-former-surface-windows-chief. Panay took full control as Amazon's Senior Vice President of Devices and Services by October 2023. *See* Jon Porter, *Amazon abandons $1.4 billion deal to buy Roomba maker iRobot*, THE VERGE, Jan. 29, 2024,

https://www.theverge.com/2024/1/29/24034201/amazon-irobot-acquisition-over-antitrust-regulator-scrutiny. At that time, all remaining integration meetings between Amazon and iRobot ceased.

136. iRobot employed Confidential Witness 4 ("CW4") as a Senior Project Manager between June 2020 and May 2024. CW4's job responsibilities included overseeing iRobot's then-burgeoning subscription business and assisting with iRobot's mergers and acquisitions.

137. According to CW4, who attended weekly and monthly integration meetings, by October 2023, ***all*** integration meetings between iRobot and Amazon had stopped, indicating that the Company no longer believed that the Merger would receive regulatory approval.

138. Defendants were not candid with investors about this information. On November 7, 2023, iRobot also filed its Form 10-Q with the SEC for the third quarter of fiscal year 2023, ended September 30, 2023 (the "Q3 2023 Form 10-Q"). The Q3 2023 Form 10-Q was signed by Zeiler. Even though iRobot had pivoted to planning to run its business independently, and integration meetings with Amazon had ceased, the Q3 2023 Form 10-Q continued to discuss the Merger in the same fashion it had done since the Merger was announced in August 2022, minimizing known regulatory risks:

> On August 4, 2022, the Company entered into the Merger Agreement with Amazon.com, Inc., subject to the terms of which Amazon has agreed to acquire the Company. On July 24, 2023, the Company entered into the Merger Agreement Amendment which amends the Merger Agreement. The Merger is conditioned upon, among other things, the adoption of the Amended Merger Agreement by holders of a majority of the outstanding shares of Common Stock, the expiration of the applicable waiting period (and any extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act"), certain other approvals, clearances or expirations of waiting periods under other antitrust laws and foreign investment laws, and other customary closing conditions. On September 19, 2022, the Company and Amazon each received a request for additional information and documentary material (the "Second Request") from the Federal Trade Commission ("FTC") in connection with the FTC's review of the transactions contemplated by the Amended Merger Agreement. The effect of the

> Second Request is to extend the waiting period imposed by the HSR Act, until 30 days after the Company and Amazon have substantially complied with the Second Request. Completion of the Merger remains subject to the expiration or termination of the waiting period under the HSR Act. On April 18, 2023, Amazon notified the Merger to the UK Competition and Markets authority (the "CMA"). On June 16, 2023, the CMA announced a decision to approve unconditionally the Merger. On June 1, 2023, Amazon notified the Merger to the European Commission. On July 6, 2023, the European Commission referred the Merger for an in-depth Phase 2 review. The Phase 2 deadline was extended on July 18, 2023 by 20 working days under Article 10(3) of Council Regulation (EC) No 139/2004. The Phase 2 deadline was suspended on August 29, 2023, and restarted on October 20, 2023. The revised Phase 2 deadline is February 14, 2024.

139. The above statements identified in ¶138 were materially false and/or misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval; (f) iRobot began, for the first time, to formulate alternative plans for the Company in September 2023 in preparation for the Merger to be rejected by regulators; (g) as a result of all the foregoing, iRobot

overstated the likelihood for successfully completing the Merger; and (h) as a result, the Company's public statements were materially false and misleading at all relevant times.

140. Further, when discussing the risks to the Merger, the Company used the same language it had used throughout the Class Period with very little alteration and continued to downplay the increasing likelihood that the Merger would not be approved:

> On August 4, 2022, we entered into the Merger Agreement with Amazon and Merger Sub, providing for the acquisition of iRobot by Amazon. On July 24, 2023, we entered into the Merger Agreement Amendment, which amends the Merger Agreement. Under the terms of the Merger Agreement Amendment, we, Amazon and Merger Sub have agreed to reduce the merger consideration to be paid by Amazon for each share of Common Stock in the Merger to $51.75 in cash per share, without interest, from $61.00 in cash per share, without interest. Completion of the Merger is subject to the satisfaction of various conditions, including (1) the adoption of the Amended Merger Agreement by a majority of the holders of the outstanding shares of our Common Stock, which occurred on October 12, 2023, (2) (i) the expiration or termination of the applicable waiting period under the HSR Act, or of any voluntary agreement with the Department of Justice Antitrust Division or the FTC not to consummate the Merger and (ii) the expiration, termination or obtainment of the applicable waiting period or clearances, as applicable, under certain specified foreign antitrust laws and foreign investment laws, (3) the absence of any law restraining, enjoining, rendering illegal or otherwise prohibiting the Merger, (4) the accuracy of the other party's representations and warranties, subject to certain materiality standards set forth in the Amended Merger Agreement, (5) compliance in all material respects with the other party's obligations under the Amended Merger Agreement, and (6) no Material Adverse Effect (as defined in the Amended Merger Agreement) being continuing as of the closing date.
>
> ***
>
> The Merger may be delayed, and may ultimately not be completed, due to a number of factors, including:
>
> - potential enforcement actions by the FTC, which could delay or prevent the Merger;
>
> - on July 6, 2023, the European Commission initiated a Phase 2 investigation of the merger that currently has a deadline of February 14, 2024, which may be extended for a variety of reasons;

