UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
PREMCA EXTRA INCOME FUND LP,     )
individually and on behalf of    )
all others similarly situated,   )
                                 )
                Plaintiff,       )
                                 )
        v.                       )          CIVIL ACTION
                                 )          NO. 24-11158-WGY
IROBOT CORPORATION,              )
COLIN M. ANGLE, and              )
JULIE ZEILER,                    )
                Defendants.      )
_____ )
```

YOUNG, D.J.                                January 27, 2025

**MEMORANDUM AND ORDER**

## I. INTRODUCTION

For the reasons stated below, defendants iRobot Corporation ("iRobot" or "the Company"), Colin M. Angle ("Angle") and Julie Zeiler's ("Zeiler") Motion to Dismiss Premca Extra Income Fund's ("Premca") First Amended Complaint, ECF No. 50, is hereby ALLOWED and this action is DISMISSED with prejudice.

## II. BACKGROUND

### A. Procedural History

In this putative class action, Premca filed a First Amended Complaint, First Am. Compl. Violations of Fed. Securities Laws ("First Amended Complaint" or "FAC"), ECF No. 47, against

iRobot, Angle, and Zeiler (collectively "the Defendants").  The Defendants move to dismiss the First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, supported by a memorandum of law.  Defs.' Mot. Dismiss Am. Compl., ECF No. 50; Mem. Law Supp. Defs.' Mot. Dismiss Am. Compl. ("iRobot Mem."), ECF No. 51.  The motion is supported by exhibits.  App. Public Rs. Cited Mem. Law Supp. Defs.' Mot. Dismiss Am. Compl. ("iRobot Exhibits" or "iRobot Exs."), ECF No. 52.  Premca filed a memorandum of law in opposition.  Pls.' Opp'n Defs.' Mot. Dismiss ("Premca Opp'n"), ECF No. 59.  The Defendants filed a reply.  Reply Supp. Defs.' Mot. Dismiss ("Reply"), ECF No. 60.

The parties presented oral arguments at a hearing on October 28, 2024.  See Elec. Clerk Notes, ECF No. 61; Mot. Dismiss Tr., ECF No. 62.  The Court took the matter under advisement.  Id.

**B.  Facts Alleged in the First Amended Complaint[1]**

### 1. Merger Regulation Background in the United States and the European Union

When companies intend to merge, they must file a premerger notification report with the United States Federal Trade Commission's ("FTC") Bureau of Competition.  FAC ¶ 29.

---

[1]  The facts are taken virtually verbatim from the First Amended Complaint for completeness, but are not quoted for readability.

Submission of the report triggers a 30-day waiting period before the parties are allowed to effect the merger.  Id.  If the FTC determines during that period that further inquiry is necessary, the FTC issues a request for additional information and documentary material (a "Second Request").  Id. ¶ 31.  A Second Request extends the waiting period for a specified period of time, providing the FTC with the opportunity to analyze the information and to take appropriate action before a transaction is consummated.  Id.  If the FTC believes that a proposed transaction may substantially lessen competition, the agency may seek an injunction in federal district court to block the transaction.  Id.

In 2022, the FTC issued Second Requests in 0.8% of cases. Id. ¶ 32.  If the FTC determines that a merger is likely to create anticompetitive effects, the FTC will attempt to negotiate remedies with the merging parties to reduce or eliminate such effects.  Id. ¶ 33.  Throughout the FTC's review of a potential transaction, the FTC Bureau of Competition remains in regular contact with the merging companies.  Id.

In the European Union ("EU"), part of the EU's executive body, the European Commission ("EC"), regulates mergers.  Id. ¶ 34.  Under Council Regulation (EC) No. 139/2004 (the "Merger Regulation") the EC only examines mergers with an EU dimension that reach certain turnover (revenue) thresholds.  Id. ¶¶ 34-35.

If the merging companies exceed the turnover thresholds outlined in the European Commission's Merger Regulation, then it conducts a full investigation.  Id. ¶ 36.

The first step for any EU merger is for merging parties to notify the EC.  Id. ¶ 37.  The EC then has 25 working days to analyze the proposed merger during the first phase of the investigation ("Phase I").  Id. ¶ 38.  More than 90% of all cases are resolved in Phase I, generally without any requested alterations to the proposed merger.  Id.  A Phase I review generally will consist of requests for information from the merging companies and questionnaires to competitors and/or customers seeking their views on the merger.  Id.  The European Commission keeps the merging companies informed about the progress of the Phase I analysis and, toward the end of Phase I, holds a "state-of-play meeting" with the merging companies where the European Commission informs the companies of the results of the investigation.  Id.  Similar to the FTC process, if the European Commission has competition concerns, the merging companies are able to offer remedies, which can extend the Phase I deadline.  Id.  At the end of Phase I, the proposed merger is either cleared, or the EC will open a Phase II investigation ("Phase II").  Id.

Phase II is a more intensive analysis.  Id. at ¶ 39.  A Phase II review generally involves more extensive information

gathering, including companies' internal documents, extensive economic data, more detailed questionnaires to market participants, and/or on-site visits.  Id.  A Phase II review also analyzes claimed efficiencies which the companies assert could be obtained by the proposed merger.  Id.  Similar to the Phase I review, the EC updates the merging companies regularly about the process.  Id.  If the EC concludes that the proposed merger will likely impede competition, it sends a statement of objections to the merging companies, informing them of the EC's preliminary conclusions.  Id.  The merging companies then have the right to respond to a statement of objections in writing, consult the European Commission's case file, and request an oral hearing conducted independently by a competition hearing officer.  Id.

Following a Phase II investigation, the European Commission will (1) unconditionally clear the proposed merger to proceed, (2) approve the merger subject to remedies, or (3) prohibit the merger if no adequate remedies to the competition concerns have been proposed by the merging parties.  Id. ¶ 41.  In 2022, only 8 EC mergers, or 2.1%, involved a Phase II investigation.  Id. ¶ 40.

### 2. iRobot Background

iRobot was founded in 1990 by Angle, Helen Greiner and Rodney Brooks with a focus on developing and manufacturing

military and domestic robots.  Id. ¶ 45.  By early 2016,
iRobot's revenue was generated solely by its domestic line of
robotic vacuum cleaners ("RVCs"), mainly the Roomba.  Id. ¶ 48.
After rapidly rising to the top of the RVC market, iRobot's
dominant market share declined steadily beginning in 2014
through 2020.  Id. ¶ 49.

The COVID-19 pandemic briefly stemmed Roomba's decline.
Id. ¶ 50.  The pandemic bump soon waned, however, and iRobot's
revenue dropped almost as fast as it initially rose.  Id. ¶ 52.
In the quarters leading up to the merger with Amazon ("the
Merger"), iRobot's revenue and margins declined consistently.
Id. ¶ 53.

### 3. August 2022 –- The Merger is Announced

On August 5, 2022, iRobot announced its Merger with Amazon
through a press release and filed with the SEC in a Form 8-K,
stating:

> Today Amazon (NASDAQ:AMZN) and iRobot (NASDAQ:IRBT)
> announced that they have entered into a definitive
> merger agreement under which Amazon will acquire
> iRobot. . . .  Amazon will acquire iRobot for $61 per
> share in an all-cash transaction valued at
> approximately $1.7 billion, including iRobot's net
> debt.  Completion of the transaction is subject to
> customary closing conditions, including approval by
> iRobot's shareholders and regulatory approvals.  On
> completion, Colin Angle will remain as CEO of iRobot.

Id. ¶ 63.

The Amazon/iRobot merger agreement ("Merger Agreement") was filed with the 8K, dated August 4, 2022.  Id. ¶ 64.  The Merger Agreement provided that iRobot and Amazon would notify each other if any government entity made a request or commenced a proceeding related to the Merger, and would keep each other informed about the status of any governmental request.  Id. ¶ 64.

The Merger Agreement also stated, among other things, that iRobot and Amazon would use "reasonable best efforts" to complete the Merger and to obtain regulatory clearance and resolve regulatory objections, supply as promptly as reasonably practicable any additional information and documentary material requested or required, and contest any proceedings challenging the Merger.  Id. ¶ 66.

On August 5, 2022, iRobot separately filed a Form 8-K to announce its second quarter 2022 financial results.  Id. ¶ 67.  In that Form 8-K, iRobot announced that revenue for Q2 2022 was over $100,000,000 less than Q2 2021.  Id.  This poor financial news, however, was offset by iRobot's announcement of the Merger with Amazon, blunting its impact.  Id.  According to Confidential Witness 2 ("CW2"),[2] iRobot stopped hosting earnings

_____

[2]  iRobot employed CW2 from June 2017 to December 2023, first as a Senior Tax Manager for Global Finance, then during the Class Period as the Director of Global Finance.  FAC ¶ 69.  As the Director of Global Finance, CW2 reported directly to

calls at Zeiler's direction because it was in such a bad financial situation that it did not want to discuss its forecasts.  Id. ¶ 70.

On August 10, 2022, iRobot filed its Form 10-Q with the SEC for the second quarter of fiscal year 2022, which ended July 2, 2022 (the "Q2 2022 Form 10-Q").  Id. ¶ 71.  The Q2 2022 Form 10-Q was signed by Zeiler.  Id.  While these statements are not within the class period, iRobot discussed the Merger and its contingencies, stating, in relevant part:

> The Merger is conditioned upon, among other things, the approval of the Merger Agreement by the Company's stockholders, the expiration of the applicable waiting period (and any extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, certain other approvals, clearances or expirations of waiting periods under other antitrust laws and foreign investment laws, and other customary closing conditions.

Id.

The Q2 2022 Form 10-Q also discussed the risks related to the Merger, and stated, in relevant part:

> On August 4, 2022, we entered into the Merger Agreement with Amazon and Merger Sub, providing for the acquisition of iRobot by Amazon. Completion of the Merger is subject to the satisfaction of various conditions, including (1) the adoption of the Merger Agreement by a majority of the holders of the

---

Zeiler, who in turn reported to Angle.  Id.  CW2's job responsibilities included serving as the finance lead for mergers and acquisitions.  Id.  In 2023, CW2's responsibilities largely involved iRobot's global real estate. CW2 attended monthly Senior Leadership Team Meetings with the iRobot executive team, including Angle and Zeiler.  Id.

outstanding shares of our common stock, (2) the
expiration or early termination of the applicable
waiting period under the Hart-Scott-Rodino Antitrust
Improvements Act of 1976, as amended, and certain
other approvals, clearances or expirations of waiting
periods under other antitrust laws and foreign
investment laws, (3) the absence of any order,
injunction or law prohibiting the consummation of the
Merger, (4) the accuracy of the other party's
representations and warranties, subject to certain
materiality standards set forth in the Merger
Agreement, (5) compliance in all material respects
with the other party's obligations under the Merger
Agreement, and (6) no Material Adverse Effect (as
defined in the Merger Agreement) having occurred since
the date of the Merger Agreement that is continuing.
There is no assurance that all of the various
conditions will be satisfied, or that the Merger will
be completed on the proposed terms, within the
expected timeframe, or at all.  Furthermore, there are
additional inherent risks in the Merger, including the
risks detailed below.
        ***
        The Merger may be delayed, and may ultimately not
be completed, due to a number of factors, including:
        • the failure to obtain the approval of the
Merger Agreement by our stockholders;
        • the failure to obtain regulatory approvals from
various governmental entities (or the imposition of
any conditions, limitations or restrictions on such
approvals);
        • potential future stockholder litigation and
other legal and regulatory proceedings, which could
delay or prevent the Merger; and
        • the failure to satisfy the other conditions to
the completion of the Merger, including the
possibility that a Material Adverse Effect on our
business would permit Amazon not to close the Merger.
        If the Merger does not close, our business and
stockholders would be exposed to additional risks,
including:
        • to the extent that the current market price of
our common stock reflects an assumption that the
Merger will be completed, the price of our common
stock could decrease if the Merger is not completed;
        • investor confidence could decline, stockholder
litigation could be brought against us, relationships

with existing and prospective customers, distributors, retailers, service providers, investors, lenders and other business partners may be adversely impacted, we may be unable to retain key personnel, and profitability may be adversely impacted due to costs incurred in connection with the pending Merger;

• the requirement that we pay a termination fee of $56.0 million if the Merger Agreement is terminated in certain circumstances, including by the Company to enter into a superior proposal or by Amazon because the Board withdraws its recommendation in favor of the Merger.

Id. ¶ 72.

After the Merger was announced, antitrust experts anticipated stiff opposition from the FTC, and privacy activists mobilized to oppose the Merger, sending an open letter to the FTC to express their concerns two days after iRobot filed a proxy statement with the FTC on September 7, 2022. Id. ¶¶ 74, 76. Lawmakers in the United States also expressed opposition to the Merger due to concerns about competition in the home robotics market, Amazon's history of anti-competitive practices, and threats to consumer privacy. Id. ¶ 78.

### 4. September 2022 –– The FTC's Second Request

On September 19, 2022, the FTC sent a Second Request concerning the Merger. Id. ¶ 77. iRobot's public filings in the latter half of 2022 repeated the same risk warnings as before when discussing the Merger's regulatory prospects. Id. ¶

79.  During the latter half of 2022, iRobot's financial situation worsened.[3]  Id.  ¶ 80.

### 5. Early 2023 -- EC's Interest in the Merger

As 2023 began, the EC intensified its scrutiny of the Merger.  Id. ¶ 82.  This enhanced scrutiny followed an investigation by MIT Technology Review, published in December 2022, that detailed how a development version of a Roomba being tested by paid volunteers had captured intimate images. Id.; see Javier Espinoza & Dave Lee, EU set to investigate Amazon's $1.7bn purchase of Roomba-maker, Fin. Times (Feb. 15, 2023), https://www.ft.com/content/b05a1260-ee5a-4ac8-9a34-31cdb8104cf1. In a direct response to the privacy concerns sparked by the MIT Technology Review investigation, regulators sent Amazon a series of detailed questions about the proposed transaction.  FAC ¶ 82. This move was seen as a prelude to a formal probe by the European Commission.  Id.