- the failure to obtain regulatory approvals from various governmental entities (or the imposition of any conditions, limitations or restrictions on such approvals), or challenge of such regulatory approvals by a third party;

- potential future stockholder litigation and other legal and regulatory proceedings, which could delay or prevent the Merger; and

- the failure to satisfy the other conditions to the completion of the Merger, including the possibility that a Material Adverse Effect on our business would permit Amazon not to close the Merger.

If the Merger does not close, our business and stockholders would be exposed to additional risks, including:

- to the extent that the current market price of our common stock reflects an assumption that the Merger will be completed, the price of our common stock could decrease if the Merger is not completed;

- investor confidence could decline, stockholder litigation could be brought against us, relationships with existing and prospective customers, distributors, retailers, service providers, investors, lenders and other business partners may be adversely impacted, we may be unable to retain key personnel, and profitability may be adversely impacted due to costs incurred in connection with the pending Merger;

- the requirement that we pay a termination fee of $56.0 million if the Amended Merger Agreement is terminated in certain circumstances, including by us to enter into a superior proposal or by Amazon because the Board withdraws its recommendation in favor of the Merger; the potential inability of us to restore business with any customers, retailers, or distributors lost due to uncertainty or competitive forces in the marketplace relating to the pending Merger, including the loss of one of our top five customers by revenue in early November 2022, that is believed to have been caused by the pending Merger, as well as the potential negative impact of these forces on the ability of us to attract prospective customers, which could adversely impact our business, financial condition, and stock price in the event that the Merger is not completed;

- to the extent a termination fee is received by us under the Amended Merger Agreement, we may be required to pay all or a portion of the amount of such termination fee to the lenders under the Credit Agreement and, to the extent not paid to the lenders, may not be able to utilize such additional funds as and when needed due to additional restrictions with respect to such funds imposed by the Credit Agreement;

- to the extent a termination fee is not received by us under the Amended Merger Agreement and the Merger is not consummated, we may be required to reserve

a portion of our cash in a controlled account in favor of the lenders under the Credit Agreement and may not be able to utilize such funds as and when needed due to additional restrictions with respect to such funds imposed by the Credit Agreement; and

- to the extent a termination fee is not received by us under the Amended Merger Agreement and the Merger is not consummated, the minimum core assets required to comply with our minimum core assets covenant under the Credit Agreement may temporarily or permanently increase and we may not be able to maintain compliance with such covenant.

141. The above statements identified in ¶140 were materially false and/or misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval; (f) iRobot began, for the first time, to formulate alternative plans for the Company in September 2023 in preparation for the Merger to be rejected by regulators; (g) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (h) as a result, the Company's public statements were materially false and misleading at all relevant times.

142. Appended as exhibits to the Q3 2023 Form 10-Q were signed certifications by Zeiler and Angle certifying that the Q3 2023 Form 10-Q "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [the Q3 2023 Form 10-Q.]"

143. The above statements identified in ¶142 were materially false and/or misleading when made because the statements in the Q3 2023 Form 10-Q omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval; (f) iRobot began, for the first time, to formulate alternative plans for the Company in September 2023 in preparation for the Merger to be rejected by regulators; (g) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (h) as a result, the Company's public statements were materially false and misleading at all relevant times.

## XV. The Full Truth is Gradually Revealed

144. On November 27, 2023, the European Commission issued a press release, entitled "Commission sends Amazon Statement of Objections over proposed acquisition of iRobot", which stated, in relevant part:

> **The Statement of Objections**
>
> On 6 July 2023, the Commission opened an in-depth investigation to assess if Amazon's acquisition of iRobot may (i) restrict competition in the **market for the manufacturing and supply of RVCs**; and (ii) allow Amazon to strengthen its position in the **market for online marketplace services** to third-party sellers (and related advertising services) and/or **other data-related markets**.
>
> As a result of this in-depth investigation, the Commission is concerned that Amazon may restrict competition in the **European Economic Area ('EEA')-wide and/or national markets for RVCs**, by **hampering rival RVC suppliers' ability to effectively compete.** In particular, the Commission found that:
>
> - Amazon may have the **ability and the incentive to foreclose iRobot's rivals by engaging in several foreclosing strategies** aimed at preventing rivals from selling RVCs on Amazon's online marketplace and/or at degrading their access to it. This may include: (i) delisting rival RVCs; (ii) reducing visibility of rival RVCs in both non-paid (i.e., organic) and paid results (i.e., advertisements) displayed in Amazon's marketplace; (iii) limiting access to certain widgets (e.g. 'other products you may like') or certain commercially-attractive product labels (e.g. 'Amazon's choice' or 'Works With Alexa'); and/or (iv) directly or indirectly raising the costs of iRobot's rivals to advertise and sell their RVCs on Amazon's marketplace. Amazon may have the **ability to foreclose iRobot's rivals** because **Amazon's online marketplace is a particularly important channel to sell RVCs** in France, Germany, Italy, and Spain. RVC customers in these countries particularly rely on Amazon both in terms of product discovery as well as for their final purchasing decision.
>
> - Amazon may have the **incentive to foreclose iRobot's rivals because it may be economically profitable to do so.** The merged entity would likely gain more from additional sales of iRobot RVCs, than it would lose from fewer sales of iRobot's rivals and other related products on Amazon. Such gains include benefits from additional data gathered from iRobot's users.
>
> - Such foreclosure strategies could restrict competition in the market for RVCs, leading to higher prices, lower quality, and less innovation for consumers.

> The [European] Commission has conducted a wide-ranging investigation to understand the market and the potential impact of the deal. This investigation has included, among others, analysing internal documents provided by the parties and gathering views from market participants such as suppliers of RVCs and other smart home devices, as well as from providers of online sales channels.

(Emphases in original.)

145. In response, iRobot filed a Form 8-K on the same day announcing the same, and stating, in relevant part:

> On November 27, 2023, the European Commission sent to Amazon.com, Inc. a Statement of Objections relating to the proposed acquisition of iRobot Corporation, a Delaware corporation (the "Company" or "iRobot") by Amazon.com, Inc., a Delaware corporation ("Parent or "Amazon"), by way of a proposed merger pursuant to which Martin Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Parent ("Merger Sub"), will merge with and into the Company (the "Merger"), with the Company surviving the Merger as a wholly owned subsidiary of Parent. The Statement of Objections is a formal step in the investigation by which the European Commission sets out in writing its preliminary assessment regarding the combination of the Company and Amazon. A Statement of Objections is a preparatory document informing the recipients of the European Commission's objections, and does not prejudge the European Commission's final decision. The issuing of a Statement of Objections allows recipients to present arguments in response to the European Commission's preliminary assessment of the competitive effects of a notified transaction and to consult the European Commission's case file. The transaction was notified to the European Commission on June 1, 2023. The European Commission opened an in-depth investigation on July 6, 2023 and has until February 14, 2024 to adopt a final decision.

146. However, when discussing risks to the Merger, the Company again repeated the same boilerplate risk warnings that it had used throughout the Class Period that failed to reflect the shifting reality of the Merger's increasingly unlikely regulatory approval prospects due, in large part, to the highly-unusual approach of non-cooperation that Amazon and iRobot had taken over the past year:

> Important risk factors that may cause such a difference include, but are not limited to: ***(i) the ability of the parties to consummate the proposed transaction in a timely manner or at all; (ii) the satisfaction (or waiver) of closing conditions to the consummation of the proposed transaction; (iii) potential delays in***

> ***consummating the proposed transaction; (iv) the ability of the Company to timely and successfully achieve the anticipated benefits of the proposed transaction; (v) the occurrence of any event, change or other circumstance or condition that could give rise to the termination of the amended merger agreement;*** (vi) the impact of the COVID-19 pandemic and the current conflict between the Russian Federation and Ukraine on the Company's business and general economic conditions; (vii) the Company's ability to implement its business strategy; (viii) significant transaction costs associated with the proposed transaction; (ix) potential litigation relating to the proposed transaction; (x) the risk that disruptions from the proposed transaction will harm the Company's business, including current plans and operations; (xi) the ability of the Company to retain and hire key personnel; (xii) potential adverse reactions or changes to business relationships resulting from the announcement or completion of the proposed transaction; ***(xiii) legislative, regulatory and economic developments affecting the Company's business;*** (xiv) general economic and market developments and conditions; ***(xv) the evolving legal, regulatory and tax regimes under which the Company operates;*** (xvi) potential business uncertainty, including changes to existing business relationships, during the pendency of the merger that could affect the Company's financial performance; (xvii) restrictions during the pendency of the proposed transaction that may impact the Company's ability to pursue certain business opportunities or strategic transactions; (xviii) unpredictability and severity of catastrophic events, including, but not limited to, acts of terrorism or outbreak of war or hostilities; (xix) current supply chain challenges including current constraints in the availability of certain semiconductor components used in the Company's products; (xx) the financial strength of the Company's customers and retailers; (xxi) the impact of tariffs on goods imported into the United States; and (xxii) competition, as well as the Company's response to any of the aforementioned factors.