---

[3]  According to Confidential Witness 1 ("CW1"), iRobot's Director of FP&A, Supply Chain and Digital Business from November 2021 until April 2024, iRobot missed internal sales forecasts for 18 months starting around the time the Merger was announced.  FAC ¶¶ 55-56.  CW1 stated that iRobot had extremely aggressive sales projections, but lacked a concrete plan to achieve those sales, and that Zeiler instituted this aggressive approach.  Id. ¶ 56.  CW1 further stated that the Roomba was no longer competitive and remained a high-end product that consumers did not want to purchase compared to lower-priced models.  Id.

According to Premca, because the Merger Agreement included a provision mandating that iRobot and Amazon would notify each other if any government entity made a request or commenced a proceeding related to the Merger, iRobot must have been aware of the EC's questions sent to Amazon.  Id.  According to Premca, iRobot refused to inform investors of the EC's actions or the increased scrutiny that the Merger was facing when it submitted its filings on iRobot's fourth quarter and full-year 2022 financial results between February 13 and February 14, 2023. Id. ¶ 84.

### 6. The Class Period Begins -- February 13, 2023

On February 13, 2023, iRobot filed its Form 8-K with the following risk disclosures:

> Important risk factors that may cause such a difference include, but are not limited to: (i) the ability of the parties to consummate the proposed transaction with Amazon.com, Inc in a timely manner or at all; (ii) the satisfaction (or waiver) of closing conditions to the consummation of the proposed transaction; (iii) potential delays in consummating the proposed transaction; (iv) the ability of the Company to timely and successfully achieve the anticipated benefits of the proposed transaction; (v) the occurrence of any event, change or other circumstance or condition that could give rise to the termination of the merger agreement; (vi) the impact of the COVID-19 pandemic and the current conflict between the Russian Federation and Ukraine on the Company's business and general economic conditions; (vii) the Company's ability to implement its business strategy; (viii) significant transaction costs associated with the proposed transaction; (ix) potential litigation relating to the proposed transaction; (x) the risk that disruptions from the

[12]

proposed transaction will harm the Company's business, including current plans and operations; (xi) the ability of the Company to retain and hire key personnel; (xii) potential adverse reactions or changes to business relationships resulting from the announcement or completion of the proposed transaction; (xiii) legislative, regulatory and economic developments affecting the Company's business; (xiv) general economic and market developments and conditions; (xv) the evolving legal, regulatory and tax regimes under which the Company operates; (xvi) potential business uncertainty, including changes to existing business relationships, during the pendency of the merger that could affect the Company's financial performance; (xvii) restrictions during the pendency of the proposed transaction that may impact the Company's ability to pursue certain business opportunities or strategic transactions; (xviii) unpredictability and severity of catastrophic events, including, but not limited to, acts of terrorism or outbreak of war or hostilities, (xviv) current supply chain challenges including current constraints in the availability of certain semiconductor components used in our products; (xx) the financial strength of our customers and retailers; (xxi) the impact of tariffs on goods imported into the United States; and (xxii) competition, as well as the Company's response to any of the aforementioned factors.

Id. ¶ 86 ("Statement No. 1").

Premca alleges that the above statements were materially false or misleading when made because the statements failed to disclose the following purportedly material adverse information necessary to make the statement not misleading:

(a) the European Commission had increased its scrutiny of the Merger after the MIT exposé in December 2022 and sent Amazon detailed questions over the Merger which were not resolved, increasing the regulatory threat to the Merger;

[13]

(b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition;

(c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely;

(d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger;

(e) as a result of all the foregoing, iRobot materially understated the regulatory threat to the Merger;

Id. ¶ 87.

On February 14, 2023, iRobot filed its Form 10-K with the SEC for its fourth quarter and full-year 2022 financial results, ended December 31, 2022 (the "2022 Form 10-K"). Id. ¶ 88. The 2022 Form 10-K was signed by Angle. Id. Therein, the Company discussed the Merger and, in a purported "carbon-copy" statement of risks compared to previous SEC disclosures. Id. ¶¶ 88 ("Statement No. 2"), 89 ("Statement No. 3"). Appended as exhibits to the 2022 Form 10-K were signed certifications by Zeiler and Angle. Id. ¶ 91 ("Statement No. 4").

According to Premca, the 2022 Form 10-K statements were materially false or misleading when made because:

(1) iRobot and Amazon were not "work[ing] cooperatively" with governmental regulators, but

[14]

instead taking an adversarial approach and refusing to provide requested information or answer regulators' questions; and

(2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission had increased its scrutiny of the Merger after the MIT exposé in December 2022 and sent Amazon detailed questions over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger.

Id. ¶¶ 90, 92.  Despite iRobot's poor quarter, the Company's stock price remained steady.  Id. ¶ 93.

### 7. Amazon, Purportedly with iRobot's Knowledge, Engages in a Strategy of Obstruction and Non-Cooperation

On March 20, 2023, Politico reported on the FTC's investigations into Amazon, including on its proposed Merger with iRobot, and stated that the FTC was weighing whether to challenge the Merger and was leaning towards suing to stop the Merger.  Id. ¶ 94.  While the FTC had not yet decided whether to sue to block the Merger, the article cited FTC staff raising competition and privacy concerns.  Id.  Notably, despite iRobot

[15]

and Amazon's commitment in the Merger Agreement to use "reasonable best efforts" to obtain regulatory clearance and to "supply as promptly as reasonably practicable any additional information and documentary material" requested or required, the article reported that Amazon had been "largely unresponsive to the FTC's investigation" and "refus[ed] to turn over information requested by the FTC." Id. This article relied entirely on unnamed sources. Id.

Premca asserts that pursuant to the Merger Agreement and its commitment for Amazon and iRobot to share information related to governmental requests about the Merger, iRobot would have known about both the FTC's requests and Amazon's refusal to cooperate. FAC ¶ 94. Neither company admitted to the facts asserted in the Politico article, and Amazon claimed it was, in fact, cooperating. Id.

Sometime in May 2023, according to CW2, at a Senior Leadership Team Meeting with Angle and Zeiler, iRobot's Chief Legal Officer, Glen Weinstein ("Weinstein"), announced to iRobot employees that European Commission regulators had asked Amazon for information on how its search engine worked, due to antitrust concerns over Amazon boosting its own products at the expense of competitors, and Amazon steadfastly refused to cooperate with regulators' requests. Id. ¶ 95.

On May 9, 2023, iRobot filed a Form 8-K announcing its first quarter 2023 financial results. Id. ¶ 96. In that Form 8-K, iRobot informed investors that the Company's revenue continued to decline. Id. The May 9th Form 8-K did not disclose any increase in regulatory risks, instead repeating the same "boilerplate" risk warnings that were issued in August 2022 after the Merger was announced. Id. ¶ 97 ("Statement No. 5"). According to Premca, these statements were materially false or misleading when made because they failed to disclose the following material adverse information necessary to make the statements not misleading:

> (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger;

> (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition;

> (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely;

> (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger[.]

Id. ¶ 98.

On May 9, 2023, iRobot also filed its Form 10-Q with the SEC for the first quarter of fiscal year 2023, ended April 1, 2023 (the "Q1 2023 Form 10-Q").  The Q1 2023 Form 10-Q was signed by Zeiler.  Id. ¶ 99 ("Statement No. 6").  Appended as exhibits to the Q1 2023 Form 10-Q were signed certifications by Zeiler and Angle.  Id ¶ 102 ("Statement No. 7").

Premca asserts that the above statements were materially false or misleading when made because:

(1) iRobot and Amazon were not "work[ing] cooperatively" with governmental regulators, but instead taking an adversarial approach in refusing to provide requested information or answer regulators' questions; and

(2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading:

(a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger;

(b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition;

(c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely;

(d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and

instead had refused to respond to the regulatory
requests for information, thereby increasing the
likelihood that regulators would oppose the
Merger[.]

Id. ¶¶ 100, 103.

According to Premca, despite iRobot issuing another quarter
of poor results, the Company's stock price remained artificially
high because investors expected the Merger's approval.  Id. ¶
104.  According to one analyst report, the stock remained in
"limbo" as the FTC evaluated the Merger.  Id. (citation
omitted).

### 8. The Purported True Risk of Amazon's Non-Cooperation and Regulatory Disapproval Starts to Be Revealed as the EC Announces a Full-Scale Investigation

On June 1, 2023, almost a year after iRobot announced its
Merger with Amazon, the companies officially notified the EC of
the Merger.  Id. ¶ 105.  Shortly thereafter, the EC initiated
its Phase I review.  Id.

On June 16, 2023, Reuters reported that the Merger was
cleared to proceed by the United Kingdom.  Id. ¶ 106.  The
article quoted the defendant Angle as confirming that "both
companies are continuing to work cooperatively with other
relevant regulators in their review of the merger."  Id.
("Statement No. 8").  News of the United Kingdom's Competition
and Markets Authority ("UK CMA") clearance was almost
immediately undercut by commentators at the time.  Id. ¶ 108.

[19]

On June 22, 2023, shortly after markets opened, news outlets reported that the EC was planning to launch a full-scale investigation into the Merger. <u>Id.</u> ¶ 109. iRobot's stock price fell from $49.66 by $5.17, or 10.4%, to a low of $44.49, before rebounding to close at $45.41 on June 22, 2023. <u>Id.</u> ¶ 110. Premca, however, claims that iRobot shares continued trading at artificially inflated prices throughout the remainder of the Class Period due to the Defendants' continued misstatements and omissions concerning the Merger, Amazon and iRobot's interactions with regulators, and the Merger's true regulatory prospects. <u>Id.</u>

On July 6, 2023, the EC issued a press release confirming that it had initiated a Phase II review of the Merger. <u>Id.</u> ¶ 111.

### 9. iRobot's Financial Issues Require Additional Credit and a Modification to the Merger Agreement

On July 24, 2023, iRobot filed a Form 8-K announcing that it had entered into a credit agreement with TCG Senior Funding L.L.C. for a loan of $200,000,000. <u>Id.</u> ¶ 112. The credit agreement was necessary because of iRobot's continued dwindling cash reserves and delay in the Merger's regulatory approval. <u>Id.</u>

On July 25, 2023, iRobot and Amazon issued a joint press release (the "Modified Merger Announcement") "announc[ing] that

they [had] agreed to amend the existing terms of their merger agreement to reflect a change to the price per share" whereby "Amazon [would] pay $51.75 per share revised from $61.00 per share" (the "Amended Merger Agreement").  Id. ¶ 113.  The Modified Merger Announcement purportedly downplayed the European Commission's investigation into the Merger, stating, in relevant part, that "[c]ompletion of the transaction remains subject to customary closing conditions, including regulatory approvals and approval of the amended merger agreement by iRobot's stockholders"; and that "Amazon and iRobot are working cooperatively with the relevant regulators in their review of the merger."  Id. ("Statement No. 9").

### 10. Amazon and iRobot Begin to Halt Integration Meetings

Right after the Merger was announced, Amazon and iRobot began to conduct monthly (and sometimes weekly) meetings to address integration.  Id. ¶ 116.  The two companies had separate meetings for nine different work streams, including finance, production, research and development, and real estate.  Id.  CW2 routinely attended the monthly real estate integration meeting.  Id.  According to that confidential witness, however, in August 2023, shortly after the EC announced its formal probe of the Merger, the real estate integration meetings ceased.  Id.

Confidential Witness 3 ("CW3")[4] purportedly "corroborated" CW2, apparently in reference to CW2's statement that real estate integration meetings had stopped.  Id. ¶ 118.  According to CW3, employees in iRobot's software engineering department stopped working on all integration matters with Amazon in August 2023. Id.

At the same time that Amazon and iRobot were supposedly closing down integration meetings, according to CW3, Weinstein stated during a meeting with Angle, Zeiler, and other iRobot executives that Amazon was refusing to cooperate with the EU Commission.  Id. ¶ 119.  Specifically, Weinstein announced that the EC had requested information about how Amazon's search engine worked, in order to determine whether Amazon was favoring its internal products to the detriment of competition, but Amazon refused to cooperate or share that information.  Id. Nevertheless, when speaking with investors, the Defendants failed to disclose this purportedly heightened risk.  Id. Premca claims that although the purported refusal to cooperate threatened Merger approval, the Defendants continued to "parrot"

---

[4]  iRobot employed CW3 from April 2021 to May 2024 as a director-level employee.  FAC ¶ 117.  CW3's job responsibilities included overseeing the Company's user experience and software design.  Id.

their expectation that regulators would approve the Merger, and mislead investors about cooperation. Id.

On August 8, 2023, iRobot filed a Form 8-K, announcing its second quarter 2023 financial results. Id. ¶ 120. iRobot informed investors of its amendment to the Merger Agreement to lower the acquisition price. Id. ("Statement No. 10"). When discussing risks with the Company, iRobot restated the "carbon-copy" risks that it had used since the beginning of the Class Period. Id. ¶ 122 ("Statement No. 11").