147. The above statements identified in ¶¶145-46 were materially false and/or misleading when made because the statements in omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (b) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (c) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood

that regulators would oppose the Merger; (d) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval; (e) iRobot began, for the first time, to formulate alternative plans for the Company in September 2023 in preparation for the Merger to be rejected by regulators; (f) Amazon did not plan to offer any concessions to regulators in order to appease their objections to the Merger, increasing the likelihood that regulators would oppose the Merger; (g) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (h) as a result, the Company's public statements were materially false and misleading at all relevant times.

148. On this news, iRobot's stock price fell from $42.10 by $10.97, or 26%, to a low of $31.13 before rebounding to close at $34.35 on November 27, 2023. Despite this decline in the Company's stock price, iRobot securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning the Merger and its true regulatory prospects.

149. On December 12, 2023, it was announced that Amazon would defend the Merger at a closed European Commission hearing on December 18, 2023. Pursuant to the Merger Agreement's cooperation provision, iRobot would have been informed of Amazon's plans for the December 18, 2023 hearing, coordinated strategy, and been debriefed on the hearing itself.

150. On January 10, 2024, during intraday trading hours, news outlets reported that Amazon refused the standard practice of offering concessions to address concerns raised by the European Commission. One such article published that day by *POLITICO*, entitled "Amazon skips concessions to EU on iRobot deal", reported, in relevant part:

> Amazon didn't offer concessions to the European Commission to try to garner approval for its planned $1.4 billion takeover of robot vacuum cleaner maker iRobot.
>
> The European Union's webpage on the deal shows that the companies didn't make an offer by the end of the day on Wednesday, its last chance to tackle European Union objections that Amazon could hamper rival vacuum cleaners' sales on Amazon's online marketplace. Regulators have said the sales platform is a particularly important sales channel for the product.
>
> * * *
>
> ***iRobot's [CEO Defendant] Angle said in a statement that the company "continues to work cooperatively with the [European Commission] and other regulators in their review of the merger . . . We remain excited about the opportunity to work together with Amazon to continue innovating, bringing valuable products to customers and making their lives easier."***

(Emphasis added.)

151. The above statements identified in ¶150 were materially false and/or misleading when made because (1) contrary to Angle's statements, the companies were not working cooperatively with regulators, but instead refusing to respond to regulators' investigation and requests for information, and refused to offer any concessions to regulators; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (b) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (c) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (d) Amazon and iRobot ceased holding integration meetings between the companies, indicating an

increased pessimism over the Merger receiving regulatory approval; (e) iRobot began, for the first time, to formulate alternative plans for the Company in September 2023 in preparation for the Merger to be rejected by regulators; (f) Amazon refusal to offer any concessions to regulators in order to appease their objections to the Merger significantly increasing the likelihood that regulators would oppose the Merger; (g) as a result of all the foregoing, iRobot overstated the likelihood for successfully completing the Merger; and (h) as a result, the Company's public statements were materially false and misleading at all relevant times.

152. On this news, iRobot's stock price fell from $36.99 by $7.99, or 21.6%, to $29, before rebounding to close at $29.75 per share on January 10, 2024. Despite this decline in the Company's stock price, iRobot securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning the Merger and its true regulatory prospects, including Angle's misrepresentations about continued cooperation.

153. On January 11, 2024, one day after Angle claimed that the company continues to work cooperatively with the European Commission, EU Competition Commissioner Margaret Vestager confirmed to *Bloomberg* that, contrary to Angle's statement, no concessions were offered with respect to the Merger. *See* https://www.bloomberg.com/news/videos/2024-01-11/eu-s-vestager-on-apple-google-microsoft-investigations-video?sref=2UTFpANZ.

154. On January 18, 2024, during post-market hours, *WSJ* published an article (the "*WSJ* Article") entitled "EU Commission Intends to Block Amazon's iRobot Acquisition", stating, in relevant part:

> The European Union's competition watchdog intends to block Amazon's $1.7 billion bid to purchase Roomba maker iRobot, people familiar with the matter said.

> ***Competition officials from the European Commission, the bloc's executive body, met Thursday with representatives from Amazon to discuss the deal, one of those people said. Amazon was told during the meeting that the deal was likely to be rejected, the person said. Amazon declined to comment.***
>
> The plan to reject the deal would still need formal approval from the commission's 27 top political leaders before a final decision can be issued. Historically, that process is unlikely to overrule a recommendation from the bloc's competition commissioner, Margrethe Vestager. The commission has a Feb. 14 deadline for its final decision.