That same day, iRobot also filed its Form 10-Q with the SEC for the second quarter of fiscal year 2023, which ended July 1, 2023 (the "Q2 2023 Form 10-Q"). Id. ¶ 124. ("Statement No. 12"). When discussing the risks to the iRobot, iRobot repeated the same risk warnings that it had used right after the Merger was announced. Id. ¶ 126 ("Statement No. 13"). Appended as exhibits to the Q2 2023 Form 10-Q were signed certifications by Zeiler and Angle. Id. ¶ 128 ("Statement No. 14").

According to Premca, the August 8, 2023 statements were materially false and/or misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading:

> (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and

[23]

requests for information over the Merger which were
not resolved, increasing the regulatory threat to the
Merger;

(b) regulators had expressed concern that the Merger
would allow Amazon and iRobot to exercise significant
control over the RVC market, threatening competition;

(c) the Merger faced significant resistance from
regulators at the FTC and European Commission due to
antitrust and privacy concerns that were expressed to
Merger participants and known internally at iRobot,
making its approval unlikely;

(d) Amazon, with iRobot's knowledge, was not
cooperating with governmental regulators, and instead
had refused to respond to the regulatory requests for
information, thereby increasing the likelihood that
regulators would oppose the Merger;

(e) Amazon and iRobot ceased holding integration
meetings between the companies, indicating an
increased pessimism over the Merger receiving
regulatory approval[.]

Id. ¶¶ 123, 125, 127, & 129.

On August 24, 2023, iRobot filed a definitive proxy

statement (the "Modified Merger Proxy Statement") with the SEC

on Form DEFM14A, signed by Angle, in connection with the Amended

Merger Agreement.  Id. ¶ 130.  The Modified Merger Proxy

Statement used substantially similar language as the original

Proxy Statement.  Id. ("Statement No. 15").

According to Premca, the above statements were materially

false and/or misleading when made because:

(1) iRobot and Amazon did not subjectively expect that
the Merger would receive all regulatory approvals, as
reflected in their decision to cease many integration
activities;

(2) iRobot had no reasonable basis that the Merger would be approved, since it and Amazon ceased "work[ing] cooperatively" with governmental regulators and adopted an adversarial approach, refusing to provide requested information or answer regulators' questions;

(3) "intensifying competitive conditions" did not support Merger, but instead, regulators had expressed concerns over the Merger worsening competitive conditions; and

(4) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger; (b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (e) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval[.]

Id. ¶ 132.

In addition, the Modified Merger Proxy Statement told investors that Company management's and the Board's review of "intensifying competitive conditions" in iRobot's market weighed in favor of the Merger's approval.  Id. ¶ 131 ("Statement No.

[25]

16."). On October 12, 2023, iRobot shareholders voted in favor of the Merger. Id.

On August 29, 2023, the EC suspended the Merger's Phase II deadline so that regulators could obtain additional information on the Merger. Id. ¶ 133. The EC ultimately gained the requested information and formally restarted the clock on its Phase II investigation of the Merger on October 19, 2023, and set a deadline of February 14, 2024 to decide whether or not to approve the Merger. Id.

### 11. In Fall 2023, the Merger's Failure to Obtain Regulatory Approval Purportedly Appears Likely to iRobot Executives

According to CW2, in September 2023, during monthly Senior Leadership Team Meetings, iRobot executives internally formulated plans for the business without the Merger. Id. ¶ 134. This allegedly reflected a growing understanding within the Company that the Merger was unlikely to be approved by regulators. Id.

Further, in August 2023, the long-time Amazon executive who led Amazon's push for the Merger, Senior Vice President of Devices and Services Dave Limp, announced his plans to leave Amazon. Id. ¶ 135. In September 2023, it was announced that he would be replaced by Panos Panay ("Panay"), who was less supportive of the Merger. Id. Panay took full control as Amazon's Senior Vice President of Devices and Services by

October 2023.  Id.  At that time, all remaining integration meetings between Amazon and iRobot ceased.  Id.

According to Confidential Witness 4 ("CW4"),[5] who attended weekly and monthly integration meetings, by October 2023 all integration meetings between iRobot and Amazon had stopped, indicating that iRobot no longer believed that the Merger would receive regulatory approval.  Id. ¶ 137.

On November 7, 2023, iRobot filed its Form 10-Q with the SEC for the third quarter of fiscal year 2023, which ended September 30, 2023 (the "Q3 2023 Form 10-Q").  Id. ¶ 138 ("Statement No. 17").  Further, when discussing the risks to the Merger, the Company used the same language it had used throughout the Class Period with little alteration.  Id. ¶ 140 ("Statement No. 18").  Appended as exhibits to the Q3 2023 Form 10-Q were signed certifications by Zeiler and Angle.  Id. ¶ 142 ("Statement No. 19").

According to Premca, these statements were materially false or misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading:

---

[5]  iRobot employed Confidential Witness 4 ("CW4") as a Senior Project Manager between June 2020 and May 2024.  FAC ¶ 136.  CW4's job responsibilities included overseeing iRobot's then-burgeoning subscription business and assisting with iRobot's mergers and acquisitions.  Id.

(a) the European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger;

(b) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition;

(c) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely;

(d) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger;

(e) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval;

(f) iRobot began, for the first time, to formulate alternative plans for the Company in September 2023 in preparation for the Merger to be rejected by regulators[.]

Id. ¶¶ 139, 141, 143.

### 12. The Purported "Full Truth" is Gradually Revealed

On November 27, 2023, the European Commission issued a press release, entitled "Commission sends Amazon Statement of Objections over proposed acquisition of iRobot," describing its objections to the merger. Id. ¶ 144. In response, iRobot filed a Form 8-K on the same day announcing the same and relating the

relevant timeline.  Id. ¶ 145 ("Statement No. 20").  iRobot

again repeated the same risk warnings that it had used

throughout the Class Period.  Id. ¶ 146 ("Statement No. 21").

According to Premca, these statements were false and/or

misleading when made because they failed to disclose the

following material adverse information necessary to make the

statements not misleading:

> (a) regulators had expressed concern that the Merger
> would allow Amazon and iRobot to exercise significant
> control over the RVC market, threatening competition;
>
> (b) the Merger faced significant resistance from
> regulators at the FTC and European Commission due to
> antitrust and privacy concerns that were expressed to
> Merger participants and known internally at iRobot,
> making its approval unlikely; (c) Amazon, with
> iRobot's knowledge, was not cooperating with
> governmental regulators, and instead had refused to
> respond to the regulatory requests for information,
> thereby increasing the that regulators would oppose
> the Merger; (d) Amazon and iRobot ceased holding
> integration meetings between the companies, indicating
> an increased pessimism over the Merger receiving
> regulatory approval; (e) iRobot began, for the first
> time, to formulate alternative plans for the Company
> in September 2023 in preparation for the Merger to be
> rejected by regulators; (f) Amazon did not plan to
> offer any concessions to regulators in order to
> appease their objections to the Merger, increasing the
> likelihood that regulators would oppose the Merger[.]

Id. ¶ 147.  Upon news of the EC's objections, iRobot's

stock price fell 26%, to a low of $31.13 before rebounding

to close at $34.35 on November 27, 2023.  Id. ¶ 148.

On December 12, 2023, it was announced that Amazon would

defend the Merger at a closed European Commission hearing on

December 18, 2023.  Id. ¶ 149.  According to Premca, pursuant to
the Merger Agreement's cooperation provision, iRobot would have
been informed of Amazon's plans for the December 18, 2023
hearing, coordinated strategy, and been debriefed on the hearing
itself.  Id.

On January 10, 2024, during intraday trading hours, news
outlets reported that Amazon refused to offer concessions to
address concerns raised by the European Commission.  Id. ¶ 150.
One such article published that day by Politico, entitled
"Amazon skips concessions to EU on iRobot deal," reported, in
relevant part:

> Amazon didn't offer concessions to the European
> Commission to try to garner approval for its planned
> $1.4 billion takeover of robot vacuum cleaner maker
> iRobot.
> The European Union's webpage on the deal shows
> that the companies didn't make an offer by the end of
> the day on Wednesday, its last chance to tackle
> European Union objections that Amazon could hamper
> rival vacuum cleaners' sales on Amazon's online
> marketplace. Regulators have said the sales platform
> is a particularly important sales channel for the
> product.
>     * * *
> iRobot's [CEO Defendant] Angle said in a
> statement that the company "continues to work
> cooperatively with the [European Commission] and other
> regulators in their review of the merger . . . We
> remain excited about the opportunity to work together
> with Amazon to continue innovating, bringing valuable
> products to customers and making their lives easier."

Id. ¶ 150 ("Statement No. 22").  According to Premca, the above statements were materially false or misleading when made because:

> (1) contrary to Angle's statements, the companies were not working cooperatively with regulators, but instead refusing to respond to regulators' investigation and requests for information, and refused to offer any concessions to regulators; and

> (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) regulators had expressed concern that the Merger would allow Amazon and iRobot to exercise significant control over the RVC market, threatening competition; (b) the Merger faced significant resistance from regulators at the FTC and European Commission due to antitrust and privacy concerns that were expressed to Merger participants and known internally at iRobot, making its approval unlikely; (c) Amazon, with iRobot's knowledge, was not cooperating with governmental regulators, and instead had refused to respond to the regulatory requests for information, thereby increasing the likelihood that regulators would oppose the Merger; (d) Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval; (e) iRobot began, for the first time, to formulate alternative plans for the Company in September 2023 in preparation for the Merger to be rejected by regulators; (f) Amazon refusal to offer any concessions to regulators in order to appease their objections to the Merger significantly increasing the likelihood that regulators would oppose the Merger[.]

Id. ¶ 151.

On this news, iRobot's stock price fell from $36.99 by $7.99, or 21.6%, to $29, before rebounding to close at $29.75 per share on January 10, 2024.  Id. ¶ 152.

On January 11, 2024, the EU Competition Commissioner Margaret Vestager confirmed to Bloomberg that no concessions were offered with respect to the Merger.  Id. ¶ 153.

On January 18, 2024, during post-market hours, the Wall Street Journal published an article (the "WSJ Article") entitled "EU Commission Intends to Block Amazon's iRobot Acquisition," which stated, in relevant part:

> The European Union's competition watchdog intends to block Amazon's $1.7 billion bid to purchase Roomba maker iRobot, people familiar with the matter said.
>
> Competition officials from the European Commission, the bloc's executive body, met Thursday with representatives from Amazon to discuss the deal, one of those people said.  Amazon was told during the meeting that the deal was likely to be rejected, the person said.  Amazon declined to comment.
>
> The plan to reject the deal would still need formal approval from the commission's 27 top political leaders before a final decision can be issued. Historically, that process is unlikely to overrule a recommendation from the bloc's competition commissioner, Margrethe Vestager.  The commission has a Feb. 14 deadline for its final decision.

Id. ¶ 154.

Also on January 18, 2024, during post-market hours, Bloomberg published an article entitled "Amazon's $1.4 Billion iRobot Deal to Be Blocked by EU Antitrust Watchdog" (the "Bloomberg Article"), which corroborated the findings of the earlier WSJ Article.  Id. ¶ 155.

The next day, during intraday trading hours, Bloomberg updated the Bloomberg Article, reporting that the FTC was drafting a lawsuit to block the Merger, stating, in relevant part:

> The deal is likely to face opposition in the US as well. According to people familiar with the matter, the [FTC] has been drafting a lawsuit that would seek to block the acquisition.  The FTC's three commissioners haven't yet voted on a challenge nor had a final meeting with Amazon to discuss the potential case, said the people, who asked not to be named discussing an ongoing probe.

Id. ¶ 156.

On January 24, 2024, representatives from iRobot attended a closed meeting with the FTC.  Id. ¶ 158.  No details emerged from the meeting at the time, but it was later revealed that Amazon also attended a meeting with the FTC around the same time in which the FTC informed Amazon that it planned to vote to sue to block the Merger.  Id.  Either at its own meeting with the FTC or, pursuant to the Merger Agreement's cooperation provision, through communication with Amazon, the Defendants were allegedly informed that the FTC would oppose the Merger. Id.

On January 29, 2024, during pre-market hours, Amazon and iRobot issued a joint press release entitled "Amazon and iRobot Agree to Terminate Pending Acquisition," announcing their entry

"into a mutual agreement" to terminate the Merger.

Specifically, that press release stated, in relevant part:

> Today Amazon . . . and iRobot . . . announced
> that they have entered into a mutual agreement to
> terminate their previously announced acquisition
> agreement, originally signed on August 4, 2022, under
> which Amazon would have acquired iRobot for cash
> consideration.
>         * * *
> The companies have signed a termination agreement
> that resolves all outstanding matters from the
> transaction, including Amazon paying iRobot the
> previously agreed upon termination fee.

Id. ¶ 159.

Pursuant to the Merger Agreement, iRobot received a cash
infusion in the form of a $94,000,000 termination fee from
Amazon.  Id. ¶ 160.

Also on January 29, 2024, during pre-market hours, iRobot
issued a press release entitled "iRobot Announces Operational
Restructuring Plan to Position Company for the Future," which,
among other things, reported that the Company would reduce its
workforce by "approximately 350 employees, which represents 31
percent of the Company's workforce as of December 30, 2023," and
that, "[a]s part of this workforce reduction, iRobot expects to
record restructuring charges totaling between $12 million and
$13 million, primarily for severance and related costs, over the
first two quarters of 2024, with the majority of the
restructuring charges anticipated in the first quarter of 2024."