155. Also on January 18, 2024, during post-market hours, *Bloomberg* published an article entitled "Amazon's $1.4 Billion iRobot Deal to Be Blocked by EU Antitrust Watchdog" (the "*Bloomberg* Article"), which corroborated the findings of the earlier *WSJ* Article.

156. The next day, during intraday trading hours, *Bloomberg* updated the *Bloomberg* Article, reporting that the FTC was drafting a lawsuit to block the Merger, stating, in relevant part:

> The deal is likely to face opposition in the US as well. According to people familiar with the matter, the [FTC] has been drafting a lawsuit that would seek to block the acquisition. The FTC's three commissioners haven't yet voted on a challenge nor had a final meeting with Amazon to discuss the potential case, said the people, who asked not to be named discussing an ongoing probe.

157. Following the publication of the *Bloomberg* and *WSJ* Articles, iRobot's stock price fell from closing on January 18, 2024 at $23.62 by $7.85, or 33.2%, to a low of $15.77, before rebounding to close at $17.26 per share on January 19, 2024.

158. On January 24, 2024, representatives from iRobot attended a closed meeting with the FTC. No details emerged from the meeting at the time, but it later emerged that Amazon also attended a meeting with the FTC around the same time where the FTC informed Amazon that it planned to vote to sue to block the Merger. Either at its own meeting with the FTC or, pursuant to the Merger Agreement's cooperation provision, through communication with Amazon, Defendants were informed that the FTC would oppose the Merger. However, Defendants did not immediately inform investors of this fact.

159. On January 29, 2024, during pre-market hours, Amazon and iRobot issued a joint press release entitled "Amazon and iRobot Agree to Terminate Pending Acquisition[,]" finally announcing their entry "into a mutual agreement" to terminate the Merger. Specifically, that press release stated, in relevant part:

> Today Amazon . . . and iRobot . . . announced that they have entered into a mutual agreement to terminate their previously announced acquisition agreement, originally signed on August 4, 2022, under which Amazon would have acquired iRobot for cash consideration.
>
> * * *
>
> The companies have signed a termination agreement that resolves all outstanding matters from the transaction, including Amazon paying iRobot the previously agreed upon termination fee.

160. Pursuant to the Merger Agreement, iRobot received a cash infusion in the form of a $94 million termination fee from Amazon, but was otherwise left rudderless after the Merger was abandoned.

161. Also on January 29, 2024, during pre-market hours, iRobot issued a press release entitled "iRobot Announces Operational Restructuring Plan to Position Company for the Future", which, among other things, reported that the Company would reduce its workforce by "approximately 350 employees, which represents 31 percent of the Company's workforce as of December 30, 2023," and that, "[a]s part of this workforce reduction, iRobot expects to record restructuring charges totaling between $12 million and $13 million, primarily for severance and related costs, over the first two quarters of 2024, with the majority of the restructuring charges anticipated in the first quarter of 2024." The same press release also disclosed that "[c]oncurrent with the implementation of its operational restructuring plan . . . [Defendant] Angle, Chairman of the Board . . . and CEO, has stepped down as Chairman and CEO."

162. Later that same day, *Reuters* published an article entitled "Amazon, Roomba-parent iRobot abandon $1.4 billion merger deal", which revealed, *inter alia*, that FTC staff had notified Amazon the week before that it planned to block the Merger, stating, in relevant part:

> Separately, the [FTC] was poised to reject Amazon's deal before the companies announced they were abandoning it, a source told Reuters.
>
> * * *
>
> The FTC staff met with Amazon last week to inform them they planned to recommend the commission vote to sue to block the acquisition, the source added, saying the commission was set to hold a final meeting on Monday with Amazon before the commission could have voted to approve a legal challenge to the merger.

163. On this news, iRobot's stock price fell from a January 26, 2024 closing price of $16.99 by $3.19, or 18.7%, before rebounding to close at $15.50 per share on January 29, 2024.

164. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages. Indeed, January's disclosures alone destroyed more than $532 million in market value for investors.

## XVI. Additional Allegations of Scienter

### A. Defendants had access to, and received, information contradicting their public statements

165. Defendants iRobot, Angle and Zeiler had access to information about, and according to the Merger Agreement, received actual knowledge of, Amazon's refusal to cooperate with regulators. They also knew of the cancelled integration meetings between Amazon and iRobot, iRobot's preparation for business without the Merger in September 2023, and the Merger's increasingly dim prospects for regulatory approval, and therefore knew or recklessly ignored that their statements were materially misleading.