The same press release also disclosed that "[c]oncurrent with

the implementation of its operational restructuring plan . . . [Defendant] Angle, Chairman of the Board . . . and CEO, has stepped down as Chairman and CEO." Id. ¶ 161.

Later that same day, Reuters published an article entitled "Amazon, Roomba-parent iRobot abandon $1.4 billion merger deal," which revealed, inter alia, that FTC staff had notified Amazon the week before that it planned to block the Merger, stating, in relevant part:

> Separately, the [FTC] was poised to reject Amazon's deal before the companies announced they were abandoning it, a source told Reuters.
> * * *
> The FTC staff met with Amazon last week to inform them they planned to recommend the commission vote to sue to block the acquisition, the source added, saying the commission was set to hold a final meeting on Monday with Amazon before the commission could have voted to approve a legal challenge to the merger.

Id. ¶ 162.

## III. ANALYSIS

### A. Motion to Dismiss Standard and Securities Act Pleading Standards

In order to withstand a motion to dismiss, Premca's FAC must "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). That is, Premca's FAC must include sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). Under this standard, the Court must "accept well-pleaded factual allegations in [Premca's

FAC] as true and view all reasonable inferences in [its] favor." Zhou v. Desktop Metal, Inc., 120 F. 4th 278, 287 (1st Cir. Oct. 28, 2024) (quoting ACA Financial Guaranty Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008)).  The Court does not, however, "draw unreasonable inferences or credit bald assertions [or] empty conclusions," Guilfoile v. Shields, 913 F.3d 178, 186 (1st Cir. 2019) (quoting Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018)), and disregards allegations that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (cleaned up).  As set forth below, "[b]ecause [Premca] brought federal securities fraud claims, several additional legal standards apply." Zhou, 120 F. 4th at 287.

      "To state a claim under section 10(b), [the FAC] must allege: '(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.'" Quinones v. Frequency Therapeutics, Inc., 106 F. 4th 177, 182 (1st Cir. 2024) (quoting In re Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017)).  "Further, under Rule 9(b) [of the Federal Rules of Civil Procedure], as with all fraud claims, [Premca] is required to plead the circumstances of the securities fraud with particularity. . . . And, under the

[Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, Premca] must 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" Zhou, 120 F. 4th at 287 (quoting ACA Fin. Guar. Corp., 512 F.3d at 58). The First Circuit "has been notably strict and rigorous in applying the Rule 9(b) standard in securities fraud actions." Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999) (citing Maldonado v. Dominguez, 137 F.3d 1, 9 (1st Cir. 1998)). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). This Circuit has interpreted Rule 9(b) to require "specification of the time, place, and content of an alleged false representation." Greebel, 194 F.3d at 193 (quoting McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 228 (1st Cir. 1980)).

Here, iRobot successfully challenges elements one (falsity) and two (scienter). iRobot Mem. 2-3. Both elements are addressed below.

### B.   Material Misrepresentation/Omission Element

"The securities statutes seek to maintain public confidence in the marketplace." Dura Pharmaceuticals, Inc. v. Broudo, 544

U.S. 336, 345 (2005).  Securities statutes "make the . . .

actions available, not to provide investors with broad insurance

against market losses, but to protect them against those

economic losses that misrepresentations actually cause." Hill

v. Gozani, 638 F.3d 40, 53-54 (1st Cir. 2011) (alterations in

original) (quoting Dura Pharm., 544 U.S. at 345).  "To survive a

motion to dismiss, [Premca] 'must show that defendants made a

materially false or misleading statement or omitted to state a

material fact necessary to make a statement not misleading.'"

Quinones v. Frequency Therapeutics, Inc., 665 F. Supp. 3d 156,

167 (D. Mass. 2023) (quoting Ganem v. InVivo Therapeutics

Holdings Corp., 845 F.3d 447, 454 (1st Cir. 2017)).  The

pleading standard is stiff, requiring that Premca "specify **each**

statement alleged to have been misleading [and] **the reason or**

**reasons why the statement is misleading.**'"  Id. at 168

(alteration in original) (quoting Ganem, 845 F.3d at 455).

"Importantly, section 10(b) and Rule 10b-5 only prohibit

omissions that engender 'half-truths.'"  Zhou, 120 F. 4th at 292

(quoting Macquarie Infrastructure v. Moab Partners, L. P., 601

U.S. 257, 263 (2024)).  Indeed, "section 10(b) and Rule 10b-5

'do not create an affirmative duty to disclose any and all

material information.'"  Id. (quoting Matrixx Initiatives, Inc.

v. Siracusano, 563 U.S. 27, 44 (2011)).  Said another way, "[a]n

omission, even if material, is actionable only if it 'renders

affirmative statements made misleading.'" Id. (quoting
Macquarie Infrastructure, 601 U.S. at 265).  As to materiality,
"a fact or omission is material if a 'reasonable investor would
have viewed it as having significantly altered the total mix of
information made available.'"  Id. (quoting Ponsa-Rabell v.
Santander Sec. LLC, 35 F. 4th 26, 33 (1st Cir. 2022)).

    iRobot categorizes the 22 alleged statements identified
above into five somewhat overlapping groups, four of which are
analyzed here:

> (1)  statements that iRobot and Amazon were "working
>       cooperatively" with regulators (Statement Nos. 2
>       (FAC ¶ 88), 6 (FAC ¶ 99), 8 (FAC ¶ 106), 9 (FAC ¶
>       113), 15 (FAC ¶ 130), and 22 (FAC ¶ 150));
>
> (2)  statements describing the status of the Merger
>       and the antitrust reviews (Statement Nos. 2 (FAC
>       ¶ 88), 5 (FAC ¶ 97), 6 (FAC ¶ 99), 9 (FAC ¶ 113),
>       10 (FAC ¶ 120), 12 (FAC ¶ 124), 15 (FAC ¶ 130),
>       16 (FAC ¶ 131); 17 (FAC ¶ 138), 18 (FAC ¶ 140),
>       and 20 (FAC ¶ 145));
>
> (3)  risk factor disclosures about the Merger
>       (Statement Nos. 1 (FAC ¶ 86), 3 (FAC ¶ 89), 5
>       (FAC ¶ 97), 11 (FAC ¶ 122), 13 (FAC ¶ 126), 15
>       (FAC ¶ 130), 18 (FAC ¶ 140), and 21 (FAC ¶ 146));
>
> (4)  Sarbanes-Oxley Act ("SOX") certifications
>       (Statement Nos. 4 (FAC ¶ 91), 7 (FAC ¶ 102), 14
>       (FAC ¶ 128), and 19 (FAC ¶ 142)).

iRobot Mem. 8 (citing FAC ¶¶ 86-150).[6]

---

[6]  Although iRobot argues that certain statements are
optimistic and forward-looking statements about the Merger are
not actionable as opinion or under the PSLRA's safe harbor
provision, the Court need not evaluate reach these issues
because "this Court concludes that the facts alleged in the

### 1.    Cooperation with Regulators Statements

Premca argues that statements relating to cooperation with regulators are, in general, actionable, citing Ho v. Duoyuan Glob. Water, Inc., 887 F. Supp. 2d 547, 571-72 (S.D.N.Y. 2012) (finding actionable claims based on misrepresentations of "full" cooperation with audit), and Special Situations Fund III, L.P. v. American Dental Partners, Inc., 775 F. Supp. 2d 227, 241-42 (D. Mass. 2011) (finding actionable claims based on misrepresentation that defendants' conduct toward business partner had not changed).  Premca Opp'n 8-9.  There is no real dispute that claims concerning cooperation in a merger **could** be actionable in theory.  Premca's claim is that iRobot was aware that Amazon was, from the outset and through the Class Period, not cooperating with regulators in the face of increasing regulatory and public pressure against the Merger, and that therefore its SEC filings and public statements at issue here were false or misleading.  Id.

iRobot argues that the allegations based on cooperation statements (Statement Nos. 2 (FAC ¶ 88), 6 (FAC ¶ 99), 8 (FAC ¶ 106), 9 (FAC ¶ 113), 15 (FAC ¶ 130), and 22 (FAC ¶ 150)) are

[FAC] do not plausibly show that the defendants made materially false or misleading statements or omissions, nor do they establish a strong inference of scienter."  Brill v. Invivyd, Inc., No. 1:23-CV-10254-JEK, 2024 WL 4228832, at *7 (D. Mass. Sept. 18, 2024) (Kobick, J.).

unsupported by plausibly pleaded facts, supported by
confidential witnesses whose allegations fail under the "hard
look" that the First Circuit prescribes, and supported by
speculative news articles.  iRobot Mem. 9.

    As an initial matter, the parties devote much argument to
the definition of the word "cooperation."  See Premca Opp'n 9-
13; Reply 1-3.  Premca claims that arguments about the
definition of cooperation result in a fact question that must be
resolved at the merits stage.  Premca Opp'n 9 (citing Gerneth v.
Chiasma, Inc., 2018 WL 935418, at *5 (D. Mass. Feb. 15, 2018)
(Casper, J.) (noting, regarding a dispute as to the materiality
of a regulator's reservations, that "the Court cannot consider
that disputed issue of fact on a motion to dismiss")).  To be
sure, "cooperate," "cooperation," "cooperative," and "working
cooperatively" have meanings that are highly context-dependent.
Nevertheless, in the context of an antitrust regulator's review
of a merger, iRobot is correct to observe, relying on the FTC
merger guidance materials, that "working cooperatively" or
"cooperation" is not equivalent to the "total capitulation"
definition argued for by Premca.  Reply 1.

    The Court, however, need not get into the definitional
weeds as to cooperation, because it is the paucity of plausibly
pleaded facts, not the definition of "cooperation," that makes
the FAC deficient.  As iRobot persuasively argues, "[t]he

[41]

failure to allege particularized facts supporting falsity is not
an evidentiary matter, but is instead a facial pleading
deficiency under the PSLRA and Rule 9(b)."  Reply 6.  Premca's
pleading problem is that it identifies discrete, though
imprecise, points in time that Amazon purportedly did not
provide certain information to the EC, without any context
behind the request or the refusal that would make the alleged
lack of "cooperation" grounds for an action of fraud.

### a.    EC Cooperation

Premca argues that the following virtually identical
statements indicate a lack of cooperation by Amazon:

(1) a June 16, 2023 statement attributed to Angle in a
Reuters article discussing the UK CMA's approval of
the Merger in which he said that "both companies are
continuing to work cooperatively with other relevant
regulators in their review of the merger" (Statement
No. 8, FAC ¶ 106);

(2) a July 25, 2023 statement in a iRobot and Amazon joint
press release that said "Amazon and iRobot are working
cooperatively with the relevant regulators in their
review of the merger" (Statement No. 9, FAC ¶ 113);
and

(3) a January 10, 2024 statement attributed to Angle in a
Politico article in which he said "the [C]ompany
'continues to work cooperatively with the [European
Commission] and other regulators in their review of
the merger.'" (Statement No. 22, FAC ¶ 150).

iRobot Mem. 10.  Premca relies on two confidential witnesses --
CW2 and CW3 -- to support its cooperation claims.  FAC ¶¶ 95,
119.

Confidential witnesses are permissible, of course, but they must be buttressed by other plausibly pleaded facts.  The First Circuit cautions against reliance on confidential witnesses. New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 51 (1st Cir. 2008) ("We have never said a complaint would survive if it were based only on confidential source allegations.  Indeed, we have said there must be a hard look at such allegations to evaluate their worth.").  The First Circuit's standard for the use of confidential sources is as follows:

> [W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an **adequate basis for believing that the defendants' statements were false.**  Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.  In both of these situations, the plaintiffs will have pleaded enough facts **to support their belief, even though some arguably relevant facts have been left out.**

Id. at 51 (emphasis added) (quoting In re Cabletron Sys., Inc., 311 F.3d 11, 29 (1st Cir. 2002)).  The Court must weigh a variety of factors in making its determination: "When allegations depend in part on confidential sources, a court 'evaluat[es], inter alia, [ ] the **level of detail** provided by the confidential sources, the **corroborative nature of the other**

[43]

**facts alleged** (including from other sources), the **coherence and
plausibility of the allegations**, the **number of sources**, the
**reliability of the sources**, and **similar indicia.**'" <u>City of
Miami Fire Fighters' & Police Officers' Ret. Tr.</u> v. <u>Cerence
Inc.</u>, No. 22-CV-10321-ADB, 2024 WL 1258149, at *13 (D. Mass.
Mar. 25, 2024) (Burroughs, J.) (emphasis added) (quoting <u>N.J.
Carpenters Pensions & Annuity Funds</u>, 537 F.3d at 51).  These
factors are not exclusive.  While confidential witnesses are not
required to "recall all possible details from their former
positions," in order "[f]or the Court to consider and credit
[CW] allegations, [the] allegations cannot merely be 'conclusory
allegations of fraud, but specific descriptions of the precise
means through which it occurred, provided by persons said to
have personal knowledge of them.'"  <u>Collier</u> v. <u>ModusLink Glob.
Sols., Inc.</u>, 9 F. Supp. 3d 61, 71 (D. Mass. 2014) (Casper, J.)
(quoting <u>In re Cabletron Sys., Inc.</u>, 311 F.3d at 30).