166. As outlined in ¶¶23-24, Defendants Angle and Zeiler occupied executive positions at iRobot, which would have provided them full access to information about regulatory communications pertaining to the Merger as were required to be shared under the Merger Agreement. They were also intimately involved in the Merger process itself. Angle was the primary contact for Amazon when initially negotiating the Merger and remained integral to the Merger throughout the Class Period, consistently communicating to the press on behalf of the Company about the Merger. Zeiler took a lead role in responding to regulators. Additionally, Individual Defendants attended Senior Leadership Team Meetings where the Merger, Amazon's refusal to cooperate with regulators, and alternative plans for iRobot should the Merger not be approved by regulators, was discussed. Finally, pursuant to the Merger Agreement's cooperation provision, Amazon would have told iRobot's executives – which included Angle and Zeiler – about every interaction with both FTC and European Commission regulators.

167. Not only did Individual Defendants have access to information contradicting their public statements, but they actually received it. According to CW2, in May 2023, Weinstein admitted at a Senior Leadership Team Meeting – which included Angle and Zeiler – that European Commission regulators asked Amazon for information on how its search engine worked, due to antitrust concerns over Amazon boosting its own products at the expense of competitors, but Amazon steadfastly refused to cooperate with regulators' requests.

168. Similarly, according to CW3, who attended the Senior Leadership Team Meetings with Individual Defendants, in late Summer of 2023, Weinstein announced in a Senior Leadership Team Meetings that was attended by Angle and Zeiler that the European Commission had again requested such information, but Amazon refused to cooperate and share that information.

169. Therefore, Angle and Zeiler had access to information that belied their statements which downplayed the regulatory risks to the Merger and misstated the cooperation Amazon and iRobot engaged in with governmental regulators.

**B. That Defendants' misrepresentations involved the most critical deal facing iRobot bolsters scienter**

170. Before the Merger, iRobot was facing dismal financial prospects, missing financial goals, and saw their revenues drop by over 50% from the prior years during the Class Period. The Merger provided a lifeline to Defendants, as Amazon was not only willing to pay over a billion dollars for the Company, despite its plummeting revenue, but Amazon would then also use its platform to help iRobot increase its market share. Furthermore, the Merger was the only thing holding up iRobot's share price amid missed earnings reports, plummeting sales figures, and dwindling cash reserves. At least one analyst during the Class Period made clear that, absent the Merger, the Company's share price would be trading at $5 to $12 a share. *See* Yiqin Shen, *Amazon's (AMZN) IRobot (IRBT) Deal Path Gets Muddied by Antitrust Concerns*, BLOOMBERG, Nov. 28, 2023, at 1, https://news.bloomberglaw.com/mergers-and-acquisitions/irobot-amazon-deal-path-gets-muddied-by-antitrust-concerns.

171. Therefore, it would be absurd to infer that iRobot's most senior executives were unaware of Amazon's uncooperative approach with regulators, that was shared pursuant to the Merger Agreement with iRobot or the increasingly poor prospects of the Merger's regulatory approval.

**C. That Defendant Angle resigned one minute after iRobot announced the abandonment of the Merger bolsters scienter**

172. On January 29, 2024, during pre-market hours, Amazon and iRobot issued a joint press release announcing that they would be abandoning the Merger. ***One minute*** after announcing

that iRobot was abandoning the Merger, the Company announced that Angle would immediately resign as CEO and chairman of the board of directors. *See* Deb Kiner*, iRobot CEO steps down, company announces layoffs after Amazon deal terminated*, PENN LIVE, Jan. 29, 2024, https://www.pennlive.com/life/2024/01/irobot-ceo-steps-down-company-announces-layoffs-after-amazon-deal-terminated.html.

173. The temporal proximity between Angle's ouster from iRobot and the manifestation of risks that Defendants had previously hidden/downplayed contributes to a strong inference of scienter.

### D. Individual Defendants had financial incentive to push the Merger and hide any regulatory risks

174. Defendants Angle and Zeiler had significant financial incentive to downplay any risk to the Merger. If the Merger passed, according to the Modified Merger Proxy Statement, both Individual Defendants would have received "Golden Parachute Compensation" packages that equaled millions of dollars:

**Golden Parachute Compensation**

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(3) | Total ($) |
|---|---|---|---|---|
| Colin Angle | 3,655,000 | 10,362,679 | 66,470 | 14,084,149 |
| Julie Zeiler | 2,250,000 | 3,178,589 | 45,409 | 5,473,998 |

175. However, if investors knew that the Merger faced significant regulatory risks, then they would likely evaluate the Company on its deteriorating balance sheet and financial results, thereby depressing the stock price. Indeed, analysts during the Class Period were clear that "[t]he outlook for iRobot without an Amazon deal is bleak – an informal poll of a half-dozen merger arbitrage specialists values the company at $5 to $12 a share on its own." Yiqin Shen, *Amazon's (AMZN) IRobot (IRBT) Deal Path Gets Muddied by Antitrust Concerns*, BLOOMBERG, Nov. 28,

2023, at 1, https://news.bloomberglaw.com/mergers-and-acquisitions/irobot-amazon-deal-path-gets-muddied-by-antitrust-concerns.