As for Premca's Amazon-non-cooperation-theory, Premca's two
confidential witnesses do not provide sufficient, plausibly
pleaded facts in a level of detail and with a level of coherence
to support an inference that Amazon was not working
cooperatively with regulators, or that iRobot was reckless with
respect to such knowledge or had knowledge of purported non-
cooperation when any of the referenced cooperation statements
were made.

As the First Circuit requires, this Court must look closely at the statements, and how the FAC's allegations are presented. Even crediting, without ruling, that the Confidential Witnesses were sufficiently identified or positioned within iRobot, the two Confidential Witnesses -- CW2 and CW3 -- provide a handful of sentences, untethered from the time, duration, and scope of the purported lack of cooperation.  See FAC ¶¶ 95, 119.  Indeed, if these confidential witnesses were as well-positioned as Premca claims, they would presumably know actual facts which would paint a complete picture without resort to broad characterization by Premca's counsel.

Here, CW2's and CW3's statements are sparse in this regard, backfilled by Premca's surmise and conjecture.  It is not clear, moreover, where these two CWs' factual allegations end and Premca's characterization begins.  Take CW2, at FAC ¶ 95:

> In May 2023, according to CW2, at a Senior Leadership Team Meeting with Angle and Zeiler, iRobot's Chief Legal Officer, Glen Weinstein ("Weinstein"), announced to iRobot employees that European Commission regulators asked Amazon for information on how its search engine worked, due to antitrust concerns over Amazon boosting its own products at the expense of competitors, and Amazon steadfastly refused to cooperate with regulators' requests.  Thus, in the Spring of 2023, iRobot had actual knowledge that, contrary to the Company's public statements to investors, Amazon was not cooperating with regulators and instead ignoring their requests for information to review the Merger.

FAC ¶ 95; see also id. ¶ 167.  This is the entirety of CW2's
information related to Amazon's purported non-cooperation.  The
first sentence is at least somewhat factual -- iRobot's CLO
announced at a May 2023 meeting that Amazon had refused to
provide certain information to the EC.  Save for the CLO's
statement, though, this allegation adds little because it is
entirely silent as to context.  That is, there are no plausibly
pleaded facts surrounding Amazon's refusal to cooperate with an
unspecified request by the EC at an unknown time, and for an
unknown duration.  The second sentence, moreover, is not a
reasonable inference from the first, and appears to be Premca's
speculation.  That is, a vague, one-time instance of non-
cooperation does not logically lead to a reasonable inference
that Amazon was not cooperating with regulators at all times or
at any particular time relevant to statements made by iRobot.
Further, CW2's information does not tie to any particular false
or misleading statement or support an inference of knowledge of
falsity when made -- even if Angle and Zeigler were present at a
meeting **sometime** in May 2023.

Turning to CW3 at FAC ¶ 119, the same problem is evident:

[A]ccording to CW 3, Weinstein admitted during a
meeting with Angle, Zeiler, and other iRobot
executives [in the late Summer of 2023] that Amazon
was refusing to cooperate with the EU Commission.
Specifically, Weinstein announced that the European
Commission had requested information about how
Amazon's search engine worked, in order to determine

> whether Amazon was favoring its internal products to
> the detriment of competition, but Amazon refused to
> cooperate or share that information.

FAC ¶ 119; see also id. ¶ 168.  Here, the pleading deficiency is
structurally the reverse of CW2's statements; that is, the first
sentence relies on the second sentence to lead to the broad,
unsupported conclusion contained in the first.  Again, a CW in
this position would likely have at least **some** other facts.

This not a mere pleading oversight: tellingly, Premca is
able to draft complete, straight-forward, declarative statements
about allegations made by confidential witnesses without spin,
conjecture, and speculation.  For example, as to CW2, relating
to earnings calls, CW2 recounts that "iRobot stopped hosting
earnings calls [at Zeiler's direction] because it was in such a
bad financial situation that it did not want to discuss its
forecasts."  FAC ¶ 70.

In stark contrast to CW2 and CW3's statements concerning
the Chief Legal Officer's announcement, CW1's statements
similarly provide plausibly pleaded allegations, though on a
different topic:

> According to CW1, iRobot missed internal sales
> forecasts for 18 months starting around the time the
> Merger was announced.  CW1 stated that iRobot had
> extremely aggressive sales projections but lacked a
> concrete plan to achieve those sales.  According to
> CW1, Zeiler instituted this aggressive approach.  CW1
> further stated that the Roomba was no longer
> competitive and remained a high-end product that

consumers did not want to pay for compared to lower-
priced models.

FAC ¶ 56.  The difference between CW2 and CW3's allegations on
the one hand, and CW1's allegations on the other, further
confirms that, at least on this record, Premca's allegations
lack sufficient particularity to permit a reasonable inference
that Amazon was being uncooperative with regulators, and
certainly do not support any allegations of falsity of
statements relating to cooperation when made.  See In re Boston
Sci. Corp. Sec. Litig., 646 F. Supp. 3d 249, 279 (D. Mass. 2022)
(Woodlock, J.) (rejecting confidential witness statements that
lacked sufficient particularity); LSI Design & Integration Corp.
v. Tesaro, Inc., No. 18-CV-12352-LTS, 2019 WL 5967994, at *4 (D.
Mass. Nov. 13, 2019) (Sorokin, J.); cf. Collier, 9 F. Supp. 3d
at 67-68, 70-73 (analyzing sufficiently pleaded confidential
witness statements).  Indeed, Premca's claim that iRobot is
engaging in "tunnel vision," Premca Opp'n 11 (quoting Hill v.
State St. Corp., No. 09cv12146-NG, 2011 WL 3420439, at *13 (D.
Mass. Aug. 3, 2011)), and that it need not produce "even more
details of Amazon's obstruction," because "the information [CW 2
and CW3] provide was exactly as discussed internally in
corporate meetings", id. (citing FAC ¶¶ 95, 119), is mere
deflection.

[48]

Premca's reliance on Collier is misplaced.  Premca Opp'n 11.  In that case, Judge Casper expressed doubt that CWs need recall "all possible details from their former positions."  Collier, 9 F. Supp. 3d at 73.  This Court agrees; however, there must be sufficient, particularized detail to support the inferences claimed.  Collier is distinguishable.  There, the CWs had fulsome fact-based allegations: one recalled specific conversations with the defendants, and another recalled her termination after raising accounting inconsistencies.  Id. at 72.  Premca's reliance on Washtenaw Cnty. Emps.' Ret. Sys. v. Talbots, Inc., No. 11-10186-NMG, 2013 WL 5348569, at *10 (D. Mass. Sept. 23, 2013) (Gorton, J.), is also unpersuasive.  In that case, the level of detail provided by the confidential witnesses included specific questions placed to, and answers by, individual defendants, going to the heart of the fraud.  Id.

With respect to non-cooperation with the EC, Premca also relies on a February 15, 2023 Financial Times Article, iRobot Exs., Ex. 8, Feb. 15, 2023 Fin. Times Article, ECF No. 52-8, that describes the EC's gearing up for a review of the proposed merger, and sending questions to Amazon, FAC ¶¶ 82-83.  iRobot argues that the article's sources are anonymous, that it lacks particularity, and that the article does not corroborate the specific statement at issue because the article discusses privacy concerns as opposed to Amazon's search engine.  iRobot

[49]

Mem. 13.  iRobot cites In re Optionable Sec. Litig., 577 F.
Supp. 2d 681, 690 (S.D.N.Y. 2008) (finding newspaper article
relying on anonymous source insufficiently reliable and
specific); Plumbers & Steamfitters Loc. 773 Pension Fund v.
Canadian Imperial Bank of Com., 694 F. Supp. 2d 287, 300-01
(S.D.N.Y. 2010) (rejecting speculative media reports as
insufficiently particularized) as persuasive authority.  Id.
These cases, though not entirely on point, provide some insight.
Premca distinguishes these cases based upon the specifics of the
news reports.  Premca Opp'n 13-14.

There is, of course, no dispute that the Court may consider
news articles, but the Court is not required blindly to accept
them as fact.  As the Defendants point out in reply, not all
news articles are the same, and cases where news articles are
found acceptable typically feature articles that identify
sources, quote the defendants, or reference other evidence.
Reply 6-7 (citing Matrixx Initiatives, Inc., 563 U.S. at 34
(2011); Aldridge v. A.T. Cross Corp., 284 F.3d 72, 79-80 (1st
Cir. 2002); City of Warren Police & Fire Ret. Sys. v. World
Wrestling Ent. Inc., 477 F. Supp. 3d 123, 133 (S.D.N.Y. 2020);
In re Vivendi Universal, S.A., 381 F. Supp. 2d 158, 180
(S.D.N.Y. 2003); Godinez v. Alere Inc., 272 F. Supp. 3d 201, 208
(D. Mass. 2017) (Saris,J.)).

[50]

Even were the news articles otherwise sufficient, the
articles speak to vague concerns by regulators.  Nothing in
these articles signals that regulators had taken a final
position, nor expresses that that position had been communicated
to Amazon or iRobot.  Further, even were iRobot aware of these
news reports, iRobot is "not obligated to respond to every
potentially disparaging news story or to rebut the musings of
the financial press."  Plumbers & Steamfitters, 694 F. Supp. 2d
at 300 (citing In re Omnicom Group, Inc. Sec. Litig., 597 F.3d
501, 514 (2d Cir.2010) ("Firms are not required by the
securities laws to speculate about distant, ambiguous, and
perhaps idiosyncratic reactions by the press or even by
directors."); Hershfang v. Citicorp, 767 F.Supp. 1251, 1259
(S.D.N.Y.1991) ("Plaintiffs have stitched together a patchwork
of newspaper clippings and proclaimed the result a tale of
securities fraud. . . . Read as a whole, the complaint creates
the strong impression that when [the defendant] announced a cut
in dividends, plaintiff's counsel simply stepped to the nearest
computer console, conducted a global Nexis search, [and] pressed
the 'Print' button.")).

Articles discussing regulators' concerns or that they were
gearing up for an investigation of a merger really say nothing
more than what was obvious to all investors at that time.
Premca has in effect "stitched together a patchwork of newspaper

[51]

clippings and proclaimed the result a tale of securities fraud."
Hershfang, 767 F.Supp. at 1259.  Taken together, Premca's press
reports by themselves lack foundational reliability and do not
indicate one way or the other whether the merger was expected to
succeed or whether there was an unusual level of scrutiny.  Most
importantly, they are untethered to any particular statement by
the Defendants.

Finally, iRobot argues that Angle's statement in a January
10, 2024, Politico article that the "company" continued to work
with regulators does not refer to Amazon, but rather, to iRobot.
Mem. 14.  This is persuasive; indeed, Angle as CEO of iRobot
would not be expected to be commenting on Amazon's conduct, and
the word "company" is not attributed to Angle as a quote, but
rather to the author of the Politico article.  Josh Sisco &
Aoife White, Amazon skips concessions to EU on iRobot deal,
Politico (Jan. 10, 2024),
https://www.politico.eu/article/amazon-dodges-concessions-to-
appease-eu-on-irobot-deal/.  No one has provided a copy of
Angle's actual statement, and its placement in the article
supports only an inference that Angle was speaking with respect
to iRobot, not Amazon.  Statement No. 22 is therefore neither
false nor misleading.

### b.    FTC Cooperation Statements

Three of the statements pertain to Amazon's purported lack of cooperation with the FTC, Statement Nos. 2 (FAC ¶ 88), 6 (FAC ¶ 99), 15 (FAC ¶ 130), relying solely on a Politico article, Josh Sisco, <u>Washington prepares for war with Amazon</u>, Politico (Mar. 20, 2023), https://www.politico.com/news/2023/03/20/ftc-amazon-irobot-antitrust-00087711.  iRobot argues that the Politico article, although it does address the iRobot merger, is more broadly focused on Amazon's cooperation with multiple FTC investigations.  iRobot Mem. 9-10; <u>see</u> Sisco, <u>Washington prepares</u>, <u>supra</u> ("Amazon has been largely unresponsive to the FTC's investigations so far, refusing to turn over information requested by the FTC, **some of the people said.**") (emphasis added)).  As iRobot argues, the Politico article is largely nonspecific, and does not provide a reliable basis to assert that Amazon was being uncooperative with the FTC specifically relating to the Merger.  iRobot Mem. 9-10; Reply 6.  Indeed, the same sufficiency problems that plagued CW2 and CW3's statements persist in this article as well.

### 2. Merger Status and Regulatory Reviews

These statements refer to iRobot's 8-K, 10-Q, and 10-K forms filed between February 13, 2023 and November 27, 2023, which provided investors with updates as to the status of the Merger and stated the risks related to it in general terms.  <u>See</u>

[53]

Statement Nos. 2 (FAC ¶ 88), 5 (FAC ¶ 97), 6 (FAC ¶ 99), 9 (FAC ¶ 113), 10 (FAC ¶ 120), 12 (FAC ¶ 124), 15 (FAC ¶ 130), 17 (FAC ¶ 138), 18 (FAC ¶ 140), and 20 (FAC ¶ 145).  iRobot cabins Premca's claim that the statements were misleading as follows:

> (i) the "European Commission and FTC had taken concrete steps to increase their scrutiny of the Merger, including sending Amazon detailed questions and requests for information over the Merger which were not resolved, increasing the regulatory threat to the Merger"; (ii) "Amazon and iRobot ceased holding integration meetings between the companies, indicating an increased pessimism over the Merger receiving regulatory approval"; and (iii) "iRobot began, for the first time, to formulate alternative plans for the Company in September 2023 in preparation for the Merger to be rejected by regulators." (See, e.g., FAC ¶¶ 100, 114, 132, 139.)