176. Therefore, Individual Defendants had significant financial incentive to downplay any regulatory risk to the Merger in hopes of gaining regulatory approval and receiving their Golden Parachute Compensation packages worth millions of dollars.

**E. That Defendant Angle held himself out as knowledgeable bolsters scienter**

177. Defendant Angle's own statements show that he repeatedly held himself out as knowledgeable about the Merger, Amazon's and iRobot's cooperations with regulators, and the Merger's regulatory prospects.

178. On June 16, 2023, in a statement to the press following the Merger's approval from the CMA, Angle stated that "both companies are continuing to work cooperatively with other relevant regulators in their review of the merger[.]"

179. Similarly, on January 10, 2024, Angle told the press that iRobot "continues to work cooperatively with the [European Commission] and other regulators in their review of the merger . . . We remain excited about the opportunity to work together with Amazon to continue innovating, bringing valuable products to customers and making their lives easier."

180. Only two inferences are plausible: that Angle actually possessed the knowledge he claimed to have with respect to iRobot's and Amazon's interactions with regulators, and therefore knew the truth that the companies were uncooperative and obstructive with regulators, but concealed this from investors; or Angle, despite holding himself out as knowledgeable, recklessly chose not to inform himself of the truth and made no attempt to avoid misleading investors.

**F. The temporal proximity between Defendants' misleading statements and the disclosure of the truth bolsters scienter**

181. The temporal proximity between Defendants' misleading statements and the disclosure that Amazon and iRobot would abandon the Merger after facing disapproval from both the FTC and European Commission further supports scienter.

182. As late as November 27, 2023, iRobot was continuing to downplay the regulatory risks to the merger, and as late as January 10, 2024, Angle was reassuring investors that it was iRobot "continues to work cooperatively with the [European Commission] and other regulators in their review of the merger" and that the Company "remain[s] excited about the opportunity to work together with Amazon[.]"

183. One day later, it was reported that Amazon refused to offer ***any*** concessions to the European Commission, casting the Merger in doubt. Eight days later, it was reported that the European Commission would block the Merger, and less than three weeks later, iRobot and Amazon announced that they would abandon the $1.4 billion Merger. Thus, the temporal proximity of Defendants' statements to the ultimate abandonment of the Merger bolsters Defendants' scienter.

**G. iRobot's failure to pursue Merger Agreement remedies bolsters scienter**

184. Under the Merger Agreement, Amazon had an obligation to "defend through litigation on the merits and, if necessary, appeal any claim asserted in court or through administrative tribunal any Person or Governmental Authority in order to avoid entry of, or to have vacated, any Order (whether temporary, preliminary or permanent) that would prevent the Closing from occurring as promptly as practicable[.]"

185. Accordingly, iRobot had the right to insist that Amazon litigate to a final resolution any regulatory challenge to the Merger, including the lawsuits anticipated from the FTC and European Commission.

186. That iRobot elected to forego that remedy, avoiding the potential to receive Merger compensation worth exponentially more than the $94 million termination fee or its market capitalization as an independent entity, demonstrates that Defendants understood their complicity in the failed approach taken towards regulators.

**H. That Individual Defendants certified iRobot's filings to investors bolsters scienter**

187. Angle and Zeiler's actual knowledge of the falsity of the alleged misstatements and omissions is also established by their signing of certifications in connection with iRobot's filing of its Form 10-Qs and Form 10-Ks with the SEC. These certifications certified, among other things, that the filings "do[] not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [the Company's filings]."

188. If Angle and Zeiler had, in fact, made these assessments, then they were aware of the true risk to the Merger receiving regulatory approval from the FTC and European Commission, and should have informed investors of the truth. If they had not, then they were reckless in making such statements to investors.

**LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS**

189. Lead Plaintiff bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired iRobot securities during the Class Period (the "Class"); and were damaged upon the

revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

190. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, iRobot securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by iRobot or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

191. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

192. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

193. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of iRobot;
- whether the Individual Defendants caused iRobot to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of iRobot securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

194. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

195. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- iRobot securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiff and members of the Class purchased, acquired and/or sold iRobot securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

196. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

197. Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

198. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

199. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

200. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class

members, as alleged herein; (ii) artificially inflate and maintain the market price of iRobot securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire iRobot securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

201. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for iRobot securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about iRobot's potential merger with Amazon and the Company's business prospects.

202. By virtue of their responsibilities at iRobot, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

203. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of iRobot, the Individual Defendants had knowledge of the details of iRobot's internal affairs.

204. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their day-to-day control and authority over iRobot, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of iRobot. As senior officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to iRobot's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of iRobot securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning iRobot's business and financial condition which were concealed by Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired iRobot securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

205. During the Class Period, iRobot securities were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of iRobot securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or

otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of iRobot securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of iRobot securities declined sharply upon public disclosure of the facts alleged herein, and/or materialization of the risks concealed by Class Period misrepresentations and omissions, to the injury of Lead Plaintiff and Class members.

206. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

207. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

208. Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

209. During the Class Period, the Individual Defendants participated in the operation and management of iRobot, and conducted and participated, directly and indirectly, in the conduct of iRobot's business affairs. Because of their senior positions, they knew the adverse non-public information about iRobot's misstatement of income and expenses and false financial statements.

210. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to iRobot's financial condition and results of operations, and to correct promptly any public statements issued by iRobot which had become materially false or misleading.

211. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which iRobot disseminated in the marketplace during the Class Period concerning iRobot's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause iRobot to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of iRobot within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of iRobot securities.

212. Each of the Individual Defendants, therefore, acted as a controlling person of iRobot. By reason of their senior management positions and/or being directors of iRobot, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, iRobot to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of iRobot and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

213. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by iRobot.

## COUNT III

**(Violations of Section 14(a) of the Securities Exchange Act and Rule 14a-9 Promulgated Thereunder Against iRobot and Angle)**

214. Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

215. This Count is asserted against Defendants and is based upon Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder by the SEC, against the Company and Defendant Angle and does not sound in fraud. Lead Plaintiff does not allege that either iRobot or Angle acted with scienter or fraudulent intent with respect to this Count as that intent is not an element of a Section 14(a) claim.

216. SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

217. iRobot and Angle prepared, reviewed, and disseminated the Modified Merger Proxy Statement (¶¶130-32), which as specified above made false statements, omitted material information that was required to be set forth therein, and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

218. By virtue of his position within iRobot, Angle and iRobot were aware of the undisclosed or misrepresented information and of their duty to disclose this information in the Modified Merger Proxy Statement. The Modified Merger Proxy Statement was prepared, reviewed, and/or disseminated by iRobot and Angle. It misrepresented and/or omitted material facts, as detailed above. iRobot and Angle were at least negligent in filing the Modified Merger Proxy Statement with these materially false and misleading statements.

219. As a direct result of these iRobot and Angle's negligent preparation, review and dissemination of the Modified Merger Proxy Statement, members of the 14(a) Class were precluded from exercising their right to sell their shares and instead induced to vote their shares on a fully informed basis in favor of a Merger that was never going to gain regulatory approval, and subsequently experienced a significant decrease in the value of their shares once the Merger was abandoned. The Modified Merger Proxy Statement used to obtain shareholder approval of the merger deprived 14(a) Class members of their right to a fully informed shareholder vote in connection therewith, and deprived them of their right to the information necessary to make an informed redemption decision. At all times relevant to the dissemination of the Modified Merger Proxy Statement, iRobot and Angle were aware of and/or had access to the true facts concerning the Merger. Thus, as a direct and proximate result of the dissemination of the Modified Merger Proxy Statement that iRobot and Angle used to obtain shareholder approval of the merger, and to dissuade investors from selling their iRobot shares for a fair market value at the time, the 14(a) Class suffered damages and actual economic losses in an amount to be determined at trial.

220. The omissions and false and misleading statements in the Modified Merger Proxy Statement were material in that a reasonable stockholder would have considered them important in deciding how to vote on the merger. In addition, a reasonable investor would view a full and

accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

221. As stated herein, the Modified Merger Proxy Statement contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. It was an essential link in the consummation of the Merger, and described itself as the sole source of information investors were to rely upon in making the Merger vote decision. iRobot and Angle failed to correct the Modified Merger Proxy Statement prior to the merger vote or redemption deadline, and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

222. By reason of the foregoing, these Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated: July 19, 2024

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Christopher P.T. Tourek*
Christopher P.T. Tourek (*pro hac vice*)
Joshua B. Silverman (*pro hac vice*)
Genc Arifi (*pro hac vice* application forthcoming)
10 S. LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 229-8811
ctourek@pomlaw.com
jbsilverman@pomlaw.com
garifi@pomlaw.com

-and-

Emily C. Finestone (BBO #693684)
Jeremy A. Lieberman (*pro hac vice*)
J. Alexander Hood II (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
(212) 661-1100
efinestone@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com

*Counsel for Lead Plaintiff Premca Extra Income Fund LP and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I, Christopher P.T. Tourek, certify that this document filed on July 19, 2024 through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: July 19, 2024

*<u>/s/ Christopher P.T. Tourek</u>*
Christopher P.T. Tourek