iRobot Mem. 15.  Premca's arguments are bit more broad, essentially claiming that iRobot "consistently painted regulatory approval as a when-not-if-proposition, despite knowing undisclosed material facts" otherwise.  Premca Opp'n. 14 Premca claims that iRobot knew of regulatory objections, non-cooperation of the Merger participants, iRobot's expectation that the Merger would fail, cessation of integration meetings, and the iRobot's contingency planning .  Id. at 14-15.

First, the allegations that iRobot ignored increasing regulatory risk is primarily supported by vague news articles that are largely unremarkable.  At the same time, merger status updates were timely and fulsome.  See e.g., FAC ¶¶ 88, 97, 99, 113, 120, 124, 130, 138, 140, and 145.  Premca's noncooperation

argument fails for the same reasons identified above.  See Section III.B.1, supra.  Again, identifying (at most) two instances of purported non-cooperation over a year-long period is simply insufficient to plead that any of the updates and regulatory statements were false when made.

As for the cessation of integration meetings and contingency planning, once again, the Court needs to scrutinize the sources of information as to these allegations.  Here, the statements from CW2, CW3, and CW4 allege that iRobot beginning in August 2023 began suspending integration meetings with Amazon, and that by October 2023, it had halted "all" integration meetings.  FAC ¶¶ 9, 115-19, 137, 165.  As iRobot points out, Premca makes no argument about express statements regarding sufficiency of integration; rather, the cessation of the meetings allegedly signaled "increased pessimism over the Merger receiving regulatory approval," which the form statements then allegedly misrepresented.  iRobot Mem. 16 (citing FAC ¶¶ 120-21, 123-27, 129-30, 138-40, 145).

The allegations that are based on confidential witnesses fail at a pleading level.  Turning first to CW2, at FAC ¶ 134, the allegations are as follows:

> According to CW2, in September 2023, during monthly Senior Leadership Team Meetings, iRobot executives internally formulated plans for the business without the Merger.  **This reflected** a growing understanding

> within the Company that the Merger was unlikely to be
> approved by regulators.

FAC ¶ 134 (emphasis added).  Similar to Premca's confidential

witness allegations relating to cooperation, see Section

III.B.1, supra, the first sentence provides no context as to why

the plans were formulated, the scope of the plans, or any other

contextual information that a confidential witness attending

these meetings would likely possess.  The second sentence is

also unclear as to whether it is to be attributed to CW2, or is

merely Premca's argument.  For example, the second sentence's

use of the word "reflected" is speculative and muddies the

water.  On its face, it is pleaded plausibly that CW2 claims

that contingency plans for the business to operate without the

merger were formulated, but absent any factual context, the

allegation is insufficient to establish the further inference

that iRobot expected the Merger to fail.

Turning to CW4, at FAC ¶ 137 the allegations are as

follows:

> According to CW4, who attended weekly and monthly
> integration meetings, by October 2023, all integration
> meetings between iRobot and Amazon had stopped,
> **indicating** that the Company no longer believed that
> the Merger would receive regulatory approval.

FAC ¶ 137 (emphasis added).  Again, the fact asserted by CW4 is

the cessation of meetings; then the allegation pivots to the

word "indicating," which introduces a speculative statement.[7]
From the drafting of the FAC, CW4 has failed plausibly to plead
personal knowledge of iRobot's belief concerning the approval.

As for the updates, Premca argues that even if technically
true (which it does not concede), the omission of known adverse
information renders the updates misleading.  Premca Opp'n 15.
Premca spotlights Glazer Cap. Mgmt., L.P. v. Forescout Techs.,
Inc., 63 F. 4th 747 (9th Cir. 2023), in which the Ninth Circuit
rejected language describing hypothetical risks as to
information the company already knew.  Id. (citing Glazer, 63 F.
4th at 778-79).  Glazer, however, is inapposite.  There, the
defendant company had actual knowledge that the counterpart
company to the merger was considering bailing out of the merger
process, but that fact was omitted from communications conveying
expectations that the merger would close.  Glazer, 63 F. 4th at
778-79.  The allegations here are not nearly so robust.  Cf. In
re Coinbase Glob., Inc. Sec. Litig., No. 2:22-CV-04915
(BRM)(LDW), 2024 WL 4053009, at *13 (D.N.J. Sept. 5, 2024)
(observing that, while defendant company was not required to
speculate about regulator's activity, its own internal processes
directly contradicted its representations about the possibility

---

[7] The Court presumes without ruling that the FAC
sufficiently alleges that CW4 would be in a position to know
about "all" integration meetings.  See FAC ¶ 136.

of regulatory action); In re Sprint Corp. Sec. Litig., 232 F. Supp. 2d 1193, 1219 (D. Kan. 2002) (observing that defendants were informed by regulators that merger investigation would be suspended, suggesting serious problems).

In sum, iRobot has the better of the argument here.  Premca cobbles together loose public information with unfocused confidential witness statements intertwined with argument, to present a scenario of fraud.  Indeed, the confidential witnesses do not allege that the Merger was somehow in trouble, or the reasons for the cessation of integration meetings or the contingency planning.  "Like Conan Doyle's dog that did not bark, this silence says much."  Quinones, 106 F.4th at 183.

### 3. Risk Factor Disclosures

The First Circuit analyzes misleading risk disclosures as follows:

> [W]e can understand the contours of what makes a risk so great that it is akin to the Grand Canyon (and therefore a disclosure is misleading if it frames the risk as merely hypothetical) and what makes a situation merely risky (i.e., simply a ditch). A securities fraud defendant is at the edge of the Grand Canyon where the alleged risk had a "near certainty" of causing "financial disaster" to the company.  Of course, the defendant company must have understood the near certainty of the risk at the time it made the statements at issue.

Karth v. Keryx Biopharmaceuticals, Inc., 6 F.4th 123, 137–38 (1st Cir. 2021) (citations omitted).  A Grand Canyon event, for example, "is often evidenced by a company's frenzied,

underhanded efforts 'to keep the house of cards standing.'"  Id.
at 138 (quoting In re Cabletron Sys., Inc., 311 F.3d at 24).
Similarly, "[i]f a company is 'desperate[ly]' working to
'protect itself' from rapidly approaching harm, then it is at
the edge of the Grand Canyon and must warn investors of an
imminent cliff."  Id. (quoting Tutor Perini Corp. v. Banc of Am.
Sec. LLC, 842 F.3d 71, 88-91 (1st Cir. 2016)).  These factors
are not plausibly pleaded in the FAC.

The risk-factor disclosures, while characterized as
"boilerplate," "hypothetical," and "carbon-copy," are here
nonetheless sufficient in light of the plausibly pleaded facts
in the FAC.  See Statement Nos. 1 (FAC ¶ 86), 3 (FAC ¶ 89), 5
(FAC ¶ 97), 11 (FAC ¶ 122), 13 (FAC ¶ 126), 15 (FAC ¶ 130), 18
(FAC ¶ 140), and 21 (FAC ¶ 146).  Indeed, as iRobot argues, the
disclosures were accurate and "tailored and repeatedly updated
throughout the Class Period as iRobot navigated the
uncertainties around the regulators' ongoing review of the
Merger."  iRobot Mem. 18; see also Reply 10-12.  The FAC's
allegations do not demonstrate that risk had begun to
materialize or that there was near certainty of risk at the time
of the disclosures.  Id.  Premca asserts that the disclosures
did not accurately update investors because: (1) communications
from regulators raised concerns that made approval from
regulators unlikely; (2) Amazon and iRobot were not cooperating

[59]

with regulators; and (3) the merger prospects were so poor that
iRobot was preparing for the merger's abandonment.  Premca Opp'n
18.

    While the Court agrees with Premca that iRobot was not
entitled to "misrepresent Merger risks," what emerges from the
few well-pleaded factual allegations in the FAC is run-of-the-
mill merger processes updated through disclosure and appropriate
risk-disclosure language, not a "whitewash."  Premca Opp'n 18
(quoting Tutor Perini Corp., 842 F.3d at 91).

    There are no communications from the regulators that
approval of the Merger was unlikely.  For example, to the extent
that regulators sought a Second Request (FTC), began a Phase 2
investigation (EC), or filed a Notice of Objections (EC), there
is no dispute that information was timely and publicly
disclosed.  Premca describes such actions as somehow increasing
the likelihood of the failure of the Merger.  There is, again, a
lack of factual allegation as to what the regulators were doing
or not doing, and although not necessary, it is telling that
not a single confidential witness from **Amazon** provides
information as to what happened.  As for iRobot's confidential
witnesses, CW2, CW3, and CW 4 fail to make sufficient, plausibly
pleaded allegations to support fraud.[8]  To use the First

---

[8] As mentioned above, CW1 has little to add other than that
iRobot was having financial trouble.  See FAC ¶¶ 55-56.

Circuit's analogy, the FAC might paint a picture of a ditch, but it is certainly no "Grand Canyon."  The FAC bootstraps its own characterizations of the few facts into a narrative that is, on this record, not pleaded plausibly, i.e., that requires unreasonable inferences to be made.

### 4. Sarbanes-Oxley Certifications

The claims relating to the Sarbanes-Oxley certifications made by Angle and Zeiler (Statement Nos. 4 (FAC ¶ 91), 7 (FAC ¶ 102), 14 (FAC ¶ 128), and 19 (FAC ¶ 142)) fail for the same reasons set forth above.  Namely, there are insufficient allegations that the statements made by Angle and Zeiler were knowingly false or misleading when signed.

### C.  Premca Fails to Establish a Strong Inference of Scienter

Even if any of the above statements were false or misleading, Premca has failed to establish a strong inference of scienter as required under the PSLRA.  See Salim v. Mobile Telesystems PJSC, No. 19-CV-1589(AMD)(RLM), 2021 WL 796088, at *12 (E.D.N.Y. Mar. 1, 2021) (considering scienter elements even in the absence of misrepresentations), aff'd, No. 21-839-CV, 2022 WL 966903 (2d Cir. Mar. 31, 2022).  "To support a finding of scienter under the PSLRA, a complaint must state with particularity facts giving rise to a strong inference that the defendant . . . either . . . consciously intended to defraud, or

that they acted with a high degree of recklessness."  Quinones,
106 F.4th at 182 (citation and internal quotation marks
omitted).

As this Court recently wrote about the applicable PSLRA
pleading standard:

> Congress has heightened the pleading standard for
> scienter allegations in private enforcement actions.
> S.E.C. v. Sharp, 2022 WL 4085676 (D. Mass. 2022)
> (citing Merrill Lynch, Pierce, Fenner & Smith, Inc. v.
> Dabit, 547 U.S. 71, 81 (2006)).  The reasons
> underlying this important legislative intervention
> were described in Galileo:
>
>> In particular, Congress sought to reform
>> private securities litigation to discourage
>> unmeritorious class actions, including
>> actions brought because of a decline in
>> stock prices.  The aims of the PSLRA are
>> three-fold: (1) to encourage the voluntary
>> disclosure of information by corporate
>> issuers; (2) to empower investors so that
>> they -- not their lawyers -- exercise
>> primary control over private securities
>> litigation; and (3) to encourage plaintiffs'
>> lawyers to pursue valid claims and
>> Defendants to fight abusive claims.  The
>> PSLRA seeks to curtail the filing of abusive
>> lawsuits at the pleading stage of litigation
>> by establishing uniform and stringent
>> pleading requirements.
>
> In re Galileo Corp. S'holders Litig., 127 F. Supp. 2d
> 251, 260 (D. Mass. 2001) (Lindsay, J.).
>
> Specifically, the pleaded facts must give rise to
> a "strong" inference of scienter.  Tellabs, Inc. v.
> Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).
> This means that the complaint must "with respect to
> each act or omission . . . state with particularity
> facts giving rise to a strong inference that the
> defendant acted with the required state of mind."  15
> U.S.C. § 78u-4(b)(2)(A); see also In re Boston

<u>Scientific Corp. Secs. Litig.</u>, 686 F.3d [21,] 30 [(1st Cir. 2012)]. "It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." <u>Tellabs</u>, 551 U.S. at 314.  Instead, the inference of scienter must be "cogent and at least as compelling as any other opposing inference of nonfraudulent intent." <u>Id</u>. at 328.

<u>Quinones</u>, 665 F. Supp. 3d at 173-174 (parallel citations omitted).

In affirming this Court, the First Circuit recently restated the high scienter pleading requirements.  "The PSLRA dictates that to survive a motion to dismiss, '[a]n inference of scienter' must be 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" <u>Quinones</u>, 106 F. 4th at 184 (alteration in original) (quoting <u>In re Genzyme Corp. Sec. Litig.</u>, 754 F.3d 31, 40 (1st Cir. 2014)). In that case, in the context of a motion to dismiss, the First Circuit succinctly restated the standard under Fed. R. Civ. P. 9(b) and the PSLRA as follows:

> To support a finding of scienter under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant . . . either . . . consciously intended to defraud, or that they acted with a high degree of recklessness." A "strong" inference is "more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations."

<u>Quinones</u>, 106 F.4th at 182 (citations omitted).  "Recklessness in this context means 'a highly unreasonable omission, involving not merely simple, or even inexcusable[ ] negligence, but an

extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d 5, 44 (D. Mass. 2016) (Saylor, J.), aff'd, 857 F.3d 34 (1st Cir. 2017) (quoting Mississippi Pub. Emps.' Ret. Sys. v. Boston Sci. Corp. II, 649 F.3d 5, 20 (1st Cir.2011)).  A high burden indeed.

Scienter is a holistic concept and "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Tellabs, 551 U.S. at 323-324 (quoting Fidel v. Farley, 392 F.3d 220, 227 (6th Cir. 2004)).  Nevertheless, as here, where the FAC is largely "devoid of any direct-evidence allegations, the indirect-evidence allegations in the [FAC] will need to do more work to carry the burden of raising a 'strong inference of scienter' on their own." Shash v. Biogen, Inc., 84 F. 4th 1, 16 (1st Cir. 2023) (quoting Brennan v. Zafgen, Inc., 853 F.3d 606, 615 n.8 (1st Cir. 2017)).  "Certainly while '[e]ach individual fact about scienter may provide only a brushstroke,' . . . [the Court's] obligation [is] to consider 'the resulting portrait.'" Quinones, 106 F. 4th at 184 (quoting Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc., 838 F.3d 76, 81 (1st Cir. 2016)).  As the First Circuit points out, "[a]t the same time plaintiffs cannot amalgamate a series of sketchy brushstrokes and call it a van

[64]

Gogh." Id.  Indeed, "competing inferences should be weighed
against plaintiffs' preferred interpretation of the facts." ACA
Fin. Guar. Corp., 512 F.3d at 59.  "While it may be unusual for
courts to weigh competing inferences from facts, Congress
mandated this review in the PSLRA." Id.  "When there are
equally strong inferences for and against scienter, 'the draw is
awarded to the plaintiff.'" Pizzuto v. Homology Medicines.,
Inc., No. 1:23-CV-10858-AK, 2024 WL 1436025, at *15 (Kelley, J.)
(quoting City of Dearborn Heights Act 345 Police & Fire Ret.
Sys. v. Waters Corp., 632 F.3d 751, 757 (1st Cir. 2011)).  In
the end, "[t]here is no one-size-fits-all way of analyzing
securities fraud cases; rather, [the Court must] take a '"fact-
specific approach" that proceeds case by case.'" Karth, 6 F.
4th at 134 (quoting In re Cabletron Sys., Inc., 311 F.3d at 38).

Premca repackages many of the FAC's misrepresentation
allegations into additional allegations of scienter.  FAC ¶¶
165-188.  Ultimately, Premca's news articles and four
confidential witness statements, even if taken as true, do not
meet the rigorous standards of Rule 9(b) and the scienter
requirement of the PSLRA.

First, as for the confidential witnesses, CW1 is relatively
the most reliable, but least important, confidential witness,
establishing nothing more than that iRobot was having difficulty
making its product appealing.  As for the remaining confidential

witnesses, the Court has already dealt with the anemic
allegations made by CW2, CW3 and CW4, and the pleading problems
associated with them.  See Section III.B.1, supra.

Second, the press articles do not paint a picture of fraud.
For the most part, the press articles fret over well-known
privacy issues relating to Amazon that were apparently subject
to scrutiny by regulators in the United States and Europe.  The
content of the articles is also relatively murky; while there is
much conjecture about scrutiny of the Merger by regulators, it
is all based upon anonymous sourcing and speculation as to
merger investigations.  "Although a plaintiff may use such
sources in pleadings, 'the news articles cited still must
indicate particularized facts about a defendant's conduct in
order to support [the] claims.'"  Plumbers & Steamfitters, 694
F. Supp. 2d at 300 (alteration in original) (quoting Miller v.
Lazard, Ltd., 473 F.Supp.2d 571, 586 (S.D.N.Y. 2007)); Brennan
v. Zafgen, Inc., 199 F. Supp. 3d 444, 451-52 (D. Mass. 2016)
(Saylor, J.) ("[T]he complaint's circumstantial allegations
concerning scienter -- a patchwork of scientific literature and
unsuspicious insider sales -- are insufficient to support a
strong inference of defendants' 'conscious intent to defraud or
high degree of recklessness.'" (quoting ACA Fin. Guar. Corp.,
512 F.3d at 58)), aff'd, 853 F.3d 606 (1st Cir. 2017).  In the
absence of plausibly pleaded facts concerning internal

knowledge, Premca is left asserting that iRobot, itself, should have speculated about the merger's success based upon anonymously sourced press articles. "The securities laws do not require -- and good business practice does not suggest -- that [companies] respond to every warble of the 24-hour news cycle." Id. at 301.

Third, Premca's reliance on executives' high level of access and the Merger Agreement's cooperation provision is, as iRobot argues, a dressed-up "must have known" claim. iRobot Mem. 24. Premca argues that the Merger Agreement, along with "multiple facts," demonstrate actual knowledge. Premca Opp'n 25. Stripped of any supporting plausibly pleaded facts from the confidential witnesses relating to the merger, the claims of knowledge through access to information by iRobot's executives, even including the Merger Agreement, are "tantamount to the 'scienter by status' theory, which has been 'uniformly rejected' and which cannot sustain a showing of scienter here." State Teacher Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc., No. 23-CV-11132-DJC, 2024 WL 3258293, at *16 (D. Mass. July 1, 2024) (Casper, J.) (quoting City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems, Inc., 683 F. Supp. 3d 120, 132 (D. Mass. 2023)) (citing Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 283 (D. Mass. 1998)). Indeed, the allegations relying on the Merger Agreement reflect the speculative nature

[67]

of this type of allegation.  See FAC ¶ 149 ("Pursuant to the Merger Agreement's cooperation provision, iRobot **would have been informed** of Amazon's plans for the December 18, 2023 hearing, coordinated strategy, and been debriefed on the hearing itself." (emphasis added)); FAC ¶ 158 ("**Either** at its own meeting with the FTC or, pursuant to the Merger Agreement's cooperation provision, through communication with Amazon, Defendants were informed that the FTC would oppose the Merger." (emphasis added)); FAC ¶ 165 ("Defendants iRobot, Angle and Zeiler had access to information about, and according to the Merger Agreement, received actual knowledge of, Amazon's refusal to cooperate with regulators.")[9]; FAC ¶ 166 ("[P]ursuant to the Merger Agreement's cooperation provision, Amazon **would have told** iRobot's executives –– which included Angle and Zeiler –– about every interaction with both FTC and European Commission regulators." (emphasis added)).

Fourth, as for "core operations," the First Circuit has not determined the contours of this doctrine.  See In re Biogen Inc. Sec. Litig., 857 F.3d at 44.  Even though such operations are, and are here, considered in the calculus, courts "have been

---

[9] This allegation apparently relates to CW2 and CW3's allegations that iRobot's Chief Legal Officer referenced an instance of Amazon's failure to provide information to the European Commission, which are analyzed above as insufficiently pleaded.  See Section III.B.1.a, supra.

[68]

hesitant to apply significant weight to 'core operations'
allegations without other significant evidence of a defendant's
intent or recklessness, or a 'plus factor.'"   Leung v. Bluebird
Bio, Inc., 599 F. Supp. 3d 49, 66 (D. Mass. 2022) (Casper, J.)
(quoting In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d at 51).
While the Merger was a critical transaction to iRobot, there is
an absence of the plus factor here typically necessary to
support an inference of scienter.   In re iRobot Corp. Sec.
Litig., 527 F. Supp. 3d 124, 141 (D. Mass. 2021) (Casper, J.)
(discussing cases involving "plus factors").   Rather, the claims
that iRobot must have been aware of Amazon's uncooperative
approach are unsupported by plausibly pleaded facts.
Accordingly, this factor has little impact on scienter.

Fifth, Angle's resignation and the timing of that
resignation are similarly without effect.   As iRobot argues,
Angle stayed on as a director after resigning as Chief Executive
Officer until May 2024, and as a senior advisor to iRobot while
it found a new CEO.   iRobot Mem. 27 (citing iRobot Exs., Ex. 23,
Jan. 29, 2024 Form 8-K 26, ECF No. 52-23).   Premca's focus on
Angle's resignation also ignores any mention of Zeiler.

Premca cites to cases where the timing of the resignation
was tied directly to the purported fraud.   See, e.g., Collier, 9
F. Supp. 3d at 65-66, 76 (discussing resignations after audit
committee findings and restatement of company financials).   This

is not a situation where an officer or director was pushed out
of the company after an internal investigation, findings of
fraud or misfeasance.  While Angle may have resigned as a result
of the Merger's not going through, there is no linkage to any
fraud by Angle.  Angle's resignation, although it occurred at
the same time as the merger termination, does not weigh
significantly in favor of scienter.  See Metzler Asset Mgmt.
GmbH v. Kingsley, 305 F. Supp. 3d 181, 219 (D. Mass. 2018)
(Saylor,J.) ("The complaint fails to plead with any
particularity that [the defendant's] employment was terminated
because of [the subject of the alleged fraud]."), aff'd, 928
F.3d 151 (1st Cir. 2019).  Without more, there is nothing
suspicious about Angle's resigning as CEO, while staying on as a
director until May 2024 and assisting iRobot with finding a
replacement.  See In re iRobot Corp. Sec. Litig., 527 F. Supp.
3d at 140-41 ("[T]here is nothing inherently suspicious about 'a
COO resigning to become a CEO' of another company.  Absent any
further particularized allegations, other than the timing of
aligning with alleged corrective disclosures, the complaint
fails to allege sufficient facts to show that [the executives']
departures were tied to their knowledge or even participation in
the alleged fraud." (citation omitted)); see also In re Hertz
Glob. Holdings Inc., 905 F.3d 106, 119 (3d Cir. 2018)
("[P]leading scienter requires more than pleading a link between

bad news and an executive's resignation.  Changes in leadership
are only to be expected when leadership fails.  That is not, in
itself, a symbol of fraud."); Ezzes v. Vintage Wine Ests., Inc.,
No. 2:22-CV-01915-GMN-DJA, 2024 WL 895018, at *14-15 (D. Nev.
Mar. 1, 2024) (finding that transition from CEO to Executive
Chairman of the Board of Directors by one officer and transition
from CFO to Executive Vice President, and then resignation, by
another do not support strong inference of scienter); In re
Intel Corp. Sec. Litig., No. 5:20-CV-05194-EJD, 2023 WL 2767779,
at *24 (N.D. Cal. Mar. 31, 2023) ("Such departures are hardly
uncharacteristic since '[m]ost major stock losses are often
accompanied by management departures.'" (alteration in original)
(quoting In re CornerStone Propane Partners, L.P. Sec. Litig.,
355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005))), aff'd, No. 23-
15695, 2024 WL 1693340 (9th Cir. Apr. 19, 2024).

Sixth, Angle's statements at FAC ¶¶ 177-80 are insufficient
to demonstrate a strong inference of scienter.  Here, the
temporal proximity of the June 16, 2023 and January 10, 2024
general statements of cooperation and optimism to the eventual
failure of the Merger is not supported by other plausibly
pleaded allegations sufficient to raise that inference.

Seventh, the SOX certifications are insufficient insofar as
the few plausibly pleaded factual allegations fail to suggest

with any particularity that the statements were false or false
when made.

Eighth, Premca's generalized and indirect assertions of
financial motive are insufficient. "When financial incentives
to exaggerate earnings go far beyond the usual arrangements of
compensation based on the company's earnings, they may be
considered among other facts to show scienter." Aldridge, 284
F.3d at 83. The Merger Agreement's "Golden Parachute
Compensation" package itself, which simply incentivized
completion of the Merger, did not operate as a motivating factor
artificially to keep share prices high. See FAC ¶¶ 174-76.
There was no special financial benefit to the Defendants for the
Merger to reach fruition other than a seemingly customary
compensation package, and no indication of why artificially
inflating stock prices would make the Merger more likely to
succeed with regulators. On this record, and in the absence of
any on point authority, iRobot's alleged financial motive adds
little to the scienter analysis.

Finally, stepping back and assessing the few plausibly
pleaded allegations holistically, a non-culpable inference is
more compelling than Premca's largely conclusory narrative of
fraud. Weighing the competing theories here, the more
compelling inference drawn from the facts alleged is that iRobot
provided consistent updates of the Amazon/iRobot merger that

[72]

ultimately failed as a result of regulatory resistance.  Indeed,
"[o]ften in cases where the scienter pleading standard is
satisfied, the complaint 'contains clear allegations of
admissions, internal records or witnessed discussions suggesting
that at the time they made the statements claimed to be
misleading, the defendant officers were aware that they were
withholding vital information or at least were warned by others
that this was so.'"  Brill, 2024 WL 4228832, at *11 (quoting In
re Boston Sci. Corp. Sec. Litigation, 686 F.3d 21, 31 (1st Cir.
2012)).  That is not present here.

## IV.  SECTION 14(A) CLAIM

Premca's Count III attempts to bring a proxy claim under
Section 14(a) of the Securities Exchange Act.  "Section 14(a)
seeks to 'prevent management or others from obtaining
authorization for corporate action by means of deceptive or
inadequate disclosure in proxy solicitation.'"[10]  Winters v.

---

[10]  Section 14(a) of the Act provides, in pertinent part:

It shall be unlawful for any person . . . in
contravention of such rules and regulations as the
Commission may prescribe as necessary or appropriate in
the public interest or for the protection of investors,
to solicit or to permit the use of his name to solicit
any proxy or consent or authorization in respect of any
security (other than an exempted security) registered
pursuant to section 78l of this title.

15 U.S.C. § 78n(a)(1).

Stemberg, 529 F. Supp. 2d 237, 252 (D. Mass. 2008) (quoting J.I.
Case Co. v. Borak, 377 U.S. 426, 431 (1964)).  In turn, "SEC
Rule 14a-9, promulgated pursuant to Section 14(a) of the
Exchange Act, prohibits solicitation by means of a proxy
statement containing 'any statement which, at the time and in
the light of the circumstances under which it is made . . .
omits to state any material fact necessary in order to make the
statements therein not false or misleading.'"  Vardakas v.
American DG Energy Inc., No. 17-CV-10247-LTS, 2018 WL 1141360,
at *2 (D. Mass. Mar. 2, 2018) (Sorokin, J.) (citing 17 C.F.R. §
240.14a-9(a)).[11]

     iRobot argues that the FAC "fails to adequately allege a
material misrepresentation."  iRobot Mem. 29 (citing In re
Analogic Corp. S'holder Litig., NO. 18-cv-11301-ADB, 2019 WL
4804800, at *8-10 (D. Mass. Sept. 30, 2019)); see In re Analogic

---

[11] Rule 14a-9(a) provides, in pertinent part:

> No solicitation subject to this regulation shall be made
> by means of any proxy statement, form of proxy, notice of
> meeting or other communication, written or oral,
> containing any statement which, at the time and in the
> light of the circumstances under which it is made, is
> false or misleading with respect to any material fact, or
> which omits to state any material fact necessary in order
> to make the statements therein not false or misleading or
> necessary to correct any statement in any earlier
> communication with respect to the solicitation of a proxy
> for the same meeting or subject matter which has become
> false or misleading.

17 C.F.R. § 240.14a-9(a).

<u>Corp</u>, 2019 WL 4804800, at *7 ("To prevail on a claim under Section 14(a), a plaintiff must show: (1) the proxy statement contained a material misstatement or omission, that (2) caused plaintiff's injury, and (3) that the proxy solicitation was an essential link in the accomplishment of the transaction.").

Premca's claim attempts to carve out a negligence claim under Section 14(a) to avoid the more rigorous pleading requirements of a Section 10(b) claim, claiming that Count III does not "sound in fraud" nor allege that iRobot or Angle acted "with scienter or fraudulent intent." FAC ¶ 215. While the First Circuit has not ruled on this tactic, iRobot cites to persuasive authority that, "[w]hen plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, even if they disclaim reliance on a fraud theory." <u>In re JP Morgan Chase Sec. Litig.</u>, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) (citation omitted); <u>see</u> <u>In re Meta Materials Inc. Sec. Litig.</u>, No. 21-CV-7203(CBA)(JRC), 2023 WL 6385563, at *22 n.18 (E.D.N.Y. Sept. 29, 2023).

So it is here. Premca ignores that it has incorporated every allegation in the FAC into Count III. <u>See</u> FAC ¶ 214 ("Lead plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein."). Premca then tries to limit the effect of the

[75]

rest of the FAC by claiming that Count III, somehow, "does not sound in fraud." See id. ¶ 215. Premca then attempts to delimit the claim to one that iRobot was "**at least** negligent in filing the Modified Merger Proxy Statement." Id. ¶ 218 (emphasis added).

The FAC, as a whole, is grounded in fraud, and therefore Count III fails for the same reasons as the Rule 10(b)-5 claim. Proceeding with 84 pages and 213 paragraphs of an amended complaint on a theory of "wrongful acts and omissions," FAC ¶ 16, where jurisdiction was premised solely on securities fraud, see FAC ¶ 17 ("The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5)"), with a Section 20(a) claim, Count II, premised on the securities fraud allegations, and without a hint of the word negligence until Count III, demonstrates that in substance the claim is based in fraud, even though Premca disclaims reliance on fraud. Cf. Sharma v. Rent the Runway, Inc., No. 22-CV-06935(OEM)(VMS), 2024 WL 4287229, at *8 (E.D.N.Y. Sept. 25, 2024) (upholding Section 11 claim where complaint made clear throughout that the action sounded only in negligence).

**V. SECTON 20(A) CLAIM**

Premca argues that its Section 20(a) claim in Count II survives because the Section 10(b) claim survives, apparently abandoning a Section 20 claim under Section 14(a).  "The plain terms of section 20(a) indicate that it only creates liability derivative of an underlying securities violation." ACA Fin. Guar. Corp., 512 F.3d at 67 (citing 15 U.S.C. § 78t(a)).  The parties agree on this point.  iRobot Mem. 30; Premca Opp'n 29. Accordingly, because Premca "did not state any claims under section 10(b), [its] derivative section 20(a) claims also fail." Zhou, 120 F. 4th at 296 (citing Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 246 (1st Cir. 2015)).

**VI.  THE ACTION IS DISMISSED WITH PREJUDICE**

The Court dismisses this action with prejudice.  Alleging securities **fraud** is serious business, and the pleading process ought not be used as a trial balloon, with repeated bites at the apple ensuing at the motion to dismiss stage.  To the contrary, Congress envisioned the PSLRA to raise the standard, striking a delicate balance between the need to curb vexatious litigation and protecting the public from fraud.[12]  The Court recognizes

---

[12] The Legislative History of the PSLRA confirms the delicate balance Congress envisioned in its passage:

> The overriding purpose of our Nation's securities laws is to protect investors and to maintain confidence in the securities markets, so that our

national savings, capital formation and investment may
grow for the benefit of all Americans.

The private securities litigation system is too
important to the integrity of American capital markets
to allow this system to be undermined by those who
seek to line their own pockets by bringing abusive and
meritless suits.  Private securities litigation is an
indispensable tool with which defrauded investors can
recover their losses without having to rely upon
government action.  Such private lawsuits promote
public and global confidence in our capital markets
and help to deter wrongdoing and to guarantee that
corporate officers, auditors, directors, lawyers and
others properly perform their jobs.  This legislation
seeks to return the securities litigation system to
that high standard.

Congress has been prompted by significant
evidence of abuse in private securities lawsuits to
enact reforms to protect investors and maintain
confidence in our capital markets.  The House and
Senate Committees heard evidence that abusive
practices committed in private securities litigation
include: (1) the routine filing of lawsuits against
issuers of securities and others whenever there is a
significant change in an issuer's stock price, without
regard to any underlying culpability of the issuer,
and with only faint hope that the discovery process
might lead eventually to some plausible cause of
action; (2) the targeting of deep pocket defendants,
including accountants, underwriters, and individuals
who may be covered by insurance, without regard to
their actual culpability; (3) the abuse of the
discovery process to impose costs so burdensome that
it is often economical for the victimized party to
settle; and (4) the manipulation by class action
lawyers of the clients whom they purportedly
represent.  These serious injuries to innocent parties
are compounded by the reluctance of many judges to
impose sanctions under Federal Rule of Civil Procedure
11, except in those cases involving truly outrageous
misconduct.  At the same time, the investing public
and the entire U.S. economy have been injured by the
unwillingness of the best qualified persons to serve
on boards of directors and of issuers to discuss

[78]

that the First Circuit has expressed its "discomfort" with
dismissals with prejudice at the motion to dismiss stage and has
"emphatically reiterate[d] that the PSLRA does not require that
orders of dismissal be with prejudice."  In re Genzyme Corp.

_____

publicly their future prospects, because of fear of
baseless and extortionate securities lawsuits.

    In these and other examples of abusive and
manipulative securities litigation, innocent parties
are often forced to pay exorbitant "settlements."
When an insurer must pay lawyers' fees, make
settlement payments, and expend management and
employee resources in defending a meritless suit, the
issuers' own investors suffer. Investors always are
the ultimate losers when extortionate "settlements"
are extracted from issuers.

    This Conference Report seeks to protect
investors, issuers, and all who are associated with
our capital markets from abusive securities
litigation. This legislation implements needed
procedural protections to discourage frivolous
litigation.  It protects outside directors, and others
who may be sued for non-knowing securities law
violations, from liability for damage actually caused
by others.  It reforms discovery rules to minimize
costs incurred during the pendency of a motion to
dismiss or a motion for summary judgment. It protects
investors who join class actions against lawyer-driven
lawsuits by giving control of the litigation to lead
plaintiffs with substantial holdings of the securities
of the issuer. It gives victims of abusive securities
lawsuits the opportunity to recover their attorneys'
fees at the conclusion of an action. And it
establishes a safe harbor for forward looking
statements, to encourage issuers to disseminate
relevant information to the market without fear of
open-ended liability.

H.R. Rep. No. 104-369, at 31-32 (1995), as reprinted in 1995
U.S.C.C.A.N. 730-31.

Sec. Litig., 754 F.3d at 47.  "This is particularly so in light
of the fact that the PSLRA is a tool designed to curb vexatious
litigation, not a mechanism for denying bona fide claimants
their day in court."  Id. (citing Tellabs, 551 U.S. at 320); see
also Belizan v. Hershon, 434 F.3d 579, 584 (D.C. Cir. 2006)
("[H]ad the Congress wished to make dismissal with prejudice the
norm, and to that extent supersede the ordinary application of
Rule 15(a), we would expect the text of the PSLRA so to
provide.").  While a dismissal with prejudice is not required by
Congress, the First Circuit also has recognized that in
appropriate cases it is "certainly within the bounds of the
district court's discretion to dismiss with prejudice."  In re
Genzyme Corp. Sec. Litig., 754 F.3d at 47.

This Court does not hesitate liberally to allow leave to
file a motion for leave to amend when warranted and requested.
See Fed. R. Civ. P. 15(a).  Notwithstanding that "the PSLRA has
not modified the liberal amendment policy of Rule 15(a)," In re
Genzyme Corp. Securities Litig., 754 F.3d at 47, however, that
policy has limits.

Here, the complaint has already been amended once.  The
Court took this matter under advisement, but was crystal clear
that it wanted **all** of the relevant information before it to make
a decision under the heightened pleading standards of the PSLRA.
The parties were invited to submit any further information while

the Court undertook writing this memorandum and order, with no
deadline imposed other than the uncertainty of the Court's
issuance of this decision:

> [THE COURT:] I do want to say one thing.  This has
> been well-briefed and well-argued and the Court
> appreciates that.  I have -- within the past year in
> another PSLRA case, I have, um, allowed a motion to
> dismiss and then, with the addition of additional
> data, I had to eat what I had said and in part anyway
> reverse my earlier ruling.  I don't want to do that.
> I expect I have everything, and if there's anything
> else that this argument or the briefs have raised that
> is not before the Court, I expect to see it so that
> when I do rule, um, that that ruling will stand.

October 28, 2024 Hr'g Tr. 18-19, ECF No. 62; see Oklahoma
Firefighters Pension & Ret. Sys. v. Biogen, Inc., No. 22-10200-
WGY, 2024 WL 3178638, at *5 (D. Mass. Mar. 19, 2024) (partially
allowing Rule 59 motion, but "not[ing] [that] the gamesmanship
of plaintiff's counsel in failing initially to put their best
foot forward has caused unwarranted delay in this case and a
squandering of judicial resources that could better have been
used on other matters").  Nothing further was filed -- either in
support of the FAC, or, for example, a timely motion to amend
the complaint under Rule 15.  This indicates to the Court that
Premca has already put its best foot forward: it had nothing
further to elucidate from its confidential witnesses, nor any
new information from its investigation of the facts.  See
Hensley v. Imprivata, Inc., 260 F. Supp. 3d 101, 126 (D. Mass.
2017) (Sorokin, J.) (dismissing claim with prejudice where

"Plaintiff was 'put on notice of the deficiencies in the [Amended Complaint] by the motion[s] to dismiss,' but did not claim he 'had something relevant to add' to address those deficiencies" (alteration in original) (quoting Abiomed, 778 F.3d at 247)).  In the absence of newly discovered information, amendment based upon the record appears futile.  Rather, it incentivizes plaintiffs to file voluminous, narrative complaints, with legal argument and conclusion disguised as fact, being interwoven with few plausibly pleaded factual allegations.  As the First Circuit explained when denying a late-filed motion to amend:

> The plaintiffs argue that in the end, they were entitled to wait and see if their amended complaint was rejected by the district court before being put to the costs of filing a second amended complaint.  They claim this would promote efficiency in the judicial system.  Plaintiffs have it exactly backwards -- their methodology would lead to delays, inefficiencies, and wasted work.  The plaintiffs do not get leisurely repeated bites at the apple, forcing a district judge to decide whether each successive complaint was adequate under the PSLRA.  Plaintiffs may not, having the needed information, deliberately wait in the wings for a year and a half with another amendment to a complaint should the court hold the first amended complaint was insufficient.  Such an approach would impose unnecessary costs and inefficiencies on both the courts and party opponents.

ACA Fin. Guar. Corp., 512 F.3d at 57; see Abiomed, 778 F.3d at 247 ("We wish to discourage this practice of seeking leave to amend after the case has been dismissed").  Congress has imposed a purposefully high -- but not impossible -- bar at the pleading

stage under the PSLRA.  Premca's cobbling together a few vague news articles and four confidential witnesses, most of whom had sparse and facially incomplete information, fails to meet this bar.

## VII. CONCLUSION

For the aforementioned reasons, iRobot's motion to dismiss this action, ECF No. 50, is hereby **ALLOWED**, and this action is **DISMISSED** with prejudice.  The Clerk is directed to enter a separate order of dismissal with prejudice.[13]

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[14]

---

[13]  The separate order of dismissal entered contemporaneously with this Memorandum and Order constitutes a final judgment for purposes of appeal, and post-judgment relief under Rule 59 and 60 of the Federal Rules of Civil Procedure. See Quinones v. Frequency Therapeutics, Inc., 347 F.R.D. 560, 563 n.2 (D. Mass. 2024).

[14] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.